*AE*

**FILED**

AUG 1 3 2007  **NF**

*AuG 13 2007*
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **FUSION CAPITAL FUND II, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | 07CV 4543 |
| | ) | JUDGE SHADUR |
| **MILLENIUM HOLDING GROUP, INC.,** | ) | MAGISTRATE JUDGE SCHENKIER |
| **RICHARD HAM and** | ) | |
| **CARLA AUFDENKAMP,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Fusion Capital Fund II, LLC ("Fusion") complains against Millenium Holding Group, Inc. ("Millenium"), Richard Ham, and Carla Aufdenkamp as follows:

### INTRODUCTION

1.      This action arises out of Defendant Millenium's contractual obligation to indemnify Fusion for the litigation costs Fusion incurred in defending against a lawsuit Millenium filed alleging that Fusion was responsible for the failure of a proposed merger between Millenium and Sutura, Inc. ("Sutura"). Defendants Ham and Aufdenkamp are Millenium's alter ego and, as such, are personally liable for indemnifying Fusion for its litigation costs.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and the forum selection clause contained in Section 11(a) of the July 20, 2004 Common Stock Purchase Agreement ("Stock Purchase Agreement") between Fusion and Millenium, which provides for exclusive jurisdiction in the state and federal courts sitting in the city of Chicago. (A true and correct copy of the Stock Purchase Agreement is attached hereto as Exhibit A.)

## PARTIES

4.      Plaintiff Fusion Capital Fund II, LLC ("Fusion") is an Illinois limited liability company with its principal place of business located in Chicago, Illinois. Fusion is a broad based investment fund in the business of investing capital in publicly traded companies.

5.      Defendant Millenium Holding Group, Inc. ("Millenium") is a Nevada corporation with its principal place of business located in Henderson, Nevada. Millenium is a publicly held company trading in the over-the-counter market. From 1999 to the present, Millenium has been a "shell" corporation with no ongoing business. Millenium had no revenue in 2006, has virtually no assets, and is millions of dollars in debt. Millenium has only two employees: Richard Ham and Carla Aufdenkamp.

6.      Defendant Richard Ham is an individual who resides in Henderson, Nevada. At all relevant times, he has also been Millenium's President, Treasurer, Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and a member of Millenium's Board of Directors.

7.      Defendant Carla Aufdenkamp ("Aufdenkamp") is an individual who resides in Henderson, Nevada. At all relevant times, she has been Millenium's Vice President, Secretary, and a member of Millenium's Board of Directors.

8.      Mr. Ham and Ms. Aufdenkamp ("the Hams") are married to each other and run Millenium out of their home.

## FACTUAL ALLEGATIONS

**I.    Millenium's Failed Merger With Sutura And Ensuing Litigation**

9.    In 2004, Millenium began merger discussions with Sutura, a private company specializing in medical devices. Sutura wanted to turn itself into a public company so it could access new sources of capital. Merging with Millenium would have enabled Sutura to accomplish this goal.

10.    On July 9, 2004, Sutura and Millenium signed an Agreement and Plan of Merger ("Merger Agreement") under which Sutura would occupy Millenium's "shell" and Millenium would essentially disappear. (A true and correct copy of the Merger Agreement is attached hereto as Exhibit B.)

11.    In order to ensure that the post-merger company would have immediate access to capital, paragraph 7.3(i) of the Merger Agreement provided that Millenium would enter into "definitive agreements contemplating the purchase and sale of at least $15.0 million of securities of the Purchaser . . . ." In order to satisfy that condition of the merger, Millenium entered the Stock Purchase Agreement with Fusion on July 20, 2004.

12.    The Stock Purchase Agreement included the following terms: (1) subject to certain terms and conditions, Fusion agreed to purchase up to $15 million of Millenium stock and (2) Fusion could terminate the Stock Purchase Agreement if, as of October 31, 2004, the Millenium/Sutura merger had not closed or Fusion's stock purchases had not commenced because Millenium had failed to satisfy certain specified conditions.

13.    In addition, Section 8 of the Stock Purchase Agreement included an indemnification provision, which stated in relevant part that Millenium would:

> defend, protect, indemnify and hold harmless the Buyer
> [Fusion] . . . (collectively, the "Indemnitees") from and    against
> any and all actions, causes of action, suits, claims, losses, costs,

penalties, fees, liabilities and damages, and expenses in connection therewith . . ., and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to . . . (c) any cause of action, suit or claim brought or made against such Indemnitee and arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, other than with respect to Indemnified Liabilities which directly and primarily result from the gross negligence or willful misconduct of the Indemnitee."

14.    Section 3(b) of the Stock Purchase Agreement defined "Transaction Documents" as the Stock Purchase Agreement, "the Registration Rights Agreement and each of the other agreements entered into by the parties on the Commencement Date and attached [to the Stock Purchase Agreement] as exhibits . . . ."

15.    In the months after the Merger and Stock Purchase Agreements were executed, both Sutura and Fusion came to have serious concerns about Millenium. On or about November 1, 2004, Fusion terminated the Stock Purchase Agreement. Subsequently, on or about November 22, 2004, Sutura notified Millenium that Sutura's Board of Directors would not recommend the Millenium/Sutura merger to its stockholders. On December 8, 2004, Sutura terminated the Merger Agreement.

16.    On or about February 14, 2005, Millenium filed a lawsuit against Fusion in Nevada state court, which was subsequently removed to the United States District Court for the District Court of Nevada, alleging that Millenium was damaged when the merger was not consummated (the "Nevada Lawsuit"). Millenium asserted two claims against Fusion: tortious interference with the Merger Agreement and conspiracy to breach the covenant of good faith and fair dealing implied in the Merger Agreement. (A true and correct copy of the Amended Complaint is attached hereto as Exhibit C.)

17.    The Nevada Lawsuit alleged causes of action against Fusion "arising out of or resulting from the execution, delivery, performance or enforcement" of the Stock Purchase Agreement.    The Stock Purchase Agreement was a condition precedent of the Merger Agreement, and so "but for" the Stock Purchase Agreement there would have been no Merger Agreement for Millenium to enforce.    Likewise, the Stock Purchase Agreement specifically provided that if the Merger was not fully consummated by October 31, 2004, Fusion could terminate the Stock Purchase Agreement.  (Ex. A. at § 11(k)(vii).)  The failure of the merger to close by October 31 was one of the grounds for Fusion's termination of the Stock Purchase Agreement.    And that termination, followed by Millenium's failure to obtain replacement financing to satisfy the financing condition in the Merger Agreement, were among the events that led Sutura to terminate the Merger Agreement.    Because the Stock Purchase Agreement is inextricably entwined both with the Merger Agreement and the merger's collapse, Millenium's allegations that Fusion interfered with the Merger Agreement by, among other things, terminating the Stock Purchase Agreement, are subject to the indemnification provision of the latter agreement.

18.    Pursuant to § 11(k)(vii) of the Stock Purchase Agreement, the indemnification obligations set forth in section 8 survive the termination of the agreement.

19.    On August 8, 2007, the United States District Court for the District of Nevada entered judgment in favor of Fusion on both Millenium's tortious interference and civil conspiracy claims; and dismissed Millenium's claims against Fusion with prejudice. (A true and correct copy of the order is attached hereto as Exhibit D.)

20.    In connection with the Nevada Lawsuit, Fusion incurred fees and costs totaling $850,758.99.

## II.   Millenium Is The Alter Ego Of The Hams

### A.   Millenium has no real business.

21.   Millenium is not a genuine corporation.  Since at least 1999, it has had no real business and has been run by the Hams as their personal piggy bank.  Millenium has no present business or revenue stream, negligible assets, overwhelming liabilities, and no realistic prospect for reversing its fortunes.

22.   In Fiscal Year 2006, Millenium reported no revenue, less than $108,076 in assets, and over $3.5 million dollars in liability.

23.   In Millenium's Form 10-KSB for Fiscal 2006, filed on April 19, 2007, Millenium's accountants noted the precarious nature of Millenium's future:

> As of December 31, 2006, the Company had recognized little revenue to date and had accumulated operating losses of approximately $12,119,735 since inception. The Company's ability to continue as a going concern is contingent upon its ability to successfully develop and market its products, meet future financing requirements, and achieve and maintain profitable operations. While the Company is expending its best efforts to achieve the above plans, there is no assurance that any such activity will generate funds that will be available for operations.

Form 10-KSB for Fiscal 2006 at F-14, n. 3.

24.   In fact, Millenium's position has become so dire that its accountants have concluded that Millenium "has suffered recurring losses from operations that raise doubt about its ability to continue as a going concern." Form 10-KSB for Fiscal 2006 at F-1.

25.   Effective April 27, 2007, Millenium was delisted from trading on the OTC Bulletin Board because Millenium was unable to timely file its 10-QSB for the first quarter of Fiscal 2007.

**B.    The Hams own and control Millenium.**

26.    Since October 1999, Richard Ham and Carla Aufdenkamp have been the only members of Millenium's Board of Directors. Mr. Ham appointed Ms. Aufdenkamp to fill one of the vacancies on the Board after all of the previous directors resigned. For nearly eight years, they have run the company in violation of Millenium bylaws, which require that its Board consist of at least three directors.

27.    In addition to being Millenium's only directors, Mr. Ham and Ms. Aufdenkamp are the company's only employees. They "operate" Millenium out of their home at 12 Winding Road in Henderson, Nevada, which is leased by the company with company funds.

28.    Finally, through a series of stock splits and issuances of shares to Mr. Ham, Ms. Aufdenkamp, and companies controlled by Mr. Ham between 1999 and 2004, all of which the Defendants approved without any independent Board oversight, the Hams came to improperly own 46.3% of Millenium's outstanding common stock. In addition, Mr. Ham and Ms. Aufdenkamp own 95% of Ham Consulting Company, which owns 9.7% of Millenium's outstanding common stock. In total, the couple controls approximately 56.0% of Millenium's common stock. As such, they are the controlling shareholders.

**C.    Mr. Ham and Ms. Aufdenkamp diverted funds from Millenium to themselves.**

**i.    *Excessive compensation***

29.    Despite the fact that Millenium has done little to no business between 1999 and the present, Defendants awarded themselves generous compensation. On April 2, 2003, Millenium entered into an employment agreement with Mr. Ham. The terms of the agreement included an initial annual base salary of $300,000 to be increased 10% annually, plus stock options, medical, dental, and life insurance, and profit-sharing.

30.     That same day, Millenium entered into an employment agreement with Ms. Aufdenkamp. The terms of the agreement included an initial annual base salary of $105,000 to be increased 8% annually, plus stock options, medical and dental insurance, and profit sharing.

31.     On November 30, 2004, a week after Sutura terminated merger discussions, the Defendants Ham and Aufdenkamp, acting as Millenium's Board, reinstated their employment agreements, which had been suspended pursuant to the terms of the Sutura Merger Agreement. Mr. Ham and Ms. Aufdenkamp then resolved to issue shares of Millenium common stock to themselves in exchange for accrued wages valued at $573,375, leaving a little over $200,000 in accrued wages on Millenium's books.

32.     Millenium's salary expenses for the 2005 and 2006 fiscal years were $474,954 and $520,045 respectively.  These salaries have been accruing because Millenium has had no ongoing business and, thus, no income to pay them.

### ii.     *Transfer of corporate assets*

33.     In addition to paying themselves excessive salaries, the Hams engaged in self-dealing transactions with Millenium to enrich themselves at the expense of the company.

34.     On February 15, 2000, Mr. Ham sold certain proprietary insurance-related software products to Millenium in exchange for 1,468,436 shares of Millenium common stock. For purposes of the sale, the Millenium shares transferred to Mr. Ham were valued at $0.50 a share.  Accordingly, the total consideration paid by Millenium to Mr. Ham for these assets was $734,218.

35.     On April 22, 2000, Mr. Ham sold an insurance agency to Millenium in exchange for 20,379 shares of Millenium common stock.  For purposes of the sale, the shares were valued at $1.00 per share.

36.     As the sole directors, the Hams authorized these purchases on behalf of Millenium.

37.     Millenium reported the value of the proprietary software and insurance agency as $734,218 and $20,739 in its May 15, August 15, and November 15, 2000 Form 10-QSBs filed with the SEC.

38.     In 2001, Millenium adopted a new treatment of these assets. In its Form 10-KSB for the year ending December 31, 2000, Millenium reduced the declared value of the proprietary software from $734,218 to $73,422. This ninety-percent reduction in value in less than a year was treated as an expense. In addition, Millenium began amortizing the insurance agency.

39.     In January 2002, Millenium hired new accountants, Hobe & Lucas, to prepare its public filings. Working with new accountants, Millenium filed its Form 10-QSB for the period ending September 30, 2001 on January 12, 2002. In this filing, the insurance agency dropped off Millenium's Balance Sheet without an explanation.

40.     On March 19, 2002, Millenium filed its Form 10-KSB for the year ending December 31, 2000. The Form 10-KSB treated the purchase of the insurance agency as a "recapitalization for 1999 and 2000." Yet, there are no corporate articles reflecting a recapitalization.

41.     Shortly after this filing, in May 17, 2002, Hobe & Lucas withdrew as Millenium's auditors.

42.     Although Mr. Ham profited handsomely from these transactions, Millenium did not. Four years later, Millenium still had no insurance business, and on or about April 1, 2004, Mr. Ham and Ms. Aufdenkamp, acting as Millenium's Board of Directors, voted to relinquish all of Millenium's rights and ownership in the insurance agency back to Mr. Ham for only $2,833.

At that same meeting, the Hams also voted to relinquish all of Millenium's rights to and ownership in its proprietary software to Mr. Ham in exchange for $2,500. Thus, Mr. Ham repurchased the insurance agency at about 15% of the price at which he had sold that asset to Millenium several years before, and repurchased the software for less than 1% of the price he demanded from Millenium just a year before.

43.     At that time, these two assets, the insurance agency and the software, were Millenium's only significant assets. By their vote, the Hams effectively gutted Millenium and transferred its assets to their own pockets.

44.     These transactions were not approved by a disinterested and informed Board of Directors or minority shareholders. There is no evidence that the Hams made a good faith determination that, despite the unreasonably low sale price, the exchange was in the best interests of Millenium.

### D.     Mr. Ham and Ms. Aufdenkamp have treated Millenium's assets as their own.

45.     In addition to granting themselves generous wages and engaging in profitable self-dealing, the Hams have treated the company's assets as their own. The Hams have authorized Millenium to lease a car and a home for their own personal use. According to Millenium's 2004 Form 10-KSB, Millenium leased a vehicle for Defendants' use for over $800 a month. From October 2003 through October 2004, Millenium leased the Hams' 12 Winding Road home for $2500 a month.

46.     Millenium's Form 10-KSB for Fiscal Year 2004 also shows that Mr. Ham and Ms. Aufdenkamp spent nearly $9,000 in 2004 on business expenses, including dining out and entertaining, even though Millenium had no business.

**E.    Mr. Ham and Ms. Aufdenkamp have failed to observe corporate formalities in running Millenium.**

47.    The Hams' refusal to treat Millenium as an entity distinct from themselves is further evidenced by their ongoing disregard for corporate formalities.  For example, Millenium's bylaws require that the Board consist of at least three directors.   Since 1999, Millenium's Board has been operating without the minimum number of directors.  In failing to appoint an additional director in over six years, the Hams have flaunted Millenium's basic corporate structure and used the situation to their direct financial advantage as alleged above.

48.    Millenium's bylaws also require that the company hold annual shareholder meetings in March.  Since at least 2003 at least, Millenium has not had the required annual meetings.

49.    In addition, Defendants Ham and Aufdenkamp have also ignored the tax laws that apply to running Millenium.  Since 1998, Millenium has not filed any income tax returns with the Internal Revenue Service (IRS).  Since 2000, Millenium has not filed any W2 forms with the IRS; nor has it paid any payroll taxes since that time.

## <u>COUNT I</u>

### DECLARATORY JUDGMENT ALTER EGO/PIERCING THE CORPORATE VEIL (DEFENDANTS HAM AND AUFDENKAMP)

50.    Fusion incorporates by reference and re-alleges each and every allegation contained above, as through fully set forth herein.

51.    At all times relevant hereto, Defendants Ham and Aufdenkamp influenced and governed Millenium to such an extent that the two were Millenium's alter ego.

52.    Further, there is such unity of interest and ownership between Defendants Ham and Aufdenkamp that they are inseparable from Millenium.

53.    Given their total control over Millenium, Defendants Ham and Aufdenkamp have had free reign to:

a)    divert funds from Millenium to themselves without proper corporate authorization;

b)    use Millennium's corporate assets as their own; and

c)    ignore corporate formalities for their own benefit.

54.    As a result of Defendants Ham and Aufdenkamp's looting of Millenium's corporate coffers, Millenium is now undercapitalized and has insufficient assets to satisfy its indemnification obligation to Fusion.

55.    Given these facts and Millenium's obligation to indemnify Fusion for the expenses it incurred in defending against Millenium's lawsuit, adherence to the corporate fiction of a separate entity would sanction fraud and promote injustice.

56.    Pursuant to 28 U.S.C. § 2201, Fusion is entitled to a Declaratory Judgment that

(a)    Defendants Ham and Aufdenkamp are the alter ego of Defendant Millenium; and

(b)    Defendants Ham and Aufdenkamp are liable for all the debts of Defendant Millenium to Fusion, including any indemnification obligations Millenium owes to Fusion under the Stock Purchase Agreement.

WHEREFORE, Fusion respectfully requests that this Court enter judgment against Defendants Ham and Aufdenkamp on Count I and grant such other equitable relief as may be just and appropriate.

-12-

## COUNT II

### DECLARATORY JUDGMENT INDEMNIFICATION
### (ALL DEFENDANTS)

57.     Fusion incorporates by reference and re-alleges each and every allegation contained above, as through fully set forth herein.

58.     On or about July 20, 2004, Millenium and Fusion executed the Stock Purchase Agreement.

59.     The Stock Purchase Agreement is a valid and enforceable contract.

60.     Fusion has performed all of its obligations under the Stock Purchase Agreement.

61.     Millenium has a contractual obligation under Section 8 of the Stock Purchase Agreement to indemnify Fusion for

> any cause of action, suit or claim brought or made against [it] and arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, other than with respect to Indemnified Liabilities which directly and primarily result from the gross negligence or willful misconduct of the Indemnitee.

62.     Millenium brought claims against Fusion in the Nevada Lawsuit. Those claims constitute claims against Fusion, arising out of or resulting from the execution of the Stock Purchase Agreement, a "Transaction Document" as defined in Section 3(b) of the Stock Purchase Agreement.

63.     Fusion has incurred expenses in connection with the Nevada Lawsuit, including attorneys' fees and disbursements.

64.     As the judgment in Fusion's favor demonstrates, none of the expenses incurred by Fusion are directly or primarily the result of Fusion's gross negligence or willful misconduct.

65.    Pursuant to 28 U.S.C. §2201, Fusion is entitled to a declaratory judgment that it is entitled to be indemnified for its fees and costs incurred in the Nevada Lawsuit, pursuant to Section 8 of the Stock Purchase Agreement.

WHEREFORE, Fusion respectfully requests that the Court enter judgment in favor of Fusion and against Defendants Millenium, Ham and Aufdenkamp, jointly and severally, in the amount of $850,758.99 and grant such other equitable relief as may be just and appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Fusion respectfully requests that this Court enter judgment in favor of Fusion on its claims.

Dated:  August 13, 2007                    Respectfully submitted,
                                           FUSION CAPITAL FUND II, LLC

                                           By:    _____
                                                  One of Its Attorneys

Edward F. Malone (ARDC #6208496)
Jammey L. Kligis (ARDC #6289951)
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: 312 222-9350
Facsimile: 312 527-0484

-14-

## LIST OF EXHIBITS

**EXHIBIT A**      **July 20, 2004 Common Stock Purchase Agreement**

**EXHIBIT B**      **July 9, 2004 Agreement and Plan of Merger**

**EXHIBIT C**      **December 5, 2005 Amended Complaint, *Millenium Holding Group, Inc. v. Sutura Inc.,* et al.**

**EXHIBIT D**      **August 6, 2005 Order of United States District Court, District of Nevada**

# Exhibit A

**EXECUTION COPY**

## COMMON STOCK PURCHASE AGREEMENT

**COMMON STOCK PURCHASE AGREEMENT** (the "Agreement"), dated as of July 20, 2004 by and between **MILLENIUM HOLDING GROUP, INC.**, a Nevada corporation (the "Company"), and **FUSION CAPITAL FUND II, LLC**, an Illinois limited liability company (the "Buyer"). Capitalized terms used herein and not otherwise defined herein are defined in Section 10 hereof.

### WHEREAS:

Subject to the terms and conditions set forth in this Agreement, the Company wishes to sell to the Buyer, and the Buyer wishes to buy from the Company, up to Fifteen Million Dollars ($15,000,000) of the Company's common stock, par value $0.05 per share (the "Common Stock"). The shares of Common Stock to be purchased hereunder are referred to herein as the "Purchase Shares." In addition, as set forth in Section 1(g) hereof, the Company may, in its sole discretion, at any time after the date hereof and until 30 days after such date as the Available Amount is equal to $0, deliver an irrevocable written notice to the Buyer stating that the Company elects to enter into a second Common Stock Purchase Agreement with the Buyer for the purchase of an additional Five Million Dollars ($5,000,000) of Common Stock.

**NOW THEREFORE**, the Company and the Buyer hereby agree as follows:

### 1.    PURCHASE OF COMMON STOCK.

Subject to the terms and conditions set forth in Sections 6, 7 and 9 below, the Company hereby agrees to sell to the Buyer, and the Buyer hereby agrees to purchase from the Company, shares of Common Stock as follows:

(a)    Commencement of Purchases of Common Stock. The purchase and sale of Common Stock hereunder shall commence (the "Commencement") within five (5) Trading Days following the date of satisfaction (or waiver) of the conditions to the Commencement set forth in Sections 6 and 7 below (or such later date as is mutually agreed to by the Company and Buyer) (the date of such Commencement, the "Commencement Date").

(b)    Buyer's Purchase Rights and Obligations. Subject to the Company's right to suspend purchases under Section 1(d)(ii) hereof, the Buyer shall purchase shares of Common Stock on each Trading Day during each Monthly Period equal to the Daily Purchase Amount (as defined in Section 1(c)(i)) at the Purchase Price. Within one (1) Trading Day of receipt of Purchase Shares, the Buyer shall pay to the Company an amount equal to the Purchase Amount with respect to such Purchase Shares as full payment for the purchase of the Purchase Shares so received. The Company shall not issue any fraction of a share of Common Stock upon any purchase. All shares of Common Stock (including fractions thereof) issuable upon a purchase under this Agreement shall be aggregated for purposes of determining whether the purchase would result in the issuance of a fraction of a share of Common Stock. If, after the aforementioned aggregation, the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up or down to the nearest whole share. All payments made under this Agreement shall be made in lawful money of the United States of America by check or wire transfer of immediately available funds to such account as the Company may from time to time designate by written notice in accordance with the provisions of this Agreement. Whenever any amount expressed to be due by the terms of this Agreement is due on any day

that is not a Trading Day, the same shall instead be due on the next succeeding day which is a Trading Day.

(c)    The Daily Purchase Amount; Company's Right to Decrease or Increase the Daily Purchase Amount.

(i)    The Daily Purchase Amount. As used herein the term "Original Daily Purchase Amount" shall mean Twenty Five Thousand Dollars ($25,000) per Trading Day. As used herein, the term "Daily Purchase Amount" shall mean initially Twenty Five Thousand Dollars ($25,000) per Trading Day, which amount may be increased or decreased from time to time pursuant to this Section 1(c).

(ii)    Company's Right to Decrease the Daily Purchase Amount. The Company shall always have the right at any time to decrease the amount of the Daily Purchase Amount by delivering written notice (a "Daily Purchase Amount Decrease Notice") to the Buyer which notice shall specify the new Daily Purchase Amount. The decrease in the Daily Purchase Amount shall become effective one Trading Day after receipt by the Buyer of the Daily Purchase Amount Decrease Notice. Any purchases by the Buyer which have a Purchase Date on or prior to the first (1st) Trading Day after receipt by the Buyer of a Daily Purchase Amount Decrease Notice must be honored by the Company as otherwise provided herein. The decrease in the Daily Purchase Amount shall remain in effect until the Company delivers to the Buyer a Daily Purchase Amount Increase Notice (as defined below).

(iii)    Company's Right to Increase the Daily Purchase Amount. The Company shall have the right (but not the obligation) to increase the amount of the Daily Purchase Amount in accordance with the terms and conditions set forth in this Section 1(c)(iii) by delivering written notice to the Buyer stating the new amount of the Daily Purchase Amount (a "Daily Purchase Amount Increase Notice"). A Daily Purchase Amount Increase Notice shall be effective five (5) Trading Days after receipt by the Buyer. The Company shall always have the right at any time to increase the amount of the Daily Purchase Amount up to the Original Daily Purchase Amount. With respect to increases in the Daily Purchase Amount above the Original Daily Purchase Amount, as the market price for the Common Stock increases the Company shall have the right from time to time to increase the Daily Purchase Amount as follows. For every $0.25 increase in Threshold Price above $1.50 (subject to equitable adjustment for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction), the Company shall have the right to increase the Daily Purchase Amount by up to an additional $2,500 in excess of the Original Daily Purchase Amount. "Threshold Price" for purposes hereof means the lowest Sale Price of the Common Stock during the five (5) consecutive Trading Days immediately prior to the submission to the Buyer of a Daily Purchase Amount Increase Notice (subject to equitable adjustment for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction). For example, if the Threshold Price is $1.75, the Company shall have the right to increase the Daily Purchase Amount to up to $27,500 in the aggregate. If the Threshold Price is $2.50, the Company shall have the right to increase the Daily Purchase Amount to up to $35,000 in the aggregate. Any increase in the amount of the Daily Purchase Amount shall continue in effect until the delivery to the Buyer of a Daily Purchase Amount Decrease Notice. However, if at any time during any Trading Day the Sale Price of the Common Stock is below the applicable Threshold Price, such increase in the Daily Purchase Amount shall be void and the Buyer's obligations to buy Purchase Shares hereunder in excess of the applicable maximum Daily Purchase Amount shall be terminated. Thereafter, the Company shall again have the right to increase the amount of the Daily Purchase Amount as set forth herein by delivery of a new Daily

-2-

M 00346
M00346

Purchase Amount Increase Notice only if the Sale Price of the Common Stock is above the applicable Threshold Price on each of five (5) consecutive Trading Days immediately prior to such new Daily Purchase Amount Increase Notice.

(d)     **Limitations on Purchases.**

(i)     **Limitation on Beneficial Ownership.** The Company shall not effect any sale under this Agreement and the Buyer shall not have the right to purchase shares of Common Stock under this Agreement to the extent that after giving effect to such purchase the Buyer together with its affiliates would beneficially own in excess of 4.9% of the outstanding shares of the Common Stock following such purchase. For purposes hereof, the number of shares of Common Stock beneficially owned by the Buyer and its affiliates or acquired by the Buyer and its affiliates, as the case may be, shall include the number of shares of Common Stock issuable in connection with a purchase under this Agreement with respect to which the determination is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (1) a purchase of the remaining Available Amount which has not been submitted for purchase, and (2) exercise or conversion of the unexercised or unconverted portion of any other securities of the Company (including, without limitation, any warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Buyer and its affiliates. If the 4.9% limitation is ever reached the Company shall have the option to increase such limitation to 9.9% by delivery of written notice to the Buyer. Thereafter, if the 9.9% limitation is ever reached this shall not affect or limit the Buyer's obligation to purchase the Daily Purchase Amount as otherwise provided in this Agreement. Specifically, even though the Buyer may not receive additional shares of Common Stock in the event that the 9.9% limitation is ever reached, the Buyer is still obligated to pay to the Company the Daily Purchase Amount on each Trading Day as otherwise obligated under this Agreement, e.g. no Event of Default (as defined in Section 9 hereof) has occurred, nor any event which, after notice and/or lapse of time, would become an Event of Default. Under such circumstances, the Buyer would have the right to acquire additional shares of Common Stock in the future only at such time as its ownership subsequently become less than the 9.9% limitation. For purposes of this Section, in determining the number of outstanding shares of Common Stock the Buyer may rely on the number of outstanding shares of Common Stock as reflected in (1) the Company's most recent Form 10-Q or Form 10-K, as the case may be, (2) a more recent public announcement by the Company or (3) any other written communication by the Company or its Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the reasonable written or oral request of the Buyer, the Company shall promptly confirm orally and in writing to the Buyer the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to any purchases under this Agreement by the Buyer since the date as of which such number of outstanding shares of Common Stock was reported. Except as otherwise set forth herein, for purposes of this Section 1(d)(i), beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended.

(ii)     **Company's Right to Suspend Purchases.** The Company may, at any time, give written notice (a "Purchase Suspension Notice") to the Buyer suspending purchases of Purchase Shares by the Buyer under this Agreement. The Purchase Suspension Notice shall be effective only for purchases that have a Purchase Date later than one (1) Trading Day after receipt of the Purchase Suspension Notice by the Buyer. Any purchase by the Buyer that has a Purchase Date on or prior to the first (1st) Trading Day after receipt by the Buyer of a Purchase Suspension Notice from the Company must be honored by the Company as otherwise provided herein. Such

M 00347
M00347

purchase suspension shall continue in effect until a revocation in writing by the Company, at its sole discretion. So long as a Purchase Suspension Notice is in effect, the Buyer shall not be obligated to purchase any Purchase Shares from the Company under Section 1 of this Agreement.

(iii)    Purchase Price Floor. The Company shall not affect any sales under this Agreement and the Buyer shall not have the right nor the obligation to purchase any Purchase Shares under this Agreement on any Trading Day where the Purchase Price for any purchases of Purchase Shares would be less than the Floor Price.

(e)    Records of Purchases. The Buyer and the Company shall each maintain records showing the remaining Available Amount at any give time and the dates and Purchase Amounts for each purchase or shall use such other method, reasonably satisfactory to the Buyer and the Company.

(f)    Taxes. The Company shall pay any and all transfer, stamp or similar taxes that may be payable with respect to the issuance and delivery of any shares of Common Stock to the Buyer made under this Agreement.

(g)    Option for Second Tranche; Second Common Stock Purchase Agreement. The Company may, in its sole discretion, at any time after the date hereof and until 30 days after such date as the Available Amount is equal to $0 or during the Twenty consecutive Trading Days after the Maturity Date beginning on the first Trading Day after the Maturity Date (the "Second Tranche Expiration Date"), deliver an irrevocable written notice (the "Second Tranche Notice") to the Buyer stating that the Company elects to enter into an additional Common Stock Purchase Agreement (the "Second Common Stock Purchase Agreement") with the Buyer for the purchase of Five Million Dollars ($5,000,000) of additional Common Stock. It is agreed and acknowledged by the parties hereto that entering into the Second Common Stock Purchase Agreement shall be at the option of the Company in its sole discretion until such time as the Company shall have delivered the Second Tranche Notice to the Buyer. The Buyer shall not be obligated to enter into the Second Common Stock Purchase Agreement unless the Company has delivered the Second Tranche Notice prior to the Second Tranche Expiration Date. The Second Common Stock Purchase Agreement may not be entered into until the aggregate Available Amount under this Agreement is fully used to buy Purchase Shares hereunder or during the twenty consecutive Trading Days after the Maturity Date beginning on the first Trading Day after the Maturity Date. Upon delivery of the Second Tranche Notice to the Buyer prior to the Second Tranche Expiration Date, the Buyer and the Company shall be obligated to enter into the Second Common Stock Purchase Agreement no later than the date that is 10 Trading Days after the Second Tranche Expiration Date. If the Buyer and the Company have not entered into the Second Common Stock Purchase Agreement by the date that is 10 Trading Days after the Second Tranche Expiration Date, the Buyer shall not be obligated to enter into such additional Common Stock Purchase Agreement. The terms and conditions of the Second Common Stock Purchase Agreement shall be in form and substance identical in all respects to this Agreement, provided, however, that for purposes of the Second Common Stock Purchase Agreement, this Section 1(g) shall be omitted and the number of Commitment Shares to be issued by the Company to the Buyer shall be equal to 1/3 of the aggregate number of Commitment Shares issued under this Agreement and the Maturity Date under the Second Common Stock Purchase Agreement shall be proportionately adjusted.

## 2.    BUYER'S REPRESENTATIONS AND WARRANTIES.

The Buyer represents and warrants to the Company that as of the date hereof and as of the Commencement Date:

-4-

M 00348
M00348

(a)    Investment Purpose.  The Buyer is entering into this Agreement and acquiring the Commitment Shares, (as defined in Section 4(f) hereof) (this Agreement and the Commitment Shares are collectively referred to herein as the "Securities"), for its own account for investment only and not with a view towards, or for resale in connection with, the public sale or distribution thereof; provided however, by making the representations herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term.

(b)    Accredited Investor Status.  The Buyer is an "accredited investor" as that term is defined in Rule 501(a)(3) of Regulation D.

(c)    Reliance on Exemptions.  The Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

(d)    Information.  The Buyer has been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities that have been reasonably requested by the Buyer, including, without limitation, the SEC Documents (as defined in Section 3(f) hereof). The Buyer understands that its investment in the Securities involves a high degree of risk. The Buyer (i) is able to bear the economic risk of an investment in the Securities including a total loss, (ii) has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the proposed investment in the Securities and (iii) has had an opportunity to ask questions of and receive answers from the officers of the Company concerning the financial condition and business of the Company and others matters related to an investment in the Securities. Neither such inquiries nor any other due diligence investigations conducted by the Buyer or its representatives shall modify, amend or affect the Buyer's right to rely on the Company's representations and warranties contained in Section 3 below. The Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Securities.

(e)    No Governmental Review.  The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(f)    Transfer or Resale.  The Buyer understands that except as provided in the Registration Rights Agreement (as defined in Section 4(a) hereof): (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder or (B) an exemption exists permitting such Securities to be sold, assigned or transferred without such registration; (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

-5-

(g)    <u>Validity; Enforcement</u>.  This Agreement has been duly and validly authorized, executed and delivered on behalf of the Buyer and is a valid and binding agreement of the Buyer enforceable against the Buyer in accordance with its terms, subject as to enforceability to general principles of equity and to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(h)    <u>Residency</u>.  The Buyer is a resident of the State of Illinois.

(i)    <u>No Prior Short Selling</u>.  The Buyer represents and warrants to the Company that at no time prior to the date of this Agreement has any of the Buyer, its agents, representatives or affiliates engaged in or effected, in any manner whatsoever, directly or indirectly, any (i) "short sale" (as such term is defined in Rule 3b-3 of the 1934 Act) of the Common Stock or (ii) hedging transaction, which establishes a net short position with respect to the Common Stock.

3.    **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company represents and warrants to the Buyer (including representations and warranties regarding the Target Company assuming consummation of the contemplated merger with the Company) that as of the date hereof and as of the Commencement Date:

(a)    <u>Organization and Qualification</u>.  The Company and its "Subsidiaries" (which for purposes of this Agreement means any entity in which the Company, directly or indirectly, owns 50% or more of the voting stock or capital stock or other similar equity interests) are corporations duly organized and validly existing in good standing under the laws of the jurisdiction in which they are incorporated, and have the requisite corporate power and authority to own their properties and to carry on their business as now being conducted.  Each of the Company and its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing could not reasonably be expected to have a Material Adverse Effect.  As used in this Agreement, "Material Adverse Effect" means any material adverse effect on any of: (i) the business, properties, assets, operations, results of operations or financial condition of the Company and its Subsidiaries, if any, taken as a whole, or (ii) the authority or ability of the Company to perform its obligations under the Transaction Documents (as defined in Section 3(b) hereof).  The Company has no Subsidiaries except as set forth on Schedule 3(a).

(b)    <u>Authorization; Enforcement; Validity</u>.  (i) The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Registration Rights Agreement  and each of the other agreements entered into by the parties on the Commencement Date and attached hereto as exhibits to this Agreement (collectively, the "Transaction Documents"), and to issue the Securities in accordance with the terms hereof and thereof, (ii) the execution and delivery of the Transaction Documents by the Company and the consummation by it of the transactions contemplated hereby and thereby, including without limitation, the issuance of the Commitment Shares and the reservation for issuance and the issuance of the Purchase Shares issuable under this Agreement, have been duly authorized by the Company's Board of Directors and no further consent or authorization is required by the Company, its Board of Directors or its shareholders, (iii) this Agreement has been, and each other Transaction Document shall be on the Commencement Date, duly executed and delivered by the Company and (iv) this Agreement constitutes, and each other Transaction Document upon its execution on behalf of the Company, shall constitute, the valid and binding obligations of the Company

-6-

enforceable against the Company in accordance with their terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of creditors' rights and remedies. The Board of Directors of the Company has approved the resolutions (the "Signing Resolutions") substantially in the form as set forth as Exhibit C-1 attached hereto to authorize this Agreement and the transactions contemplated hereby. The Signing Resolutions are valid, in full forth and effect and have not been modified or supplemented in any respect other than by the resolutions set forth in Exhibit C-2 attached hereto regarding the registration statement referred to in Section 4 hereof. The Company has delivered to the Buyer a true and correct copy of a unanimous written consent adopting the Signing Resolutions executed by all of the members of the Board of Directors of the Company. No other approvals or consents of the Company's Board of Directors and/or shareholders is necessary under applicable laws and the Company's Certificate of Incorporation and/or Bylaws to authorize the execution and delivery of this Agreement or any of the transactions contemplated hereby, including, but not limited to, the issuance of the Commitment Shares and the issuance of the Purchase Shares.

(c)    Capitalization. As of the date hereof, the authorized capital stock of the Company consists of (i) 50,000,000 shares of Common Stock, of which as of the date hereof, 17,160,467 shares are issued and outstanding, 0 are held as treasury shares, 10,000,000shares are reserved for issuance pursuant to the Company's stock option plans of which only approximately 9,412,242 shares remain available for future grants and 0 shares are issuable and reserved for issuance pursuant to securities (other than stock options issued pursuant to the Company's stock option plans) exercisable or exchangeable for, or convertible into, shares of Common Stock and (ii) 3,000,000 shares of Preferred Stock, $0.001 par value with a $0 per share liquidation preference, of which as of the date hereof 0 shares are issued and outstanding. All of such outstanding shares have been, or upon issuance will be, validly issued and are fully paid and nonassessable. Except as disclosed in Schedule 3(c), (i) no shares of the Company's capital stock are subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company, (ii) there are no outstanding debt securities, (iii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its Subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company or any of its Subsidiaries, (iv) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except the Registration Rights Agreement), (v) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries, (vi) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities as described in this Agreement and (vii) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation, as amended and as in effect on the date hereof (the "Certificate of Incorporation"), and the Company's By-laws, as amended and as in effect on the date hereof (the "By-laws"), and summaries of the terms of all securities convertible into or exercisable for Common Stock, if any, and copies of any documents containing the material rights of the holders thereof in respect thereto.

-7-

M 00351
M00351

(d)    Issuance of Securities. The Commitment Shares have been duly authorized and, upon issuance in accordance with the terms hereof, the Commitment Shares shall be (i) validly issued, fully paid and non-assessable and (ii) free from all taxes, liens and charges with respect to the issue thereof. 5,000,000 shares of Common Stock have been duly authorized and reserved for issuance upon purchase under this Agreement. Upon issuance and payment therefor in accordance with the terms and conditions of this Agreement, the Purchase Shares shall be validly issued, fully paid and nonassessable and free from all taxes, liens and charges with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock.

(e)    No Conflicts. Except as disclosed in Schedule 3(e), the execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the reservation for issuance and issuance of the Purchase Shares) will not (i) result in a violation of the Certificate of Incorporation, any Certificate of Designations, Preferences and Rights of any outstanding series of preferred stock of the Company or the By-laws or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, or result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of the Principal Market applicable to the Company or any of its Subsidiaries) or by which any property or asset of the Company or any of its Subsidiaries is bound or affected, except in the case of conflicts, defaults and violations under clause (ii), which could not reasonably be expected to result in a Material Adverse Effect. Except as disclosed in Schedule 3(e), neither the Company nor its Subsidiaries is in violation of any term of or in default under its Certificate of Incorporation, any Certificate of Designation, Preferences and Rights of any outstanding series of preferred stock of the Company or By-laws or their organizational charter or by-laws, respectively. Except as disclosed in Schedule 3(e), neither the Company nor any of its Subsidiaries is in violation of any term of or is in default under any material contract, agreement, mortgage, indebtedness, indenture, instrument, judgment, decree or order or any statute, rule or regulation applicable to the Company or its Subsidiaries, except for possible conflicts, defaults, terminations or amendments which could not reasonably be expected to have a Material Adverse Effect. The business of the Company and its Subsidiaries is not being conducted, and shall not be conducted, in violation of any law, ordinance, regulation of any governmental entity, except for possible violations, the sanctions for which either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect. Except as specifically contemplated by this Agreement and as required under the 1933 Act or applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency or any regulatory or self-regulatory agency in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents in accordance with the terms hereof or thereof. Except as disclosed in Schedule 3(e), all consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence shall be obtained or effected on or prior to the Commencement Date. Except as listed in Schedule 3(e), since January 1, 2003, the Company has not received nor delivered any notices or correspondence from or to the Principal Market. The Principal Market has not commenced any delisting proceedings against the Company.

(f)    SEC Documents; Financial Statements. Except as disclosed in Schedule 3(f), since January 1, 2003, the Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents

M 00352
M00352

incorporated by reference therein being hereinafter referred to as the "SEC Documents"). As of their respective dates (except as they have been correctly amended), the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC (except as they may have been properly amended), contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. As of their respective dates (except as they have been properly amended), the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as listed in Schedule 3(f), the Company has received no notices or correspondence from the SEC since January 1, 2003. The SEC has not commenced any enforcement proceedings against the Company or any of its subsidiaries.

(g)    Absence of Certain Changes. Except as disclosed in Schedule 3(g), since March 31, 2004, there has been no material adverse change in the business, properties, operations, financial condition or results of operations of the Company or its Subsidiaries. The Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to any Bankruptcy Law nor does the Company or any of its Subsidiaries have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy or insolvency proceedings. The Company is financially solvent and is generally able to pay its debts as they become due.

(h)    Absence of Litigation. There is no action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company, the Common Stock or any of the Company's Subsidiaries or any of the Company's or the Company's Subsidiaries' officers or directors in their capacities as such, which could reasonably be expected to have a Material Adverse Effect. A description of each action, suit, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body which, as of the date of this Agreement, is pending or threatened in writing against or affecting the Company, the Common Stock or any of the Company's Subsidiaries or any of the Company's or the Company's Subsidiaries' officers or directors in their capacities as such, is set forth in Schedule 3(h).

(i)    Acknowledgment Regarding Buyer's Status. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby and any advice given by the Buyer or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to the Buyer's purchase of the Securities. The Company further represents to the Buyer that the Company's decision to enter into the Transaction Documents has been based solely on the independent evaluation by the Company and its representatives and advisors.

-9-

M 00353
M00353

(j)    No General Solicitation. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(k)    Intellectual Property Rights. The Company and its Subsidiaries own or possess adequate rights or licenses to use all material trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, governmental authorizations, trade secrets and rights necessary to conduct their respective businesses as now conducted. Except as set forth on Schedule 3(k), none of the Company's material trademarks, trade names, service marks, service mark registrations, service names, patents, patent rights, copyrights, inventions, licenses, approvals, government authorizations, trade secrets or other intellectual property rights have expired or terminated, or, by the terms and conditions thereof, could expire or terminate within two years from the date of this Agreement. The Company and its Subsidiaries do not have any knowledge of any infringement by the Company or its Subsidiaries of any material trademark, trade name rights, patents, patent rights, copyrights, inventions, licenses, service names, service marks, service mark registrations, trade secret or other similar rights of others, or of any such development of similar or identical trade secrets or technical information by others and, except as set forth on Schedule 3(k), there is no claim, action or proceeding being made or brought against, or to the Company's knowledge, being threatened against, the Company or its Subsidiaries regarding trademark, trade name, patents, patent rights, invention, copyright, license, service names, service marks, service mark registrations, trade secret or other infringement, which could reasonably be expected to have a Material Adverse Effect.

(l)    Environmental Laws. The Company and its Subsidiaries (i) are in compliance with any and all applicable foreign, federal, state and local laws and regulations relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval, except where, in each of the three foregoing clauses, the failure to so comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(m)    Title. The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(m) or such as do not materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and any of its Subsidiaries. Any real property and facilities held under lease by the Company and any of its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its Subsidiaries.

(n)    Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at

-10-

M 00354
M00354

a cost that would not materially and adversely affect the condition, financial or otherwise, or the earnings, business or operations of the Company and its Subsidiaries, taken as a whole.

(o)     Regulatory Permits. The Company and its Subsidiaries possess all material certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, and neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(p)     Tax Status. Except as set forth on Schedule 3(p) with respect to federal income tax returns, the Company and each of its Subsidiaries has made or filed all federal and state income and all other material tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(q)     Transactions With Affiliates. Except as set forth on Schedule 3(q) and other than the grant or exercise of stock options disclosed on Schedule 3(c), none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has an interest or is an officer, director, trustee or partner.

(r)     Application of Takeover Protections. The Company and its board of directors have taken or will take prior to the Commencement Date all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation or the laws of the state of its incorporation which is or could become applicable to the Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and the Buyer's ownership of the Securities.

(s)     Foreign Corrupt Practices. Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any of its Subsidiaries has, in the course of its actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

M 00355
M00355

4. **COVENANTS.**

(a)     <u>Filing of Registration Statement</u>. The Company shall as soon as practicable but in no event later than 40 days from the date hereof file a new registration statement covering the sale of the Commitment Shares and at least 5,000,000 Purchase Shares in accordance with the terms of the Registration Rights Agreement between the Company and the Buyer, dated as of the date hereof ("Registration Rights Agreement.").

(b)     <u>Blue Sky</u>. The Company shall take such action, if any, as is reasonably necessary in order to obtain an exemption for or to qualify (i) the initial sale of the Commitment Shares and any Purchase Shares to the Buyer under this Agreement and (ii) any subsequent resale of the Commitment Shares and any Purchase Shares by the Buyer, in each case, under applicable securities or "Blue Sky" laws of the states of the United States in such states as is reasonably requested by the Buyer from time to time, and shall provide evidence of any such action so taken to the Buyer.

(c)     <u>No Variable Priced Financing</u>. Other than pursuant to this Agreement, the Company agrees that beginning on the date of this Agreement and ending on the date of termination of this Agreement (as provided in Section 11(k) hereof), neither the Company nor any of its Subsidiaries shall, without the prior written consent of the Buyer, contract for any equity financing (including any debt financing with an equity component) or issue any equity securities of the Company or any Subsidiary or securities convertible or exchangeable into or for equity securities of the Company or any Subsidiary (including debt securities with an equity component) which, in any case (i) are convertible into or exchangeable for an indeterminate number of shares of common stock, (ii) are convertible into or exchangeable for Common Stock at a price which varies with the market price of the Common Stock, (iii) directly or indirectly provide for any "re-set" or adjustment of the purchase price, conversion rate or exercise price after the issuance of the security, or (iv) contain any "make-whole" provision based upon, directly or indirectly, the market price of the Common Stock after the issuance of the security, in each case, other than reasonable and customary anti-dilution adjustments for issuance of shares of Common Stock at a price which is below the market price of the Common Stock.

(d)     <u>Listing</u>. The Company shall promptly secure the listing of all of the Purchase Shares and Commitment Shares upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and shall maintain, so long as any other shares of Common Stock shall be so listed, such listing of all such securities from time to time issuable under the terms of the Transaction Documents. The Company shall maintain the Common Stock's authorization for quotation on the Principal Market. Neither the Company nor any of its Subsidiaries shall take any action that would be reasonably expected to result in the delisting or suspension of the Common Stock on the Principal Market. The Company shall promptly, and in no event later than the following Trading Day, provide to the Buyer copies of any notices it receives from the Principal Market regarding the continued eligibility of the Common Stock for listing on such automated quotation system or securities exchange. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section.

(e)     <u>Limitation on Short Sales and Hedging Transactions</u>. The Buyer agrees that beginning on the date of this Agreement and ending on the date of termination of this Agreement as provided in Section 11(k), the Buyer and its agents, representatives and affiliates shall not in any manner whatsoever enter into or effect, directly or indirectly, any (i) "short sale" (as such term is defined in Rule 3b-3 of the 1934 Act) of the Common Stock or (ii) hedging transaction, which establishes a net short position with respect to the Common Stock.

-12-

M 00356
M00356

(f)     Issuance of Commitment Shares; Limitation on Sales of Commitment Shares. The Company shall issue to the Buyer a number of shares of Common Stock (the "Commitment Shares") equal to $1,050,000 divided by the "Commitment Share Dollar Value". The "Commitment Share Dollar Value" shall be equal to the lesser of: (i) the average of the Closing Sale Prices of the Common Stock for the ten (10) consecutive Trading Days prior to June 9, 2004, (ii) the average of the Closing Sale Prices of the Common Stock for the ten (10) consecutive Trading Days beginning on the Trading Day immediately after the consummation of the acquisition by the Company ("Acquisition Date") of that certain device company ("Target Company") disclosed in the Term Sheet between the Buyer and the Company dated as of June 7, 2004 and (iii) the average of the Closing Sale prices of the Common stock for the ten (10) consecutive Trading Days prior to the second Trading Day immediately prior to the Commencement Date. The Company shall issue to the Buyer on the date hereof a number of Commitment Shares based on a "Commitment Share Dollar Value" shall equal to the average of the Closing Sale Prices of the Common Stock for the ten (10) consecutive Trading Days prior to June 9, 2004, and shall issue additional Commitment Shares to the Buyer, to the extent required under this Section 4(f), on each of the 11th Trading Day after the Acquisition Date and on or prior to the Commencement Date. The Commitment Shares shall be subject to equitable adjustment for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction. The Commitment Shares shall be issued in certificated form and (subject to Section 5 hereof) shall bear the following restrictive legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF BUYER'S COUNSEL, IN A CUSTOMARY FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE SECURITIES LAWS OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT."

The Buyer agrees that the Buyer shall not transfer or sell the Commitment Shares until the earlier of 600 Trading Days (30 Monthly Periods) from the date hereof or the date on which this Agreement has been terminated, provided, however, that such restrictions shall not apply: (i) in connection with any transfers to or among affiliates (as defined in the 1934 Act), (ii) in connection with any pledge in connection with a bona fide loan or margin account, (iii) in the event that the Commencement does not occur on or before October 31, 2004, due to the failure of the Company to satisfy the conditions set forth in Section 7 or (iv) if an Event of Default has occurred, or any event which, after notice and/or lapse of time, would become an Event of Default, including any failure by the Company to timely issue Purchase Shares under this Agreement. Notwithstanding the forgoing, the Buyer may transfer Commitment Shares to a third party in order to settle a sale made by the Buyer where the Buyer reasonably expects the Company to deliver Purchase Shares to the Buyer under this Agreement so long as the Buyer maintains ownership of the same overall number of shares of Common Stock by "replacing" the Commitment Shares so transferred with Purchase Shares when the Purchase Shares are actually issued by the Company to the Buyer.

(g)     Due Diligence. The Buyer shall have the right, from time to time as the Buyer may reasonably deem appropriate, to perform reasonable due diligence on the Company during normal business hours. The Company and its officers and employees shall provide information and reasonably cooperate with the Buyer in connection with any reasonable request by the Buyer related to the Buyer's

M 00357
M00357

due diligence of the Company, including, but not limited to, any such request made by the Buyer in connection with (i) the filing of the registration statement described in Section 4(a) hereof and (ii) the Commencement. Each party hereto agrees not to disclose any Confidential Information of the other party to any third party and shall not use the Confidential Information for any purpose other than in connection with, or in furtherance of, the transactions contemplated hereby. Each party hereto acknowledges that the Confidential Information shall remain the property of the disclosing party and agrees that it shall take all reasonable measures to protect the secrecy of any Confidential Information disclosed by the other party.

## 5.    TRANSFER AGENT INSTRUCTIONS.

Immediately upon the execution of this Agreement, the Company shall deliver to the Transfer Agent a letter in the form as set forth as <u>Exhibit E</u> attached hereto with respect to the issuance of the Commitment Shares and shall deliver a letter in substantially equivalent form with respect to the issuance, if any, of such additional Commitment Shares as may be required under Section 4(f) on each of the 11th Trading Day after the Acquisition Date and immediately prior to the Commencement Date. On the Commencement Date, the Company shall cause any restrictive legend on the Commitment Shares and the shares of Common Stock issued to the Buyer upon signing that certain Term Sheet between the Buyer and the Company and dated as of June 7, 2004 (the "Signing Shares") to be removed and all of the Purchase Shares to be issued under this Agreement shall be issued without any restrictive legend. The Company shall issue irrevocable instructions to the Transfer Agent, and any subsequent transfer agent, to issue Purchase Shares in the name of the Buyer for the Purchase Shares (the "Irrevocable Transfer Agent Instructions").   The Company warrants to the Buyer that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, will be given by the Company to the Transfer Agent with respect to the Purchase Shares and that the Commitment Shares, Signing Shares and the Purchase Shares shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Registration Rights Agreement subject to the provisions of Section 4(f) in the case of the Commitment Shares.

## 6.    CONDITIONS TO THE COMPANY'S OBLIGATION TO COMMENCE SALES OF SHARES OF COMMON STOCK.

The obligation of the Company hereunder to commence sales of the Purchase Shares is subject to the satisfaction of each of the following conditions on or before the Commencement Date (the date that sales begin) and once such conditions have been initially satisfied, there shall not be any ongoing obligation to satisfy such conditions after the Commencement has occurred; provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing the Buyer with prior written notice thereof:

(a)    The Buyer shall have executed each of the Transaction Documents and delivered the same to the Company.

(b)    Subject to the Company's compliance with Section 4(a), a registration statement covering the sale of all of the Commitment Shares, Signing Shares and at least 5,000,000 Purchase Shares shall have been declared effective under the 1933 Act by the SEC and no stop order with respect to the Registration Statement shall be pending or threatened by the SEC.

-14-

M 00358
M00358

(c)     The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Commencement Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Commencement Date.

7.     **CONDITIONS TO THE BUYER'S OBLIGATION TO COMMENCE PURCHASES OF SHARES OF COMMON STOCK.**

The obligation of the Buyer to commence purchases of Purchase Shares under this Agreement is subject to the satisfaction of each of the following conditions on or before the Commencement Date (the date that sales begin) and once such conditions have been initially satisfied, there shall not be any ongoing obligation to satisfy such conditions after the Commencement has occurred; provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(a)     The Company shall have executed each of the Transaction Documents and delivered the same to the Buyer.

(b)     The Company shall have issued to the Buyer all of the  Commitment Shares required under Section 4(f) and shall have removed the restrictive transfer legend from the certificate representing the Commitment Shares and Signing Shares.

(c)     The Common Stock shall be authorized for quotation on the Principal Market, trading in the Common Stock shall not have been within the last 365 days suspended by the SEC or the Principal Market and the Purchase Shares and the Commitment Shares shall be approved for listing upon the Principal Market.

(d)     The Buyer shall have received the opinions of the Company's legal counsel dated as of the Commencement Date substantially in the form of **Exhibit A** attached hereto.

(e)     The representations and warranties of the Company shall be true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 above, in which case, such representations and warranties shall be true and correct without further qualification) as of the date when made and as of the Commencement Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Commencement Date.  The Buyer shall have received a certificate, executed by the CEO, President or CFO of the Company, dated as of the Commencement Date, to the foregoing effect in the form attached hereto as **Exhibit B**.

(f)     The Board of Directors of the Company shall have adopted resolutions in the form attached hereto as **Exhibit C** which shall be in full force and effect without any amendment or supplement thereto as of the Commencement Date.

-15-

(g)    As of the Commencement Date, the Company shall have reserved out of its authorized and unissued Common Stock, solely for the purpose of effecting purchases of Purchase Shares hereunder, at least 5,000,000 shares of Common Stock.

(h)    The Irrevocable Transfer Agent Instructions, in form acceptable to the Buyer shall have been delivered to and acknowledged in writing by the Company and the Company's Transfer Agent.

(i)    The Company shall have delivered to the Buyer a certificate evidencing the incorporation and good standing of the Company in the State of Nevada issued by the Secretary of State of the State of Nevada as of a date within ten (10) Trading Days of the Commencement Date.

(j)    The Company shall have delivered to the Buyer a certified copy of the Certificate of Incorporation as certified by the Secretary of State of the State of Nevada within ten (10) Trading Days of the Commencement Date.

(k)    The Company shall have delivered to the Buyer a secretary's certificate executed by the Secretary of the Company, dated as of the Commencement Date, in the form attached hereto as **Exhibit D**.

(l)    A registration statement covering the sale of all of the Commitment Shares, Signing Shares and at least 5,000,000 Purchase Shares shall have been declared effective under the 1933 Act by the SEC and no stop order with respect to the registration statement shall be pending or threatened by the SEC. The Company shall have prepared and delivered to the Buyer a final form of prospectus to be used by the Buyer in connection with any sales of any Commitment Shares, Signing Shares or any Purchase Shares. The Company shall have made all filings under all applicable federal and state securities laws necessary to consummate the issuance of the Commitment Shares, Signing Shares and the Purchase Shares pursuant to this Agreement in compliance with such laws.

(m)    No Event of Default has occurred, or any event which, after notice and/or lapse of time, would become an Event of Default has occurred.

(n)    On or prior to the Commencement Date, the Company shall take all necessary action, if any, and such actions as reasonably requested by the Buyer, in order to render inapplicable any control share acquisition, business combination, shareholder rights plan or poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation or the laws of the state of its incorporation which is or could become applicable to the Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and the Buyer's ownership of the Securities.

(o)    The Company shall have provided the Buyer with the information requested by the Buyer in connection with its due diligence requests made prior to, or in connection with, the Commencement, in accordance with the terms of Section 4(g) hereof.

**8.    INDEMNIFICATION.**

In consideration of the Buyer's execution and delivery of the Transaction Documents and acquiring the Securities hereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless the Buyer and

-16-

M 00360
M00360

all of its affiliates, shareholders, officers, directors, employees and direct or indirect investors and any of the foregoing person's agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, or (c) any cause of action, suit or claim brought or made against such Indemnitee and arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, other than with respect to Indemnified Liabilities which directly and primarily result from the gross negligence or willful misconduct of the Indemnitee. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

### 9.    EVENTS OF DEFAULT.

An "Event of Default" shall be deemed to have occurred at any time as any of the following events occurs:

(a)    while any registration statement is required to be maintained effective pursuant to the terms of the Registration Rights Agreement, the effectiveness of such registration statement lapses for any reason (including, without limitation, the issuance of a stop order) or is unavailable to the Buyer for sale of all of the Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of ten (10) consecutive Trading Days or for more than an aggregate of thirty (30) Trading Days in any 365-day period;

(b)    the suspension from trading or failure of the Common Stock to be listed on the Principal Market for a period of three (3) consecutive Trading Days;

(c)    the delisting of the Company's Common Stock from the Principal Market, provided, however, that the Common Stock is not immediately thereafter trading on the New York Stock Exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the Nasdaq OTC Bulletin Board or the American Stock Exchange;

(d)    the failure for any reason by the Transfer Agent to issue Purchase Shares to the Buyer within five (5) Trading Days after the applicable Purchase Date which the Buyer is entitled to receive;

(e)    the Company breaches any representation, warranty, covenant or other term or condition under any Transaction Document if such breach could have a Material Adverse Effect and except, in the case of a breach of a covenant which is reasonably curable, only if such breach continues for a period of at least ten (10) Trading Days;

M 00361
M00361

(f)    any payment default under any contract whatsoever or any acceleration prior to maturity of any mortgage, indenture, contract or instrument under which there may be issued or by which there may be secured or evidenced any indebtedness for money borrowed by the Company or for money borrowed the repayment of which is guaranteed by the Company, whether such indebtedness or guarantee now exists or shall be created hereafter, which, with respect to any such payment default or acceleration prior to maturity, is in excess of $1,000,000;

(g)    if any Person commences a proceeding against the Company pursuant to or within the meaning of any Bankruptcy Law;

(h)    if the Company pursuant to or within the meaning of any Bankruptcy Law; (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a Custodian of it or for all or substantially all of its property, (D) makes a general assignment for the benefit of its creditors, (E) becomes insolvent, or (F) is generally unable to pay its debts as the same become due; or

(i)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company in an involuntary case, (B) appoints a Custodian of the Company or for all or substantially all of its property, or (C) orders the liquidation of the Company or any Subsidiary.

In addition to any other rights and remedies under applicable law and this Agreement, including the Buyer termination rights under Section 11(k) hereof, so long as an Event of Default has occurred and is continuing, or if any event which, after notice and/or lapse of time, would become an Event of Default, has occurred and is continuing, or so long as the Purchase Price is below the Purchase Price Floor, the Buyer shall not be obligated to purchase any shares of Common Stock under this Agreement. If pursuant to or within the meaning of any Bankruptcy Law, the Company commences a voluntary case or any Person commences a proceeding against the Company, a Custodian is appointed for the Company or for all or substantially all of its property, or the Company makes a general assignment for the benefit of its creditors, (any of which would be an Event of Default as described in Sections 9(g), 9(h) and 9(i) hereof) this Agreement shall automatically terminate without any liability or payment to the Company without further action or notice by any Person. No such termination of this Agreement under Section 11(k)(i) shall affect the Company's or the Buyer's obligations under this Agreement with respect to pending purchases and the Company and the Buyer shall complete their respective obligations with respect to any pending purchases under this Agreement.

## 10.    CERTAIN DEFINED TERMS.

For purposes of this Agreement, the following terms shall have the following meanings:

(a)    "1933 Act" means the Securities Act of 1933, as amended.

(b)    "Available Amount" means initially Fifteen Million Dollars ($15,000,000) in the aggregate which amount shall be reduced by the Purchase Amount each time the Buyer purchases shares of Common Stock pursuant to Section 1 hereof.

(c)    "Bankruptcy Law" means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors.

-18-

M 00362
M00362

(d)    "Closing Sale Price" means, for any security as of any date, the last closing trade price for such security on the Principal Market as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg.

(e)    "Confidential Information" means any information disclosed by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including, without limitation, documents, prototypes, samples, plant and equipment), which is designated as "Confidential," "Proprietary" or some similar designation. Information communicated orally shall be considered Confidential Information if such information is confirmed in writing as being Confidential Information within ten (10) business days after the initial disclosure. Confidential Information may also include information disclosed to a disclosing party by third parties. Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession; or (vi) is required by law to be disclosed by the receiving party, provided that the receiving party gives the disclosing party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure.

(f)    "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

(g)    "Floor Price" means initially $2.50, which amount may be increased or decreased from time to time as provided below, except that in no case shall the Floor Price be less than $0.25. The Company may at any time give written notice (a "Floor Price Change Notice") to the Buyer increasing or decreasing the Floor Price. The Floor Price Change Notice shall be effective only for purchases that have a Purchase Date later than one (1) Trading Day after receipt of the Floor Price Change Notice by the Buyer. Any purchase by the Buyer that has a Purchase Date on or prior to the first Trading Day after receipt of a Floor Price Change Notice from the Company must be honored by the Company as otherwise provided herein. The Floor Price shall be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction.

(h)    "Maturity Date" means the date that is 600 Trading Days (30 Monthly Periods) from the Commencement Date.

(i)    "Monthly Period" means each successive 20 Trading Day period commencing with the Commencement Date.

(j)    "Person" means an individual or entity including any limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

-19-

M 00363
M00363

(k)     "Principal Market" means the Nasdaq OTC Bulletin Board; provided however, that in the event the Company's Common Stock is ever listed or traded on the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange or the American Stock Exchange, than the "Principal Market" shall mean such other market or exchange on which the Company's Common Stock is then listed or traded.

(l)     "Purchase Amount" means the portion of the Available Amount to be purchased by the Buyer pursuant to Section 1 hereof.

(m)     "Purchase Date" means the actual date that the Buyer is to buy Purchase Shares pursuant to Section 1 hereof.

(n)     "Purchase Price" means, as of any date of determination the lower of the (A) the lowest Sale Price of the Common Stock on such date of determination and (B) the arithmetic average of the three (3) lowest Closing Sale Prices for the Common Stock during the Twelve (12) consecutive Trading Days ending on the Trading Day immediately preceding such date of determination (to be appropriately adjusted for any reorganization, recapitalization, non-cash dividend, stock split or other similar transaction).

(o)     "Sale Price" means, for any security as of any date, any trade price for such security on the Principal Market as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg.

(p)     "SEC" means the United States Securities and Exchange Commission.

(q)     "Transfer Agent" means the transfer agent of the Company as set forth in Section 11(f) hereof or such other person who is then serving as the transfer agent for the Company in respect of the Common Stock.

(r)     "Trading Day" means any day on which the Principal Market is open for customary trading.

## 11.     MISCELLANEOUS.

(a)     <u>Governing Law; Jurisdiction; Jury Trial</u>.  The corporate laws of the State of Nevada shall govern all issues concerning the relative rights of the Company and its shareholders. All other questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents shall be governed by the internal laws of the State of Illinois, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Illinois or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of Illinois. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of Chicago, for the adjudication of any dispute hereunder or under the other Transaction Documents or in connection herewith or therewith, or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at

-20-

M 00364
M00364

the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(b)    Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

(c)    Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d)    Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e)    Entire Agreement; Amendments. With the exception of the Mutual Nondisclosure Agreement between the parties dated as of June 1, 2004, this Agreement supersedes all other prior oral or written agreements between the Buyer, the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein, and this Agreement, the other Transaction Documents and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and the Buyer, and no provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought.

(f)    Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Trading Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:
      Millenium Holding Group, Inc.
      12 Winding Road
      Henderson, Nevada 89052
      Telephone:    702-492-7721
      Facsimile:    702-492-7728
      Attention:    Richard Ham, Chief Executive Officer

M 00365
M00365

With a copy to:
    Carl P. Ranno
    2816 E. Windrose Drive
    Phoenix, Arizona 85032
    Telephone:   602-493-0369
    Facsimile:    602-493-5119
    Attention:    Carl P. Ranno

If to the Buyer:
    Fusion Capital Fund II, LLC
    222 Merchandise Mart Plaza, Suite 9-112
    Chicago, IL 60654
    Telephone:   312-644-6644
    Facsimile:    312-644-6244
    Attention:    Steven G. Martin

If to the Transfer Agent:
    Computershare Trust Company, Inc.
    350 Indiana Street, Suite 800
    Golden, Colorado 80401
    Telephone:   303-262-0600
    Facsimile:    303-262-0700
    Attention:    Legal Transfer Department

or at such other address and/or facsimile number and/or to the attention of such other person as the recipient party has specified by written notice given to each other party three (3) Trading Days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, and recipient facsimile number or (C) provided by a nationally recognized overnight delivery service, shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

    (g)    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Buyer, including by merger or consolidation. The Buyer may not assign its rights or obligations under this Agreement.

    (h)    <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

    (i)    <u>Publicity</u>. The Buyer shall have the right to approve before issuance any press releases or any other public disclosure (including any filings with the SEC) with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of the Buyer, to make any press release or other public disclosure (including any filings with the SEC) with respect to such transactions as is required by applicable law and regulations (although the Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release and shall be provided with a copy thereof).

-22-

M 00366
M00366

(j)    Further Assurances.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)    Termination.  This Agreement may be terminated only as follows:

(i)    By the Buyer any time an Event of Default exists without any liability or payment to the Company.  However, if pursuant to or within the meaning of any Bankruptcy Law, the Company commences a voluntary case or any Person commences a proceeding against the Company, a Custodian is appointed for the Company or for all or substantially all of its property, or the Company makes a general assignment for the benefit of its creditors, (any of which would be an Event of Default as described in Sections 9(g), 9(h) and 9(i) hereof) this Agreement shall automatically terminate without any liability or payment to the Company without further action or notice by any Person.  No such termination of this Agreement under this Section 11(k)(i) shall affect the Company's or the Buyer's obligations under this Agreement with respect to pending purchases and the Company and the Buyer shall complete their respective obligations with respect to any pending purchases under this Agreement.

(ii)    In the event that the Commencement shall not have occurred, the Company shall have the option to terminate this Agreement for any reason or for no reason without liability of any party to any other party.

(iii)    In the event that the Commencement shall not have occurred on or before October 31, 2004, due to the failure to satisfy the conditions set forth in Sections 6 and 7 above with respect to the Commencement (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement at the close of business on such date or thereafter without liability of any party to any other party.

(iv)    If by the Maturity Date (including any extension thereof by the Company pursuant to Section 10(g) hereof), for any reason or for no reason the full Available Amount under this Agreement has not been purchased as provided for in Section 1 of this Agreement, by the Buyer without any liability or payment to the Company.

(v)    At any time after the Commencement Date, the Company shall have the option to terminate this Agreement for any reason or for no reason by delivering notice (a "Company Termination Notice") to the Buyer electing to terminate this Agreement without any liability or payment to the Buyer.  The Company Termination Notice shall not be effective until one (1) Trading Day after it has been received by the Buyer.

(vi)    This Agreement shall automatically terminate on the date that the Company sells and the Buyer purchases the full Available Amount as provided herein, without any action or notice on the part of any party.

(vii)    By the Buyer at any time after October 31, 2004, in the event the acquisition of the Target Company has not been fully consummated.

M 00367
M00367

Except as set forth in Sections 11(k)(i) (in respect of an Event of Default under Sections 9(g), 9(h) and 9(i)) and 11(k)(vi), any termination of this Agreement pursuant to this Section 11(k) shall be effected by written notice from the Company to the Buyer, or the Buyer to the Company, as the case may be, setting forth the basis for the termination hereof. The representations and warranties of the Company and the Buyer contained in Sections 2 and 3 hereof, the indemnification provisions set forth in Section 8 hereof and the agreements and covenants set forth in Section 1(g) and Section 11, shall survive the Commencement and any termination of this Agreement. No termination of this Agreement shall affect the Company's or the Buyer's obligations under this Agreement with respect to pending purchases and the Company and the Buyer shall complete their respective obligations with respect to any pending purchases under this Agreement.

(l)    No Financial Advisor, Placement Agent, Broker or Finder. The Company represents and warrants to the Buyer that it has not engaged any financial advisor, placement agent, broker or finder in connection with the transactions contemplated hereby. The Buyer represents and warrants to the Company that it has not engaged any financial advisor, placement agent, broker or finder in connection with the transactions contemplated hereby. The Company shall be responsible for the payment of any fees or commissions, if any, of any financial advisor, placement agent, broker or finder relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold the Buyer harmless against, any liability, loss or expense (including, without limitation, attorneys' fees and out of pocket expenses) arising in connection with any such claim.

(m)    No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(n)    Remedies, Other Obligations, Breaches and Injunctive Relief. The Buyer's remedies provided in this Agreement shall be cumulative and in addition to all other remedies available to the Buyer under this Agreement, at law or in equity (including a decree of specific performance and/or other injunctive relief), no remedy of the Buyer contained herein shall be deemed a waiver of compliance with the provisions giving rise to such remedy and nothing herein shall limit the Buyer's right to pursue actual damages for any failure by the Company to comply with the terms of this Agreement. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(o)    Changes to the Terms of this Agreement. This Agreement and any provision hereof may only be amended by an instrument in writing signed by the Company and the Buyer. The term "Agreement" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

(p)    Enforcement Costs. If: (i) this Agreement is placed by the Buyer in the hands of an attorney for enforcement or is enforced by the Buyer through any legal proceeding; or (ii) an attorney is retained to represent the Buyer in any bankruptcy, reorganization, receivership or other proceedings affecting creditors' rights and involving a claim under this Agreement; or (iii) an attorney is retained to represent the Buyer in any other proceedings whatsoever in connection with this Agreement, then the Company shall pay to the Buyer, as incurred by the Buyer, all reasonable costs and expenses including attorneys' fees incurred in connection therewith, in addition to all other amounts due hereunder.

-24-

(q)    Failure or Indulgence Not Waiver. No failure or delay in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

\*    \*    \*    \*    \*

-25-

M 00369
M00369

**IN WITNESS WHEREOF,** the Buyer and the Company have caused this Common Stock Purchase Agreement to be duly executed as of the date first written above.

**THE COMPANY:**

**MILLENIUM HOLDING GROUP, INC.**

By:_____
Name:      Richard L. Ham
Title:      President

**BUYER:**

**FUSION CAPITAL FUND II, LLC**
**BY: FUSION CAPITAL PARTNERS, LLC**
**BY: ROCKLEDGE CAPITAL CORPORATION**

By:_____
Name: Josh Scheinfeld
Title: President

M 00370
M00370

## SCHEDULES

| | |
|---|---|
| Schedule 3(a) | Subsidiaries |
| Schedule 3(c) | Capitalization |
| Schedule 3(e) | Conflicts |
| Schedule 3(f) | 1934 Act Filings |
| Schedule 3(g) | Material Changes |
| Schedule 3(h) | Litigation |
| Schedule 3(k) | Intellectual Property |
| Schedule 3(m) | Liens |
| Schedule 3(q) | Certain Transactions |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Company Counsel Opinion |
| Exhibit B | Form of Officer's Certificate |
| Exhibit C | Form of Resolutions of Board of Directors of the Company |
| Exhibit D | Form of Secretary's Certificate |
| Exhibit E | Form of Letter to Transfer Agent |

M 00371
M00371

## DISCLOSURE SCHEDULES

Schedule 3(a) – Subsidiaries

Schedule 3(c) - Capitalization

Schedule 3(e) - No Conflicts

Schedule 3(f) - 1934 Act Filings

Schedule 3(g) - Absence of Certain Changes

Schedule 3(h) - Litigation

Schedule 3(k) - Intellectual Property Rights

Schedule 3(m) - Title

Schedule 3(q) - Transactions with Affiliates

### EXHIBIT A

**FORM OF COMPANY COUNSEL OPINION**

Capitalized terms used herein but not defined herein, have the meaning set forth in the Common Stock Purchase Agreement. Based on the foregoing, and subject to the assumptions and qualifications set forth herein, we are of the opinion that:

1. The Company is a corporation existing and in good standing under the laws of the State of Nevada. The Company is qualified to do business as a foreign corporation and is in good standing in the States of Nevada [California].

2. The Company has the corporate power to execute and deliver, and perform its obligations under, each Transaction Document to which it is a party. The Company has the corporate power to conduct its business as, to the best of our knowledge, it is now conducted, and to own and use the properties owned and used by it.

3. The execution, delivery and performance by the Company of the Transaction Documents to which it is a party have been duly authorized by all necessary corporate action on the part of the Company. The execution and delivery of the Transaction Documents by the Company, the performance of the obligations of the Company thereunder and the consummation by it of the transactions contemplated therein have been duly authorized and approved by the Company's Board of Directors and no further consent, approval or authorization of the Company, its Board of Directors or its stockholders is required. The Transaction Documents to which the Company is a party have been duly executed and delivered by the Company and are the valid and binding obligations of the Company, enforceable against the Company in accordance with their terms except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, liquidation or similar laws relating to, or affecting creditor's rights and remedies.

4. The execution, delivery and performance by the Company of the Transaction Documents, the consummation by the Company of the transactions contemplated thereby including the offering, sale and issuance of the Commitment Shares, and the Purchase Shares in accordance with the terms and conditions of the Common Stock Purchase Agreement, and fulfillment and compliance with terms of the Transaction Documents, does not and shall not: (i) conflict with, constitute a breach of or default (or an event which, with the giving of notice or lapse of time or both, constitutes or could constitute a breach or a default), under (a) the Certificate of Incorporation or the Bylaws of the Company, (b) any material agreement, note, lease, mortgage, deed or other material instrument to which to our knowledge the Company is a party or by which the Company or any of its assets are bound, (ii) result in any violation of any statute, law, rule or regulation applicable to the Company, or (iii) to our knowledge, violate any order, writ, injunction or decree applicable to the Company or any of its subsidiaries.

5. The issuance of the Purchase Shares, Signing Shares and Commitment Shares pursuant to the terms and conditions of the Transaction Documents has been duly authorized and the Signing Shares and Commitment Shares are validly issued, fully paid and non-assessable, to our knowledge, free of all taxes, liens, charges, restrictions, rights of first refusal and preemptive rights. _____ shares of Common Stock have been properly reserved for issuance under the Common Stock Purchase Agreement. When issued and paid for in accordance with the Common Stock Purchase Agreement, the Purchase Shares shall be validly issued, fully paid and non-assessable, to our knowledge, free of all taxes, liens, charges, restrictions, rights of first refusal and preemptive rights. To our knowledge, the execution and delivery of the Registration Rights Agreement do not, and the performance

M 00373
M00373

by the Company of its obligations thereunder shall not, give rise to any rights of any other person for the registration under the Securities Act of any shares of Common Stock or other securities of the Company which have not been waived.

6. As of the date hereof, the authorized capital stock of the Company consists of _____ shares of common stock, par value $_____ per share, of which to our knowledge _____ shares are issued and outstanding. Except as set forth on Schedule 3(c) of the Common Stock Purchase Agreement, to our knowledge, there are no outstanding shares of capital stock or other securities convertible into or exchangeable or exercisable for shares of the capital stock of the Company.

7. Assuming the accuracy of the representations and your compliance with the covenants made by you in the Transaction Documents, the offering, sale and issuance of the Commitment Shares to you pursuant to the Transaction Documents is exempt from registration under the 1933 Act and the securities laws and regulations of the State of Nevada, Illinois.

8. Other than that which has been obtained and completed prior to the date hereof, no authorization, approval, consent, filing or other order of any federal or state governmental body, regulatory agency, or stock exchange or market, or any court, or, to our knowledge, any third party is required to be obtained by the Company to enter into and perform its obligations under the Transaction Documents or for the Company to issue and sell the Purchase Shares as contemplated by the Transaction Documents.

9. The Common Stock is registered pursuant to Section 12(g) of the 1934 Act. To our knowledge, since January 1, 2003,, the Company has been in compliance with the reporting requirements of the 1934 Act applicable to it. To our knowledge, since January 1, 2003, the Company has not received any written notice from the Principal Market stating that the Company has not been in compliance with any of the rules and regulations (including the requirements for continued listing) of the Principal Market.

We further advise you that to our knowledge, except as disclosed on Schedule 3(h) in the Common Stock Purchase Agreement, there is no action, suit, proceeding, inquiry or investigation before or by any court, public board or body, any governmental agency, any stock exchange or market, or self-regulatory organization, which has been threatened in writing or which is currently pending against the Company, any of its subsidiaries, any officers or directors of the Company or any of its subsidiaries or any of the properties of the Company or any of its subsidiaries.

In addition, we have participated in the preparation of the Registration Statement (SEC File #_____) covering the sale of the Purchase Shares, the Commitment Shares including the prospectus dated _____, contained therein and in conferences with officers and other representatives of the Company (including the Company's independent auditors) during which the contents of the Registration Statement and related matters were discussed and reviewed and, although we are not passing upon and do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement, on the basis of the information that was developed in the course of the performance of the services referred to above, considered in the light of our understanding of the applicable law, nothing came to our attention that caused us to believe that the Registration Statement (other than the financial statements and schedules and the other financial and statistical data included therein, as to which we express no belief), as of their dates, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

**EXHIBIT B**

**FORM OF OFFICER'S CERTIFICATE**

This Officer's Certificate ("Certificate") is being delivered pursuant to Section 7(e) of that certain Common Stock Purchase Agreement dated as of _____, ("**Common Stock Purchase Agreement**"), by and between **MILLENIUM HOLDING GROUP, INC.**, a Nevada corporation (the "**Company**"), and **FUSION CAPITAL FUND II, LLC** (the "**Buyer**"). Terms used herein and not otherwise defined shall have the meanings ascribed to them in the Common Stock Purchase Agreement.

The undersigned, _____, _____ of the Company, hereby certifies as follows:

1.    I am the _____ of the Company and make the statements contained in this Certificate;

2.    The representations and warranties of the Company are true and correct in all material respects (except to the extent that any of such representations and warranties is already qualified as to materiality in Section 3 of the Common Stock Purchase Agreement, in which case, such representations and warranties are true and correct without further qualification) as of the date when made and as of the Commencement Date as though made at that time (except for representations and warranties that speak as of a specific date);

3.    The Company has performed, satisfied and complied in all material respects with covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Commencement Date.

4.    The Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to any Bankruptcy Law nor does the Company or any of its Subsidiaries have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy or insolvency proceedings. The Company is financially solvent and is generally able to pay its debts as they become due.

IN WITNESS WHEREOF, I have hereunder signed my name on this ___ day of _____.

_____
Name:
Title:

The undersigned as Secretary of _____, a _____ corporation, hereby certifies that _____ is the duly elected, appointed, qualified and acting _____ of _____ and that the signature appearing above is his genuine signature.

_____
Secretary

M 00375
M00375

## EXHIBIT C-1

### FORM OF COMPANY RESOLUTIONS
### FOR SIGNING PURCHASE AGREEMENT

### UNANIMOUS WRITTEN CONSENT OF
### MILLENIUM HOLDING GROUP, INC.

Pursuant to Section 78.315(2) of the Nevada Revised Statutes, the undersigned, being all of the directors of **MILLENIUM HOLDING GROUP, INC.**, a Nevada corporation (the "Corporation") do hereby consent to and adopt the following resolutions as the action of the Board of Directors for and on behalf of the Corporation and hereby direct that this Consent be filed with the minutes of the proceedings of the Board of Directors:

WHEREAS, there has been presented to the Board of Directors of the Corporation a draft of the Common Stock Purchase Agreement (the "Purchase Agreement") by and between the Corporation and Fusion Capital Fund II, LLC ("Fusion"), providing for the purchase by Fusion of up to Fifteen Million Dollars ($15,000,000) of the Corporation's common stock, par value $0.05 (the "Common Stock"); and

WHEREAS, after careful consideration of the Purchase Agreement, the documents incident thereto and other factors deemed relevant by the Board of Directors, the Board of Directors has determined that it is advisable and in the best interests of the Corporation to engage in the transactions contemplated by the Purchase Agreement, including, but not limited to, the issuance of 681,818 shares of Common Stock to Fusion and such additional shares of Common Stock as may be required under Section 4(f) of the Purchase Agreement as a commitment fee (the "Commitment Shares") and the sale of shares of Common Stock to Fusion up to the available amount under the Purchase Agreement (the "Purchase Shares").

#### Transaction Documents

NOW, THEREFORE, BE IT RESOLVED, that the transactions described in the Purchase Agreement are hereby approved and Richard Ham and Carla Aufdenkamp (the "Authorized Officers") are severally authorized to execute and deliver the Purchase Agreement, and any other agreements or documents contemplated thereby including, without limitation, a registration rights agreement (the "Registration Rights Agreement") providing for the registration of the shares of the Company's Common Stock issuable in respect of the Purchase Agreement on behalf of the Corporation, with such amendments, changes, additions and deletions as the Authorized Officers may deem to be appropriate and approve on behalf of, the Corporation, such approval to be conclusively evidenced by the signature of an Authorized Officer thereon; and

FURTHER RESOLVED, that the terms and provisions of the Registration Rights Agreement by and among the Corporation and Fusion are hereby approved and the Authorized Officers are authorized to execute and deliver the Registration Rights Agreement (pursuant to the terms of the Purchase Agreement), with such amendments, changes, additions and deletions as the Authorized Officer may deem appropriate and approve on behalf of, the Corporation, such approval to be conclusively evidenced by the signature of an Authorized Officer thereon; and

FURTHER RESOLVED, that the terms and provisions of the Form of Transfer Agent Instructions (the "Instructions") are hereby approved and the Authorized Officers are authorized to execute and deliver the Instructions (pursuant to the terms of the Purchase Agreement), with such

amendments, changes, additions and deletions as the Authorized Officers may deem appropriate and approve on behalf of, the Corporation, such approval to be conclusively evidenced by the signature of an Authorized Officer thereon; and

### Execution of Purchase Agreement

FURTHER RESOLVED, that the Corporation be and it hereby is authorized to execute the Purchase Agreement providing for the purchase of common stock of the Corporation having an aggregate value of up to $15,000,000; and

### Issuance of Common Stock

FURTHER RESOLVED, that the Corporation was authorized to issue 25,000 shares of Common Stock to Fusion pursuant to the Confidential Term Sheet between the Company and Fusion dated as of June 7, 2004, ("Signing Shares") and that upon issuance of the Signing Shares, the Signing Shares have been duly authorized, validly issued, fully paid and nonassessable with no personal liability attaching to the ownership thereof; and

FURTHER RESOLVED, that the Corporation is hereby authorized to issue 681,818 shares of Common Stock together with such additional shares of Common Stock as may be required under Section 4(f) of the Purchase Agreement to Fusion Capital Fund II, LLC as Commitment Shares and that upon issuance of the Commitment Shares pursuant to the Purchase Agreement, the Commitment Shares shall be duly authorized, validly issued, fully paid and nonassessable with no personal liability attaching to the ownership thereof; and

FURTHER RESOLVED, that the Corporation is hereby authorized to issue shares of Common Stock upon the purchase of Purchase Shares up to the available amount under the Purchase Agreement in accordance with the terms of the Purchase Agreement and that, upon issuance of the Purchase Shares pursuant to the Purchase Agreement, the Purchase Shares will be duly authorized, validly issued, fully paid and nonassessable with no personal liability attaching to the ownership thereof; and

FURTHER RESOLVED, that the Corporation shall initially reserve 5,000,000 shares of Common Stock for issuance as Purchase Shares under the Purchase Agreement.

### Approval of Actions

FURTHER RESOLVED, that, without limiting the foregoing, the Authorized Officers are, and each of them hereby is, authorized and directed to proceed on behalf of the Corporation and to take all such steps as deemed necessary or appropriate, with the advice and assistance of counsel, to cause the Corporation to consummate the agreements referred to herein and to perform its obligations under such agreements; and

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed on behalf of and in the name of the Corporation, to take or cause to be taken all such further actions and to execute and deliver or cause to be executed and delivered all such further agreements, amendments, documents, certificates, reports, schedules, applications, notices, letters and undertakings and to incur and pay all such fees and expenses as in their judgment shall be necessary, proper or desirable to carry into effect the purpose and intent of any and all of the foregoing resolutions,

_____

and that all actions heretofore taken by any officer or director of the Corporation in connection with the transactions contemplated by the agreements described herein are hereby approved, ratified and confirmed in all respects.

       IN WITNESS WHEREOF, the Board of Directors has executed and delivered this Consent effective as of _____, 2004.


_____

_____

_____


being all of the directors of **MILLENIUM HOLDING GROUP, INC.**

M 00378
M00378

**EXHIBIT C-2**

**FORM OF COMPANY RESOLUTIONS APPROVING REGISTRATION STATEMENT**

**UNANIMOUS WRITTEN CONSENT OF**
**MILLENIUM HOLDING GROUP, INC.**

Pursuant to Section _____ of the [RELEVANT NEVADA STATUTE], the undersigned, being all of the directors of **MILLENIUM HOLDING GROUP, INC.**, a Nevada corporation (the "Corporation") do hereby consent to and adopt the following resolutions as the action of the Board of Directors for and on behalf of the Corporation and hereby direct that this Consent be filed with the minutes of the proceedings of the Board of Directors.

WHEREAS, there has been presented to the Board of Directors of the Corporation a Common Stock Purchase Agreement (the "Purchase Agreement") by and among the Corporation and Fusion Capital Fund II, LLC ("Fusion"), providing for the purchase by Fusion of up to Fifteen Million Dollars ($15,000,000) of the Corporation's common stock, par value $0.05 (the "Common Stock"); and

WHEREAS, after careful consideration of the Purchase Agreement, the documents incident thereto and other factors deemed relevant by the Board of Directors, the Board of Directors has approved the Purchase Agreement and the transactions contemplated thereby and the Company has executed and delivered the Purchase Agreement to Fusion; and

WHEREAS, in connection with the transactions contemplated pursuant to the Purchase Agreement, the Company has agreed to file a registration statement with the Securities and Exchange Commission (the "Commission") registering the Commitment Shares (as defined in the Purchase Agreement) and the Purchase Shares (as herein defined in the Purchase Agreement) and to list the Commitment Shares and Purchase Shares on [APPLICABLE EXCHANGE];

WHEREAS, the management of the Corporation has prepared an initial draft of a Registration Statement on Form ____ (the "Registration Statement") in order to register the sale of the Purchase Shares, Signing Shares and the Commitment Shares (collectively, the "Shares"); and

WHEREAS, the Board of Directors has determined to approve the Registration Statement and to authorize the appropriate officers of the Corporation to take all such actions as they may deem appropriate to effect the offering.

NOW, THEREFORE, BE IT RESOLVED, that the officers and directors of the Corporation be, and each of them hereby is, authorized and directed, with the assistance of counsel and accountants for the Corporation, to prepare, execute and file with the Commission the Registration Statement, which Registration Statement shall be filed substantially in the form presented to the Board of Directors, with such changes therein as the Chief Executive Officer of the Corporation or any Vice President of the Corporation shall deem desirable and in the best interest of the Corporation and its shareholders (such officer's execution thereof including such changes shall be deemed to evidence conclusively such determination); and

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized and directed, with the assistance of counsel and accountants for the Corporation, to prepare, execute and file with the Commission all amendments, including post-effective amendments, and

supplements to the Registration Statement, and all certificates, exhibits, schedules, documents and other instruments relating to the Registration Statement, as such officers shall deem necessary or appropriate (such officer's execution and filing thereof shall be deemed to evidence conclusively such determination); and

FURTHER RESOLVED, that the execution of the Registration Statement and of any amendments and supplements thereto by the officers and directors of the Corporation be, and the same hereby is, specifically authorized either personally or by the Authorized Officers as such officer's or director's true and lawful attorneys-in-fact and agents; and

FURTHER RESOLVED, that the Authorized Officers are hereby designated as "Agent for Service" of the Corporation in connection with the Registration Statement and the filing thereof with the Commission, and the Authorized Officers hereby are authorized to receive communications and notices from the Commission with respect to the Registration Statement; and

FURTHER RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized and directed to pay all fees, costs and expenses that may be incurred by the Corporation in connection with the Registration Statement; and

FURTHER RESOLVED, that it is desirable and in the best interest of the Corporation that the Shares be qualified or registered for sale in various states; that the officers of the Corporation be, and each of them hereby is, authorized to determine the states in which appropriate action shall be taken to qualify or register for sale all or such part of the Shares as they may deem advisable; that said officers be, and each of them hereby is, authorized to perform on behalf of the Corporation any and all such acts as they may deem necessary or advisable in order to comply with the applicable laws of any such states, and in connection therewith to execute and file all requisite papers and documents, including, but not limited to, applications, reports, surety bonds, irrevocable consents, appointments of attorneys for service of process and resolutions; and the execution by such officers of any such paper or document or the doing by them of any act in connection with the foregoing matters shall conclusively establish their authority therefor from the Corporation and the approval and ratification by the Corporation of the papers and documents so executed and the actions so taken; and

FURTHER RESOLVED, that if, in any state where the securities to be registered or qualified for sale to the public, or where the Corporation is to be registered in connection with the public offering of the Shares, a prescribed form of resolution or resolutions is required to be adopted by the Board of Directors, each such resolution shall be deemed to have been and hereby is adopted, and the Secretary is hereby authorized to certify the adoption of all such resolutions as though such resolutions were now presented to and adopted by the Board of Directors; and

FURTHER RESOLVED, that the officers of the Corporation with the assistance of counsel be, and each of them hereby is, authorized and directed to take all necessary steps and do all other things necessary and appropriate to effect the listing of the Shares on the [Applicable Exchange].

### Approval of Actions

FURTHER RESOLVED, that, without limiting the foregoing, the Authorized Officers are, and each of them hereby is, authorized and directed to proceed on behalf of the Corporation and to take all such steps as are deemed necessary or appropriate, with the advice and assistance of counsel, to cause the Corporation to take all such action referred to herein and to perform its obligations incident to the registration, listing and sale of the Shares; and

M 00380
M00380

FURTHER RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed on behalf of and in the name of the Corporation, to take or cause to be taken all such further actions and to execute and deliver or cause to be executed and delivered all such further agreements, amendments, documents, certificates, reports, schedules, applications, notices, letters and undertakings and to incur and pay all such fees and expenses as in their judgment shall be necessary, proper or desirable to carry into effect the purpose and intent of any and all of the foregoing resolutions, and that all actions heretofore taken by any officer or director of the Corporation in connection with the transactions contemplated by the agreements described herein are hereby approved, ratified and confirmed in all respects.

IN WITNESS WHEREOF, the Board of Directors has executed and delivered this Consent effective as of _____, 2004.

_____

_____

_____

being all of the directors of **MILLENIUM HOLDING GROUP, INC.**

M 00381
M00381

**EXHIBIT D**

**FORM OF SECRETARY'S CERTIFICATE**

This Secretary's Certificate ("Certificate") is being delivered pursuant to Section 7(k) of that certain Common Stock Purchase Agreement dated as of _____, ("Common Stock Purchase Agreement"), by and between **MILLENIUM HOLDING GROUP, INC.**, a Nevada corporation (the "Company") and **FUSION CAPITAL FUND II, LLC** (the "Buyer"), pursuant to which the Company may sell to the Buyer up to Fifteen Million Dollars ($15,000,000) of the Company's Common Stock, par value $0.05 per share (the "Common Stock"). Terms used herein and not otherwise defined shall have the meanings ascribed to them in the Common Stock Purchase Agreement.

The undersigned, _____, Secretary of the Company, hereby certifies as follows:

1.      I am the Secretary of the Company and make the statements contained in this Secretary's Certificate.

2.      Attached hereto as Exhibit A and Exhibit B are true, correct and complete copies of the Company's bylaws ("Bylaws") and Certificate of Incorporation ("Articles"), in each case, as amended through the date hereof, and no action has been taken by the Company, its directors, officers or shareholders, in contemplation of the filing of any further amendment relating to or affecting the Bylaws or Articles.

3.      Attached hereto as Exhibit C are true, correct and complete copies of the resolutions duly adopted by the Board of Directors of the Company on _____, at which a quorum was present and acting throughout. Such resolutions have not been amended, modified or rescinded and remain in full force and effect and such resolutions are the only resolutions adopted by the Company's Board of Directors, or any committee thereof, or the shareholders of the Company relating to or affecting (i) the entering into and performance of the Common Stock Purchase Agreement, or the issuance, offering and sale of the Purchase Shares and the Commitment Shares and (ii) and the performance of the Company of its obligation under the Transaction Documents as contemplated therein.

4.      As of the date hereof, the authorized, issued and reserved capital stock of the Company is as set forth on Exhibit D hereto.

IN WITNESS WHEREOF, I have hereunder signed my name on this ___ day of _____.

_____
Secretary

The undersigned as _____ of _____, a _____ corporation, hereby certifies that _____ is the duly elected, appointed, qualified and acting Secretary of _____, and that the signature appearing above is his genuine signature.

_____

M 00382
M00382

**EXHIBIT E**

**FORM OF LETTER TO THE TRANSFER AGENT FOR THE ISSUANCE OF THE
COMMITMENTS SHARES AT SIGNING OF THE PURCHASE AGREEMENT**

[COMPANY LETTERHEAD]

July 20, 2004

Legal Transfer Department Computershare Trust Company, Inc.
350 Indiana Street, Suite 800
Golden, CO 80401

Re: Issuance of Common Shares to Fusion Capital Fund II, LLC

Dear _____,

On behalf of **MILLENIUM HOLDING GROUP, INC.**, (the "Company"), you are hereby instructed to issue **as soon as possible** 681,818 shares of our common stock in the name of **Fusion Capital Fund II, LLC**. The share certificate should be dated July 20, 2004. I have included a true and correct copy of a unanimous written consent executed by all of the members of the Board of Directors of the Company adopting resolutions approving the issuance of these shares. The shares should be issued subject to the following restrictive legend:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN
> REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR
> APPLICABLE STATE SECURITIES LAWS. THE SECURITIES HAVE BEEN
> ACQUIRED FOR INVESTMENT AND MAY NOT BE OFFERED FOR SALE, SOLD,
> TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE
> REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES
> ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, OR
> AN OPINION OF BUYER'S COUNSEL, IN A CUSTOMARY FORM, THAT
> REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR APPLICABLE STATE
> SECURITIES LAWS OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID
> ACT."

The share certificate should be sent **as soon as possible via overnight mail** to the following address:

       Fusion Capital Fund II, LLC
       222 Merchandise Mart Plaza, Suite 9-112
       Chicago, IL 60654
       Attention: Steven Martin

Thank you very much for your help. Please call me at 702 492-7721 if you have any questions or need anything further.

**MILLENIUM HOLDING GROUP, INC.**

BY:_____

      Carla Aufdenkamp
      Secretary

## SCHEDULE 3(a)

### SUBSIDIARIES

None

M 00385
M00385

## SCHEDULE 3(c)

### CAPITALIZATION

<u>Employee Options</u>

Richard Ham          435,875 shares as of July 15, 2004 @ $2.00/share
Carla Aufdenkamp  151,883 shares as of July 15, 2004 @ $2.00/share

<u>Issued & Outstanding Shares</u>:

17,160,467   Issued and Outstanding as of July 16, 2004
+ 681,818    Add: Fusion Capital Fund II, LLC Shares

**17,842,285   Subtotal of Issued and Outstanding Shares**
- 505,051    Less: Camden Holdings Disputed Shares

**17,337,234   Balance**

M 00386
M00386

## Schedule 3(e)

### CONFLICTS

None

M 00387
M00387

## SCHEDULE 3(f)

### 1934 ACT FILINGS

Shareholder (Al Vela) Complaint to SEC

M 00388
M00388

## SCHEDULE 3(g)

### MATERIAL CHANGES

None

M 00389
M00389

## SCHEDULE 3(h)

### LITIGATION

None

M 00390
M00390

## SCHEDULE 3(k)

### INTELLECTUAL PROPERTY

None

M 00391

## SCHEDULE 3(m)

**LIENS**

None

M 00392
M00392

## SCHEDULE 3(p)

### TAX RETURNS

Federal Income Tax Return for 1998
Federal Income Tax Return for 1999
Federal Income Tax Return for 2000
Federal Income Tax Return for 2001
Federal Income Tax Return for 2002
Federal Income Tax Return for 2003

There are no federal income taxes due for the above referenced years.

M 00393
M00393

**SCHEDULE 3(q)**

**CERTAIN TRANSACTIONS**

None

## Schedule 3(a)

## SUBSIDIARIES

1. Sutura B.V., a European Union jurisdiction company, is a wholly owned subsidiary of Sutura, Inc.
2. Sutura GmbH a German corporation, is a wholly owned subsidiary of Sutura BV.
3. Sutura B.V. France a French corporation, is a wholly owned subsidiary of Sutura B.V.

M 00395
M00395

## Schedule 3(c)

## CAPITALIZATION TABLE & RIGHTS TO RECEIVE SECURITIES

## CAPITALIZATION TABLE

Included herein as Exhibit 3(c) and referenced hereby is a complete Capitalization Table including all shareholders, option holders and warrant holders of Sutura, Inc. (hereinafter "Sutura").

## OPTIONS

2,214,000 options have been issued by Sutura as described in the 1999 and 2001 Sutura Stock Option Plans as listed in the Capitalization Table.

## WARRANTS

340,932 Warrants have been issued by Sutura as listed in the Capitalization Table.

## CONVERTIBLE NOTES

Sutura currently has the following notes that can be converted into equity.
Sutura expects to repay the following notes and is in negotiations and or has a contract with the parties to not convert into equity.

| | |
|---|---|
| Burrows/ Oasis | $2,000,000 renegotiated through 8/04 |
| Novak | $1,000,000* |
| Ratering | $1,791,618 Restated through 12/04 |
| Gauss N.V. | €80,000 Restated through 12/04 |
| Nobles | $ 982,314 restated through 12/04 |

*This Note is currently past due and in default. The principal and accrued interest was due and payable as of September 27, 2002. Sutura is currently in negotiations with the Note holder to waive default and to extend the maturity date. The company intends to repay from the proceeds of the Bridge financing.

**Schedule 3(e)**

**Sutura is currently in default under the terms of that certain convertible promissory Note payable to Al Novak as referenced on Schedule 3(c).**

M 00397
M00397

## Schedule 3(f)

**NONE**

M 00398
M00398

**Schedule 3(g)**

**NONE**

M 00399
M00399

# Schedule 3 (h)

# LITIGATION

**1. Rochelle**            A holder of a note for $200,000 with $40,000 interest which was converted to stock. Rochelle has filed a complaint in Orange County Court to rescind the note. The Company and management dispute the rescission and feel that the outcome will be favorable for the Company.

**2. Employees**            As reflected in the financial statement of the Company certain principal amounts combined with all interest and fees in the aggregate of $500,000 are owed by judgement to former employees of the Company. The amounts are not disputed. The Company intends to pay these from the proceeds of a contemplated Bridge prior to closing the Merger or from the proceeds of the financing. The Company has begun negotiations with the parties to accept reduced amounts for settlement.

**3. Al Novak**            A former Board member of Sutura and principal of Go Industries which is a shareholder of Sutura, seeks through his complaint filed with the Delaware court of chancery access to corporate documents. There are no damages sought. The Company believes that the purpose for such inspection is not in the best interest of our shareholders and contests his assertion and believes there is no proper purpose to inspect such books and records.

M 00400
M00400

## Schedule 3 (k)

## INTELLECTUAL PROPERTY

The Company received notice from Perclose, a division of Abbott Laboratories, that certain of its technologies infringe Perclose's patents. The Company responded with a denial of infringement of any valid claims and Perclose has not taken any further action. The company has had non-infringement opinions drafted by council for certain Perclose patents. Perclose subsequently offered Sutura $30M for a license.

# Patent Status

| Case Patent Number | Title of Invention Issue | Country | Status | Application | Filing |
|---|---|---|---|---|---|
| NRMED.001A 8/23/1996 | METHOD AND APPARATUS FOR SUTURING 5860990 | US 1/19/1999 | Issued | 08/702315 | |
| NRMED.001CP2 1/14/1999 | SUTURING DEVICE AND METHOD FOR 6117144 SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | US 9/12/2000 | Issued | 09/231177 | |
| NRMED.001HAU 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | AU | Pending | 29731/99 | |
| NRMED.001HCA 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | CA | Pending | 2323084 | |
| NRMED.001HCN 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | CN | Pending | 99803869.5 | |
| NRMED.001HEP | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | EP | Pending | 99301495.0 | 3/1/1999 |
| NRMED.001HHK 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | HK | Pending | 01107482.9 | |
| NRMED.001HJP2 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | JP | Pending | 544795/99 | |
| NRMED.001HRAU 2/21/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | AU | Pending | 2003212025 | |
| NRMED.001PPC | SUTURING DEVICE AND METHOD | WO | Pending | PCTUS01/08050 | |

M 00401
M00401

3/13/2001

| | | | | | |
|---|---|---|---|---|---|
| NRMED.007VEP 5/15/2000 | KNOT PUSHER | EP | Pending | 00930726.5 | |
| NRMED.007VJP 5/15/2000 | KNOT PUSHER | JP | Pending | 2000-617802 | |
| NRMED.009A 8/27/2001 | SUTURE CUTTER 6733509 | US 5/11/2004 | Issued | 09/940384 | |
| NRMED.009C1 | SUTURE CUTTER | US | Pending | 10/842031 | 5/7/2004 |
| NRMED.009VPC 8/27/2001 | SUTURE CUTTER | WO | Pending | PCTUS01/26724 | |
| NRMED.016VPC 10/3/2001 | FLUID DELIVERY AND EXTRACTION DEVICE (AMENDED PER PCT SR); | WO | Pending | PCTUS01/30966 | |
| NRMED.1CP2C1 12/23/1999 | SUTURING DEVICE AND METHOD FOR 6245079 SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | US 6/12/2001 | Issued | 09/471866 | |
| NRMED.1CP2C1C1 1/30/2001 | SUTURING DEVICE AND METHOD FOR 6551331 SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | US 4/22/2003 | Issued | 09/773046 | |
| NRMED.1CP2C1C1C 4/21/2003 | SUTURING DEVICE AND METHOD FOR SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | US | Published | 10/420355 | |
| NRMED.1CP3CP1 6/14/2001 | SUTURING DEVICE AND METHOD 6562052 | US 5/13/2003 | Issued | 09/881550 | |
| NRMED.1CP3CP1C1 5/12/2003 | SUTURING DEVICE AND METHOD | US | Pending | 10/435928 | |

# Trademark Status Report

| Case Number | Trademark Name | Country | Status |
|---|---|---|---|
| NRMED.003T | SUPERSTITCH | US | REGISTERED |
| NRMED.004T | SUTURA | US | REGISTERED |

M 00402
M00402

**Schedule 3 (m)**

**Title**

**NONE**

M 00403
M00403

## Schedule 3 (q)

## Affiliate Transactions

1. The Company currently leases its facility in Fountain Valley, Ca. from Anthony Nobles.

The BOD has approved the purchase of the facility from Mr. Nobles on terms previously discussed and approved by the BOD or the signing of a new lease with a third party if Mr. Nobles elects to sell to a party not in his control.

Any lease terms with such 3rd party would be substantially the same as with Mr. Nobles.

2. That certain employment contract entered into between Nobles and Sutura.

3. That certain employment contract entered into between Ratering and Sutura.

M 00404
M00404

|  | Issued and Outstanding | Options & Warrants | Fully Diluted |
|---|---|---|---|
| **Millenium Pre-Fusion (Signing & Commitment Shares)/ Pre-Merger** | 18,630,416 | 587,758 | 17,218,174 |
| **Millenium Post Reverse Split** | 4,157,604 | 146,940 | 4,304,544 |
| **Fusion Shares Pre Stock Split (Signing & Commitment Shares)** |  |  | 706,818 |
| **Fusion Shares Post Stock Split (Signing & Commitment Shares)** |  |  | 176,705 |
| **Sutura Pre-Merger** | 7,297,090 | 2,554,932 | 9,852,022 |
| **Sutura Post Merger** | 28,694,188 | 10,046,703 | 38,740,892 |
| **Combined Company** | 32,851,792 | 10,193,643 | 43,222,140 |
| **Control #1** |  |  | 0.004004776 |
| **Control #2** |  |  | 3.950214078 |
|  |  |  | 3.932278217 |

The above post stock split/merger amounts are estimates due to rounding of fractional shares.

M 00405
M00405





Cap table per end of June 2004

Bukra-First cap table end of June 2004 (2)

11/2/2004 5:10 PM

M 00406
M00406



M 00407
M00407

# Exhibit B

AGREEMENT AND PLAN OF MERGER


By and Between


Millenium Holding Group, Inc.,
a Nevada corporation

and

Sutura, Inc.,
a Delaware corporation


Dated as of July 9, 2004

W02-OC:3RJB1\41362102.5

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS...........................................................................................1

ARTICLE 2 THE MERGER ..........................................................................................1

2.1     The Merger.....................................................................................................1

2.2     The Closing.....................................................................................................1

2.3     Actions at Closing..........................................................................................2

2.4     Effect of Merger.............................................................................................2

2.5     Certificate of Incorporation...........................................................................2

2.6     Bylaws.............................................................................................................2

2.7     Directors and Officers....................................................................................2

ARTICLE 3 MERGER CONSIDERATION AND MANNER OF CONVERSION....................2

3.1     Merger Consideration ....................................................................................2

3.2     Dissenters' Rights...........................................................................................3

3.3     Conversion of Rights .....................................................................................3

3.4     Rights as Stockholders; Stock Transfers.......................................................4

3.5     Fractional Shares............................................................................................4

3.6     Payment for Shares ........................................................................................4

ARTICLE 4 REPRESENTATION AND WARRANTIES OF THE COMPANY .........................5

4.1     Organization....................................................................................................5

4.2     Authority .........................................................................................................5

4.3     No Consents ....................................................................................................5

4.4     No Conflicts ....................................................................................................5

4.5     Capital Structure ............................................................................................6

4.6     Obligations With Respect to Capital Stock ...................................................6

M 00264
M00264

4.7     Subsidiaries ..................................................................................................6

4.8     Financial Statements ......................................................................................6

4.9     No Undisclosed Liabilities..............................................................................7

4.10    Business Changes............................................................................................7

4.11    Properties ......................................................................................................7

4.12    Taxes ..............................................................................................................8

4.13    Compliance with Laws ...................................................................................8

4.14    Litigation........................................................................................................8

4.15    Contracts ........................................................................................................8

4.16    Intellectual Proprietary Rights .......................................................................8

4.17    Insurance ........................................................................................................9

4.18    Environmental Compliance .............................................................................9

4.19    Employment Matters.......................................................................................9

4.20    Brokers or Finders.........................................................................................10

4.21    Books and Records ........................................................................................10

4.22    Regulatory Compliance .................................................................................10

ARTICLE 5 REPRESENTATION AND WARRANTIES OF THE PURCHASER ...................10

5.1     Organization..................................................................................................10

5.2     Authority .......................................................................................................11

5.3     No Consents ...................................................................................................11

5.4     No Conflicts ...................................................................................................11

5.5     Capital Structure ...........................................................................................11

5.6     Obligations With Respect to Capital Stock ...................................................12

5.7     Subsidiaries ...................................................................................................12

5.8     Financial Statements .....................................................................................12

M 00265
M00265

| | | |
|---|---|---|
| 5.9 | No Undisclosed Liabilities | 12 |
| 5.10 | Business Changes | 12 |
| 5.11 | Properties | 13 |
| 5.12 | Taxes | 13 |
| 5.13 | Compliance with Laws | 13 |
| 5.14 | Litigation | 13 |
| 5.15 | Contracts | 14 |
| 5.16 | Intellectual Proprietary Rights | 14 |
| 5.17 | Insurance | 14 |
| 5.18 | Environmental Compliance | 15 |
| 5.19 | Employment Matters | 15 |
| 5.20 | Brokers or Finders | 15 |
| 5.21 | Books and Records | 15 |
| 5.22 | Financial Reports and Regulatory Documents | 15 |
| ARTICLE 6 | CONDUCT PENDING THE CLOSING | 16 |
| ARTICLE 7 | CONDITIONS TO CLOSING | 18 |
| 7.1 | Conditions to Each Party's Obligations | 18 |
| 7.2 | Conditions to Obligations of the Purchaser | 19 |
| 7.3 | Conditions to Obligations of the Company | 19 |
| ARTICLE 8 | TERMINATION | 21 |
| 8.1 | Termination | 21 |
| 8.2 | Effect of Termination and Abandonment | 22 |
| ARTICLE 9 | GENERAL PROVISIONS | 22 |
| 9.1 | Survival of Representations and Warranties | 22 |
| 9.2 | Further Assurances | 22 |

M 00266
M00266

9.3    Waiver ................................................................................................22

9.4    Brokers ...............................................................................................22

9.5    Notices ...............................................................................................22

9.6    Governing Law ...................................................................................23

9.7    Assigment ..........................................................................................23

9.8    Counterparts .......................................................................................23

9.9    Closing Date .......................................................................................23

9.10   Review of the Agreement ...................................................................23

9.11   Schedules ...........................................................................................23

9.12   Effective date .....................................................................................23

M 00267
M00267

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this **"Agreement"**) is made and entered into as of this 9th day of July, 2004, by and among Millenium Holding Group, Inc., a Nevada corporation (the **"Purchaser"**), and Sutura, Inc., a Delaware corporation (the **"Company"**) hereinafter referred to as the **"Parties."**

## RECITALS

**Whereas,** the Purchaser and the Company intend to effect a merger (the **"Merger"**) of the Company with and into Purchaser in accordance with this Agreement and as provided for under Chapter 92A of the Nevada Revised Statutes, as amended (**"Nevada Law"**) and Title 8 of the Delaware General Corporation Law (**"Delaware Law"**).

**WHEREAS,** the respective Boards of Directors of both the Company and the Purchaser have approved the terms of this Agreement and of the transactions contemplated hereby; and

**WHEREAS,** the Company and the Purchaser desire to set forth the terms of the Agreement in connection with the transactions provided for herein; and

## AGREEMENT

**NOW, THEREFORE,** in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration, intending to be legally bound hereby the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, the applicable definitions of terms used in this Agreement shall be set forth in **Exhibit A**.

## ARTICLE 2
## THE MERGER

2.1     The Merger. At the Effective Time (as defined in Section 2.4), and subject to and upon the terms and conditions of this Agreement and Nevada Law and Delaware Law, (i) the Company shall be merged with and into the Purchaser, (ii) the separate corporate existence of the Company shall cease and (iii) the Purchaser shall continue as the surviving corporation. The Purchaser as the surviving corporation after the Merger is hereinafter sometimes referred to as the **"Surviving Corporation."**

2.2     The Closing. The closing of the transactions contemplated by this Agreement (the **"Closing"**) shall take place as soon as practicable after the satisfaction or waiver (subject to applicable law) of the conditions (excluding conditions that, by their terms, cannot be satisfied until the Closing Date) set forth in Article VII hereof (the **"Closing Date"**) at the offices of the Company, commencing at 10:00 a.m., local time or at such other time and place as the parties may mutually agree. All proceedings to be taken and all documents to be executed at the

M 00268
M00268

Closing shall be deemed to have been taken, delivered and executed simultaneously, and no proceeding shall be deemed taken nor documents deemed executed or delivered until all have been taken, delivered and executed.  The date of Closing may be accelerated or extended by agreement of the Parties.

2.3    Actions at Closing.  At the Closing the parties shall file a Certificate of Merger with the Secretary of State of the State of Nevada and make all other filings required under any applicable State laws (including, without limitation, Delaware Law) to cause the consummation of the Merger and the transaction contemplated hereby.

2.4    Effect of Merger.  The Merger shall become effective at the time (the **"Effective Time"**) the Company and the Purchaser file the Certificate of Merger with the Secretary of State of the State of Nevada and as provided under Nevada Law and Delaware Law, or such later time as the Purchaser and the Company may agree upon and as may be set forth in the Certificate of Merger.  The Merger shall have the effects set forth in this Agreement, the Certificate of Merger and the applicable provisions of Nevada Law and Delaware Law.  Without limiting the foregoing, at the Effective Time all the property, rights, privileges, powers and franchises of the Company and the Purchaser shall vest in the Surviving Corporation, and all debts, liabilities and duties of the Company and the Purchaser shall become the debts, liabilities and duties of the Surviving Corporation.  The Surviving Corporation may, at any time after the Effective Time, take any action (including executing and delivering any document) in the name and on behalf of the Company or the Purchaser in order to carry out and effectuate the transactions contemplated hereby.

2.5    Certificate of Incorporation.  The Certificate of Incorporation of the Surviving Corporation shall be amended and restated at and as of the Effective Time to, provide that the name of the Surviving Corporation shall be Sutura, Inc.

2.6    Bylaws.  The Bylaws of the Surviving Corporation shall be amended and restated at and as of the Effective Time to read as did the Bylaws of the Company immediately prior to the Effective Time.

2.7    Directors and Officers.  The directors and officers of the Surviving Company shall be:

> Anthony A. Nobles – Chairman/ President/ CEO and a Director
> Egbert Ratering – Director
> John Crew, M.D. – Director
> Robert Hill – V.P. Operations
> Ben Brosch – V.P. R&D/ Engineering

### ARTICLE 3
### MERGER CONSIDERATION AND
### MANNER OF CONVERSION

3.1    Merger Consideration.  At the Effective Time, the shares of Company Stock issued and outstanding immediately prior to the Effective Time, other than any Company Dissenting Shares, shall by virtue of the Merger and without any action on the part of the

M 00269
M00269

Purchaser, the Company or any holder thereof, be canceled or terminated and shall be converted into and exchanged for the right to receive the Merger Consideration. No shares of Company Stock shall be deemed to be outstanding or have any rights other than those set forth in this Section 3.1 after the Effective Time. Pursuant to the Merger (i) the shareholders of Purchaser immediately prior to the Effective Time (on a fully diluted as converted basis, assuming conversion, exercise and/or exchange of all securities or other rights to acquire Purchaser Common Stock) shall hold in the aggregate ten percent (10%) of the Common Stock of the Surviving Corporation immediately following the Effective Time and (ii) the stockholders of the Company immediately prior to the Effective Time (on a fully diluted as converted basis, assuming conversion, exercise and/or exchange of all securities or other rights to acquire Company Stock ) shall hold in the aggregate ninety percent (90%) of the Common Stock of the Surviving Corporation immediately following the Effective Time.

3.2     Dissenters' Rights. Company Dissenting Shares will not be converted into the right to receive the Merger Consideration otherwise payable with respect to such shares at or after the Effective Time, but will be converted into the right to receive such consideration as may be determined to be due with respect to such Company Dissenting Shares pursuant to Delaware Law. Purchaser agrees that, except with the prior written consent of the Company, or as required under Delaware Law or Nevada Law, it will not voluntarily make any payment with respect to, or settle or offer or agree to settle, any such demand for appraisal.

3.3     Conversion of Rights.

(a)     At the Effective Time, each option or other right to purchase shares of Company Stock pursuant to stock options or stock appreciation rights granted by the Company and outstanding at the Effective Time, whether or not exercisable, and all other warrants or other rights to purchase shares of Company Stock (collectively "**Company Rights**") shall be converted into and become rights with respect to Purchaser Common Stock, and Purchaser shall assume each Company Right, in accordance with the terms of such stock option plan or such other agreement or arrangement pertaining to such Company Rights (as applicable), except that from and after the Effective Time, (i) Purchaser and its compensation committee shall be substituted for the Company Board of Directors or the committee of the Company Board of Directors administering the stock option plan, (ii) each Company Right assumed by Purchaser may be exercised only for shares of Purchaser Common Stock (or cash, in the case of stock appreciation rights), (iii) the number of shares of Purchaser Common Stock subject to Company Rights shall be equal to the number of shares of Company Stock subject to the Company Right immediately prior to the Effective Time multiplied by the Exchange Ratio and (iv) the per share exercise price under the Company Right shall be adjusted by dividing the per share exercise price under the Company Right by the Exchange Ratio and rounding up to the nearest cent. Notwithstanding the provisions of clause (iii) of the preceding sentence, Purchaser shall not be obligated to issue any fraction of a share of Purchaser Common Stock upon exercise of a Company Right, but in lieu thereof, Purchaser shall round-up fractional shares to the next highest whole number. The term, exercisability, vesting schedule, status as an "Incentive Stock Option" under Section 422 of the Code, if applicable, and all other terms and conditions of the options or warrants, to the extent permitted by law, and otherwise reasonably practical shall be unchanged. Each option, which is an Incentive Stock Option, shall be adjusted in accordance with the requirements of

M 00270
M00270

Section 424(a) of the Code so as not to constitute a modification, renewal or extension of the option within the meaning of Section 424(h) of the United States Internal Revenue Code.

(b)    The Company agrees to take all necessary steps to effectuate the foregoing provisions of this Section 3.3, including using its reasonable efforts to obtain from each holder of a Company Right any consent or agreement that may be deemed necessary or advisable in order to effectuate the transactions contemplated by this Section 3.3. Anything in this Agreement to the contrary notwithstanding, Purchaser shall have the right, in its sole discretion, not to deliver the consideration provided in this Section 3.3 to a former holder of a Company Right who has not delivered such consent or agreement.

3.4    Rights as Stockholders; Stock Transfers. At the Effective Time, holders of Company Stock shall cease to be, and shall have no rights as, stockholders of the Company, other than to receive any dividend or other distribution with respect to such Company Stock with a record date occurring prior to the Effective Time and the consideration provided for in this Article III. After the Effective Time there shall be no transfers on the stock transfer books of the Company of Company Stock outstanding prior to the Effective Time

3.5    Fractional Shares. Notwithstanding any other provision hereof, no fractional shares of Purchaser Common Stock and no certificates or scrip therefore, or other evidence of ownership therefore, will be issued as part of the Merger Consideration. Instead, Purchaser shall round-up fractional shares to the next whole number (after aggregating all Merger Consideration due such holder).

3.6    Payment for Shares.

(a)    Promptly after the Effective Time, the Purchaser shall mail to each Company Stockholder a form of letter of transmittal (which shall be in such form and contain such provisions as the Purchaser and the Company may reasonably agree and specify) and instructions for use in effecting the surrender of all the certificates or Company Rights that, immediately prior to the Effective Time, represented any of such shares of Company Stock or Company Rights in exchange for payment of the Merger Consideration therefore or Convertible Securities of Purchaser (as the case may be). At and after the Effective Time, as received, the Surviving Corporation shall promptly deliver to the persons entitled thereto the pro-rata Merger Consideration or Convertible Securities to which such person is entitled, delivered in person or by mail to the address specified in the applicable letter of transmittal.

(b)    Notwithstanding the foregoing, no party hereto shall be liable to any holder of certificates formerly representing shares of Company Stock for any amount paid to a public official pursuant to any applicable abandoned property, escheat or similar law. Unless otherwise provided for in this Agreement, the Purchaser shall pay all charges and expenses in connection with the exchange of public shares of Purchaser for shares of Company Stock.

M 00271
M00271

## ARTICLE 4
## REPRESENTATION AND
## WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Purchaser that, as of the date of this Agreement and as of the date of Closing:

4.1    Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as is now being conducted, and is duly qualified to do business and is in good standing in the State of California. **Schedule 4.1** lists (a) all Subsidiaries and correctly sets forth the capitalization of each Subsidiary and ownership interest of the Company or any other Person therein, and (b) the jurisdiction in which each Subsidiary is organized. Each of the Subsidiaries is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, except where the lack thereof would not have a Material Adverse Effect. The Company and each of its Subsidiaries has the necessary power to own its properties and assets and to carry on its business as now conducted and is duly qualified or licensed to do business in each foreign jurisdiction where it conducts business or has assets, except where failure to be so qualified, licensed or in good standing would not have a Material Adverse Effect. The Company has delivered to the Purchaser correct and complete copies of the charter and bylaws of each of its Subsidiaries and the names of the directors and officers of each of the Company and its Subsidiaries.

4.2    Authority. The Company has all requisite corporate power and authority to enter into this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Company. This Agreement has been duly executed and delivered by each of the Company and constitutes valid and binding obligations of the Company, enforceable against in accordance with its terms.

4.3    No Consents. No consents, approvals, orders, waivers or authorizations of, or registration, declaration or filing with, any third party or Governmental Body is required by or with respect to the Company or the Subsidiaries in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (a) such consents, approvals, orders, authorizations, registrations, declarations and filings as may be required under applicable state securities laws or the securities laws of the United States or of any foreign country; (b) those consents expressly listed in **Schedule 4.3**; (c) such filings, if any, required with the United States Federal Trade Commission (the **"FTC"**) and the Antitrust Division of the Department of Justice (the **"DOJ"**) pursuant to the HSR Act; and (d) those consents, approvals, orders, waivers, authorizations, registrations, declarations or filings which, if not obtained or made, would not have a Material Adverse Effect.

4.4    No Conflicts. Except as set forth in **Schedule 4.4**, the execution and delivery of this Agreement and the performance of its obligations hereunder (a) shall not be in violation or breach of, and shall not conflict with or constitute a default under, any of the terms of the Company's Certificate of Incorporation or Bylaws, of any contract, agreement or commitment

M 00272
M00272

binding upon the Company or its Subsidiaries or any of their respective assets or properties, except in each case as would not have a Material Adverse Effect, nor enable any third party to terminate any Company Material Agreement; and (b) shall not conflict with or violate, in any material respect, any applicable law, rule, regulation, judgment, order or decree of any Governmental Body having jurisdiction over the Subsidiaries or any of their assets or properties.

4.5    Capital Structure. The authorized capital stock of the Company consists of 15,000,000 shares of capital stock, of which 10,000,000 shares are Common Stock, $0.001 par value (the "**Company Common Stock**"), and 5,000,000 shares are Preferred Stock, $0.001 par value (the "**Company Preferred Stock**"), of which 352,160 shares are designated Series A Preferred Stock. As of July 9, 2004 there were 7,226,589 shares issued and outstanding, of which 6,874,429 shares were Company Common Stock, and 352,160 shares were Company Preferred Stock. All shares of Company Stock are or will be at Closing, duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive rights created by statute, the Company's charter documents or any agreement to which the Company is a party or by which it is bound.

4.6    Obligations With Respect to Capital Stock. **Schedule 4.6** sets forth a true and complete list as of the date hereof of all holders of outstanding Convertible Securities of the Company, the exercise price per share, the term of each such Convertible Security, whether such Convertible Security is a nonqualified stock option or incentive stock option and any restrictions on exercise or sale of such Convertible Securities or underlying shares. On the Closing Date, the Company shall deliver to Purchaser a complete and correct updated **Schedule 4.6** giving effect to any exercise of Convertible Securities on or prior to Closing. Except as set forth in **Schedule 4.6** there will be no outstanding: (a) securities convertible into or exchangeable for the capital stock of any class of the Company or its Subsidiaries; (b) options, warrants or other rights to subscribe for or purchase shares of Equity Securities of any class of the Company or its Subsidiaries; or (c) agreements of any kind relating to the issuance of any Equity Securities of any class of the Company or its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights to subscribe for or purchase shares of Equity Securities of the Company or its Subsidiaries. Except as set forth in **Schedule 4.6**, and as contemplated by this Agreement, to the Knowledge of the Company there are no voting trusts or other agreements or understandings with respect to the Company Stock or any stock of its Subsidiaries.

4.7    Subsidiaries. Except as described in **Schedule 4.7** the Company owns all of the Equity Securities of each of the Subsidiaries, beneficially and of record. **Schedule 4.7** lists all Equity Securities of Persons other than the Subsidiaries owned beneficially and of record by the Company. All such Equity Securities of the Subsidiaries and those listed on **Schedule 4.7** are owned free and clear of any Encumbrance and are fully paid, validly issued and nonassessable.

4.8    Financial Statements. The Company has delivered to the Purchaser true and complete copies of the Company Financial Statements. The audited portion of Company Financial Statements have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods covered thereby, and present fairly in all material respects the financial position, assets and liabilities of the Company and its Subsidiaries at the dates indicated and the results of its operations and changes in financial position for the periods indicated. The unaudited portion of Company Financial Statements present fairly in all material respects the

M 00273

results of operations of the Company and its Subsidiaries in accordance with GAAP, except as otherwise stated therein (or in any related notes) and except for the lack of footnotes and subject to normal audit adjustment.

4.9   No Undisclosed Liabilities. Except as set forth in **Schedule 4.9**, to the Company's Knowledge, the Company has no undisclosed liabilities or obligations (whether absolute, accrued, contingent or otherwise and whether due or to become due, including liabilities for taxes and interest and penalties thereon) of a material nature required by GAAP to be reflected on a consolidated balance sheet of the Company or described in the notes thereto that are not reflected in the Company Financial Statements, except for liabilities and obligations (a) incurred since December 31, 2003 in the Ordinary Course of Business; or (b) specifically disclosed in any Schedule to this Agreement.

4.10   Business Changes. Since December 31, 2003, except with respect to inter-company transactions or as otherwise contemplated by this Agreement or as set forth in **Schedule 4.10**, (a) each of the Company and its Subsidiaries has conducted its business in the Ordinary Course of Business; none of the Company and its Subsidiaries has issued, declared, set aside or paid any dividend or other distribution of cash or property on any of its respective Equity Securities nor has it, directly or indirectly, purchased, redeemed or otherwise acquired any shares of its respective Equity Securities or entered into any agreement or commitment to do any of the foregoing; (b) for each of the Company and its Subsidiaries there has not been any (i) general uniform increase in the compensation of the employees (including, without limitation, any increase pursuant to any bonus, pension, profit-sharing, deferred compensation or other plan or commitment), other than increases in the Ordinary Course of Business, (ii) increase in any such compensation payable to any individual officer, director, consultant or agent, other than increases in the Ordinary Course of Business, (iii) loans made to any officers, directors, shareholders, employees, consultants or agents; and (c) none of the Company and its Subsidiaries has incurred additional debt for borrowed money, nor has it incurred any obligation or liability (fixed, contingent or otherwise), nor made any acquisition of or contract for acquisition of any assets, nor paid any obligation or liability (except for current obligations or liabilities), in each case in excess of $4,000,000 or $7,000,000 in the aggregate, except in the Ordinary Course of Business;

4.11   Properties. **Schedule 4.11** lists all real property leased by the Company and its Subsidiaries. The Company and its Subsidiaries own no real property. Except as provided on **Schedule 4.11** hereto (i) the Company and its Subsidiaries have good and marketable title to all assets and properties listed on the Company Financial Statements or thereafter acquired, free and clear of any Encumbrances other than Permitted Liens, except where the lack of such good and marketable title would not have a Material Adverse Effect; and (ii) all of the material fixed assets and material properties listed in the Company Financial Statements or thereafter acquired are in satisfactory condition and repair in all material respects for the requirements of the business as presently conducted. All material agreements pursuant to which the Company and its Subsidiaries lease real or personal property are listed in **Schedule 4.11** hereto, are valid, effective and enforceable in accordance with their respective terms and there is not under any such leases any existing default or any event which, with notice or lapse of time or both, would have a Material Adverse Effect.

M 00274
M00274

4.12    Taxes. Each of the Company and its Subsidiaries has duly filed with the appropriate Governmental Body all tax returns and reports required to be filed, and has paid or accrued in full all Taxes due to, or claimed to be due by, any taxing authority. To the Knowledge of the Company, such tax filings where correct and complete when filed.

4.13    Compliance with Laws. To the Company's Knowledge, the business of each of the Company and its Subsidiaries has been conducted in compliance with all applicable laws, regulations, orders and other requirements of any Governmental Body, except where failure to comply will not have a Material Adverse Effect.

4.14    Litigation. Except as set forth in **Schedule 4.14,** and except for claims, disputes, actions, proceedings, suits or appeals that would not have a Material Adverse Effect, there is no claim, dispute, action, proceeding, suit or appeal, at law or in equity, pending against any of the Company and its Subsidiaries, or involving any of the Company and its Subsidiaries assets or properties, before any court, agency, authority, arbitration panel or other tribunal, and, to the Company's Knowledge, none have been threatened.

4.15    Contracts. **Schedule 4.15** lists each contract or agreement to which the Company is a party (and the Company has provided the Purchaser with a copy of each such written contract or agreement or a written description of each such verbal contract or agreement) that: (i) is a power of attorney or similar authorization granted by the Company and its Subsidiaries to third parties, or (ii) currently involves payments or receipts of more than $500,000 to vendors and $200,000 to customers on an annual basis that cannot be terminated by the Company without penalty on less than 61 days notice (collectively, the **"Company Material Agreements"**). The Company and its Subsidiaries are not in material default individually or in the aggregate (or would not be by the lapse of time and/or the giving of notice be in material default) in respect of any Company Material Agreement to which they are parties. To the Company's Knowledge, no party to any Company Material Agreement is in material default thereunder or has materially breached any terms or provisions thereof which are material to the conduct of any of the respective business. To the Company's Knowledge, none of the Material Agreements will be terminated as a result of the transaction contemplated hereby.

4.16    Intellectual Proprietary Rights. The Company and its Subsidiaries own or have the right to use all Intellectual Property necessary for the operation of their businesses as presently conducted. **Schedule 4.16** constitutes a full and complete list of all material Intellectual Property that the Company and its Subsidiaries own or license (to or from a third party) in connection with their operations (the **"Company Intellectual Property Assets"**), and specifies whether such Intellectual Property is owned or used under license and whether the Company and its Subsidiaries act as licensor or licensee. The Company and its Subsidiaries hold all right, title and interest in and to those Company Intellectual Property Assets which are specified as owned by them, except where the failure to hold all such right, title and interest would not have a Material Adverse Effect. All material license agreements and all other instruments relating to material licenses are in full force and effect and true and complete copies thereof have been provided to the Purchaser. None of the Company Intellectual Property Assets have been held or stipulated to be invalid in any litigation which has been concluded and the validity of the Company Intellectual Property Assets has not been questioned in any litigation that is currently pending or, to the Company's Knowledge, threatened, except where any such

M 00275
M00275

pending or threatened litigation would not have a Material Adverse Effect. To the Company's Knowledge, none of the Company and its Subsidiaries infringes on the Intellectual Property of any third party through its actions in the conduct of its business in any material respect.

4.17    Insurance. **Schedule 4.17** constitutes a full and complete list of all policies of insurance to which any of the Company and its Subsidiaries is a party or is a beneficiary or named insured. All of the insurance policies and bonds maintained by the Company and its Subsidiaries are in full force and effect, except where the failure of such policies or bonds to be in full force and effect would not have a Material Adverse Effect. None of the Company and its Subsidiaries has received any notice or other indication from any insurer or agent of any intent to cancel or not to renew any of such insurance policies, except where any such cancellation or failure to renew would not have a Material Adverse Effect.

4.18    Environmental Compliance. To the Company's Knowledge, each of the Company and its Subsidiaries has all permits, licenses and other authorizations, which are required under existing Environmental Laws and the failure of which would have a Material Adverse Effect. To the Company's Knowledge, each of the Company and its Subsidiaries is presently in compliance in all material respects with all Environmental Laws, and none has generated, manufactured, refined, transported, transferred, produced or processed any hazardous material or solid waste, except in compliance with all applicable Environmental Laws. There are no existing environmental conditions or circumstances with respect to any real property owned or leased by the Company and its Subsidiaries, whether or not discovered, which would be probable to result in a liability which would have a Material Adverse Effect, should any such conditions or circumstances become the basis for any claim which is asserted in the future by any aggrieved party (including, without limitation, any Governmental Body). There is no pending or, to the Company's Knowledge, threatened civil or criminal litigation, notice of violation or administrative proceeding to which any of the Company and its Subsidiaries is a party relating to Environmental Laws, except where any such litigation, violation or proceeding would not have a Material Adverse Effect.

4.19    Employment Matters. For any worldwide employee whose annual compensation exceeds $100,000 or foreign equivalent thereof, **Schedule 4.19** comprises a list of: (i) all employment contracts or agreements to which each of the Company and its Subsidiaries is a party or is subject as of the date of this Agreement, and (ii) the names, current salary rates, and accrued vacation and sick leave for all the employees of the Company and its Subsidiaries. None of the Company and its Subsidiaries has any shop union contracts or enterprise collective bargaining agreements; (i) none of the Company and its Subsidiaries is currently engaged in any labor negotiations or employment dispute or grievance except for minor grievances with individual employees and not with any employee organization or group; and (ii) to the Company's knowledge, none of the Company and its Subsidiaries is the subject of any union organizing. Except as set forth in **Schedule 4.19,** none of the Company and its Subsidiaries has sponsored, maintained or participated in, nor does it currently sponsor, maintain or participate in, any oral or written employee benefit plan (as such term is defined in Section 3(3) of Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), or any trust related to any such plan.

M 00276
M00276

4.20    Brokers or Finders. Except as set forth in **Schedule 4.20**, the Company has not incurred nor will incur, directly or indirectly, any liability for any brokerage or finders' fees or agent's commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby.

4.21    Books and Records. The minute books, stock record books and other records of the Company and its Subsidiaries, all of which have been made available to the Purchaser, are correct in all material respects. The minute books of the Company and its Subsidiaries are accurate in material respects records of all meetings and other corporate actions of their respective shareholders and board of directors and committees thereof.

4.22    Regulatory Compliance. (i) (A) With respect to each of the Company's products and, to the extent applicable, products under development (collectively, **"Company Products"**), (1) **Schedule 4.22** sets forth a list of all approvals, clearances, authorizations, licenses and registrations required by United States or foreign governments or government agencies obtained by the Company and its Subsidiaries to permit the manufacturing, distribution, sales, marketing or human research activities of the Company (the **"Company Activities to Date"**) with respect to each Product (collectively, **"Company Licenses"**); and (2) the Company and its Subsidiaries are in compliance in all material respects with all terms and conditions of each Company License and with all requirements pertaining to the Activities to Date with respect to each Product which is not required to be the subject of a Company License; (B) all manufacturing operations performed by or on behalf of the Company have been and are being conducted in all material respects in compliance with current good manufacturing practices, and quality system regulations issued by the United States Food and Drug Administration ("FDA") and, to the extent applicable, counterpart regulations in the European Union; (C) the Company and its Subsidiaries are in compliance in all material respects with all applicable reporting requirements for all licenses or plant registrations described in clause (A) above; except, in the case of the preceding clauses (A) through (C), for any such failures to obtain or noncompliance which, individually or in the aggregate, would not have a Material Adverse Effect. (ii) To the Company's Knowledge, no filing or submission to the FDA or any other Governmental Body with regard to the Products that is the basis for any approval or clearance contains any material omission or material false information.

### ARTICLE 5
### REPRESENTATION AND
### WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Company that, as of the date of this Agreement and as of the date of Closing:

5.1    Organization. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, with full corporate power and authority to conduct its business as is now being conducted, and is duly qualified to do business and is in good standing in the State of Nevada. **Schedule 5.1** lists (a) all Subsidiaries and correctly sets forth the capitalization of each Subsidiary and ownership interest of the Purchaser or any other Person therein, and (b) the jurisdiction in which each Subsidiary is organized. Each of the Subsidiaries is duly organized, validly existing and in good standing under the laws of its

W02-OC:3RJB1\41362102.5                     -10-

jurisdiction of incorporation or organization, except where the lack thereof would not have a Material Adverse Effect. The Purchaser and each of its Subsidiaries has the necessary power to own its properties and assets and to carry on its business as now conducted and is duly qualified or licensed to do business in each foreign jurisdiction where it conducts business or has assets, except where failure to be so qualified, licensed or in good standing would not have a Material Adverse Effect. The Purchaser has delivered to the Company correct and complete copies of the charter and bylaws of each of its Subsidiaries and the names of the directors and officers of each of the Purchaser and its Subsidiaries.

5.2     Authority. The Purchaser has all requisite corporate power and authority to enter into this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement has been duly executed and delivered by the Purchaser and constitutes valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms.

5.3     No Consents. No consents, approvals, orders, waivers or authorizations of, or registration, declaration or filing with, any third party or Governmental Body is required by or with respect to the Purchaser or the Subsidiaries in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for: (a) such consents, approvals, orders, authorizations, registrations, declarations and filings as may be required under applicable state securities laws or the securities laws of the United States or of any foreign country; (b) those consents expressly listed in **Schedule 5.3**; (c) such filings, if any, required with the FTC and DOJ pursuant to the HSR Act; and (d) those consents, approvals, orders, waivers, authorizations, registrations, declarations or filings which, if not obtained or made, would not have a Material Adverse Effect.

5.4     No Conflicts. Except as set forth in **Schedule 5.4** the execution and delivery of this Agreement and the performance of its obligations hereunder (a) shall not be in violation or breach of, and shall not conflict with or constitute a default under, any of the terms of the Purchaser's Certificate of Incorporation or Bylaws, of any contract, agreement or commitment binding upon the Purchaser or its Subsidiaries or any of their respective assets or properties, except in each case as would not have a Material Adverse Effect, nor enable any third party to terminate any Material Agreement; and (b) shall not conflict with or violate, in any material respect, any applicable law, rule, regulation, judgment, order or decree of any Governmental Body having jurisdiction over the Purchaser or its Subsidiaries or any of their assets or properties.

5.5     Capital Structure. The authorized capital stock of the Purchaser consists of 53,000,000 shares of capital stock, of which 50,000,000 shares are Common Stock, $0.05 par value (the **"Purchaser Common Stock"**), and 3,000,000 shares are Preferred Stock, $0.001 par value (the **"Purchaser Preferred Stock"**), of which as of July 9, 2004 there were 16,655,370 shares of Purchaser Common Stock issued and outstanding, and there were no shares of Purchaser Preferred Stock issued and outstanding. All of the shares of Purchaser Common Stock are or will be at Closing, duly authorized, validly issued, fully paid and non-assessable and not

M 00278
M00278

subject to preemptive rights created by statute, the Purchase's charter documents or any agreement to which the Purchaser is a party or by which it is bound.

5.6    Obligations With Respect to Capital Stock.  **Schedule 5.6** sets forth a true and complete list as of the date hereof of all holders of outstanding Convertible Securities of the Purchaser, the exercise price per share, the term of each such Convertible Security, whether such Convertible Security is a nonqualified stock option or incentive stock option and any restrictions on exercise or sale of such Convertible Securities or underlying shares.  On the Closing Date, the Purchaser shall deliver to Company a complete and correct updated **Schedule 5.6** giving effect to any exercise of Convertible Securities on or prior to Closing.  Except as set forth in **Schedule 5.6**, there are no outstanding: (a) securities convertible into or exchangeable for the capital stock of any class of the Purchaser or its Subsidiaries; (b) options, warrants or other rights to subscribe for or purchase shares of capital stock of any class of the Purchaser or its Subsidiaries; or (c) agreements of any kind relating to the issuance of any Equity Securities of any class of the Purchaser or its Subsidiaries, or any such convertible or exchangeable securities or any such options, warrants or rights to subscribe for or purchase shares of Equity Securities of the Purchaser or its Subsidiaries.  Except as set forth in **Schedule 5.6**, and as contemplated by this Agreement, to the Knowledge of the Purchaser there are no voting trusts or other agreements or understandings with respect to the Purchaser Common Stock or any stock of its Subsidiaries.

5.7    Subsidiaries.  Except as described in **Schedule 5.7**, the Purchaser owns all of the Equity Securities of each of the Subsidiaries, beneficially and of record.  **Schedule 5.7** lists all Equity Securities of Persons other than the Subsidiaries owned beneficially and of record by the Purchaser.  All such Equity Securities of the Subsidiaries and those listed on **Schedule 5.7** are owned free and clear of any encumbrance and are fully paid, validly issued and non-assessable.

5.8    Financial Statements.  The audited financial statements of Purchaser as filed pursuant to the Exchange Act have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods covered thereby, and present fairly in all material respects the financial position, assets and liabilities of the Purchaser at the dates indicated and the results of its operations and changes in financial position for the periods indicated. The unaudited quarterly financial statements of Purchaser as filed pursuant to the Exchange Act present fairly in all material respects the results of operations of the Purchaser except as otherwise stated therein (or in any related notes) and except for the lack of footnotes and subject to normal audit adjustment.

5.9    No Undisclosed Liabilities.  Except as set forth in **Schedule 5.9**, to the Purchaser's Knowledge, Purchaser has no undisclosed liabilities or obligations (whether absolute, accrued, contingent or otherwise and whether due or to become due, including liabilities for taxes and interest and penalties thereon) of a material nature required by GAAP to be reflected on a consolidated balance sheet of the Purchaser or described in the notes thereto that are not reflected in the Financial Statements, except for liabilities and obligations (a) incurred since December 31, 2003 in the Ordinary Course of Business; or (b) specifically disclosed in any Schedule to this Agreement.

5.10    Business Changes.  Since December 31, 2003, except with respect to inter-Purchaser transactions or as otherwise contemplated by this Agreement or as set forth in

M 00279
M00279

**Schedule 5.10,** (a) the Purchaser and its Subsidiaries has conducted its business in the Ordinary Course of Business; the Purchaser and its Subsidiaries have not issued, declared, set aside or paid any dividend or other distribution of cash or property on any of its respective Equity Securities nor has it, directly or indirectly, purchased, redeemed or otherwise acquired any shares of its respective, Equity Securities or entered into any agreement or commitment to do any of the foregoing (b) for the Purchaser and its Subsidiaries there has not been any (i) general uniform increase in the compensation of the employees (including, without limitation, any increase pursuant to any bonus, pension, profit-sharing, deferred compensation or other plan or commitment), other than increases in the Ordinary Course of Business, (ii) increase in any such compensation payable to any individual officer, director, consultant or agent, other than increases in the Ordinary Course of Business, (iii) loans made to any officers, directors, shareholders, employees, consultants or agents, and (c) the Purchaser and its Subsidiaries have not incurred additional debt for borrowed money, nor has it incurred any obligation or liability (fixed, contingent or otherwise), nor made any acquisition of or contract for acquisition of any assets, nor paid any obligation or liability (except for current obligations or liabilities), in each case in excess of $4,000,000 or $7,000,000 in the aggregate, except in the Ordinary Course of Business;

5.11    Properties. **Schedule 5.11** lists all real property leased by the Purchaser and its Subsidiaries, which is true in all material respects as of the date hereof. The Purchaser and its Subsidiaries own no real property except as provided on **Schedule 5.11** hereto: (i) the Purchaser and its Subsidiaries have good and marketable title to all assets and properties listed on the Financial Statements or thereafter acquired, free and clear of any Encumbrances other than Permitted Liens, except where the lack of such good and marketable title would not have a Material Adverse Effect; and (ii) all of the material fixed assets and material properties listed in the Financial Statements or thereafter acquired are in satisfactory condition and repair in all material respects for the requirements of the business as presently conducted. All material agreements pursuant to which the Purchaser and its Subsidiaries lease real or personal property are listed in **Schedule 5.11** hereto, are valid, effective and enforceable in accordance with their respective terms and there is not under any such leases any existing material default or any event which, with notice or lapse of time or both, would have a Material Adverse Effect.

5.12    Taxes. Except as set forth in **Schedule 5.12**, the Purchaser and each of its Subsidiaries has duly filed with the appropriate Governmental Body all tax returns and reports required to be filed, and has paid or accrued in full all Taxes due to, or claimed to be due by, any taxing authority. To the Knowledge of the Purchaser, such tax filings were correct and complete when filed.

5.13    Compliance with Laws. To the Purchaser's Knowledge, the business of the Purchaser and its Subsidiaries has been conducted in compliance with all applicable laws, regulations, orders and other requirements of any Governmental Body, except where failure to comply will not have a Material Adverse Effect.

5.14    Litigation. Except as set forth in **Schedule 5.14** and, except for claims, disputes, actions, proceedings, suits or appeals that would not have a Material Adverse Effect, there is no claim, dispute, action, proceeding, suit or appeal, at law or in equity, pending against the Purchaser and its Subsidiaries, or involving the Purchaser and its Subsidiaries assets or

M 00280
M00280

properties, before any court, agency, authority, arbitration panel or other tribunal, and, to the Purchaser's Knowledge, none have been threatened.

5.15    Contracts. **Schedule 5.15** lists each contract or agreement to which the Purchaser is a party (and the Purchaser has provided the Company with a copy of each such written contract or agreement or a written description of each such verbal contract or agreement), (i) is a power of attorney or similar authorization granted by the Purchaser and its Subsidiaries to third parties, or (ii) currently involves payments or receipts of more than $500,000 to vendors and $200,000 to customers on an annual basis that cannot be terminated by the Purchaser without penalty on less than 61 days notice (collectively, the **"Purchaser Material Agreements"**). The Purchaser and its Subsidiaries are not in material default individually or in the aggregate (or would not by the lapse of time and/or the giving of notice be in material default) in respect of any Purchaser Material Agreement to which they are parties. To the Purchaser's Knowledge, no party to any Purchaser Material Agreement is in material default thereunder or has materially breached any terms or provisions thereof which are material to the conduct of any of the respective business. To the Purchaser's Knowledge, none of the Purchaser Material Agreements will be terminated as a result of the transaction contemplated hereby.

5.16    Intellectual Proprietary Rights. The Purchaser and its Subsidiaries own or have the right to use all Intellectual Property necessary for the operation of their businesses as presently conducted. **Schedule 5.16** constitutes a full and complete list of all material Intellectual Property that the Purchaser and its Subsidiaries own or license (to or from a third party) in connection with their operations (the **"Purchaser Intellectual Property Assets"**), and specifies whether such Intellectual Property is owned or used under license and whether the Purchaser and its Subsidiaries act as licensor or licensee. The Purchaser and its Subsidiaries hold all right, title and interest in and to those Purchaser Intellectual Property Assets which are specified as owned by them, except where the failure to hold all such right, title and interest would not have a Material Adverse Effect. All material license agreements and all other instruments relating to material licenses are in full force and effect and true and complete copies thereof have been provided to the Company. None of the Purchaser Intellectual Property Assets have been held or stipulated to be invalid in any litigation which has been concluded and the validity of the Purchaser Intellectual Property Assets has not been questioned in any litigation that is currently pending or, to the Purchaser's Knowledge, threatened, except where any such pending or threatened litigation would not have a Material Adverse Effect. To the Purchaser's Knowledge, the Purchaser and its Subsidiaries do not infringe on the Intellectual Property of any third party through its actions in the conduct of its business in any material respect.

5.17    Insurance. **Schedule 5.17** constitutes a full and complete list of all policies of insurance to which the Purchaser and its Subsidiaries is a party or is a beneficiary or named insured. All of the insurance policies and bonds maintained by the Purchaser and its Subsidiaries are in full force and effect, except where the failure of such policies or bonds to be in full force and effect would not have a Material Adverse Effect. None of the Purchaser and its Subsidiaries has received any notice or other indication from any insurer or agent of any intent to cancel or not to renew any of such insurance policies, except where any such cancellation or failure to renew would not have a Material Adverse Effect.

M 00281
M00281

5.18    Environmental Compliance. To the Purchaser's Knowledge, the Purchaser and its Subsidiaries have all permits, licenses and other authorizations, which are required under existing Environmental Laws and the failure of which would have a Material Adverse Effect. To the Purchaser's Knowledge, the Purchaser and its Subsidiaries is presently in compliance in all material respects with all Environmental Laws, and has not generated, manufactured, refined, transported, transferred, produced or processed any hazardous material or solid waste, except in compliance with all applicable Environmental Laws. There are no existing environmental conditions or circumstances with respect to any real property owned or leased by the Purchaser and its Subsidiaries, whether or not discovered, which would be probable to result in a liability which would have a Material Adverse Effect, should any such conditions or circumstances become the basis for any claim which is asserted in the future by any aggrieved party (including, without limitation, any Governmental Body). There is no pending or, to the Purchaser's Knowledge, threatened civil or criminal litigation, notice of violation or administrative proceeding to which the Purchaser and its Subsidiaries is a party relating to Environmental Laws, except where any such litigation, violation or proceeding would not have a Material Adverse Effect.

5.19    Employment Matters. For any worldwide employee whose annual compensation exceeds $100,000 or foreign equivalent thereof, **Schedule 5.19** comprises a list of: (i) all employment contracts or agreements to which each of the Purchaser and its Subsidiaries is a party or is subject as of the date of this Agreement, and (ii) the names, current salary rates, and accrued vacation and sick leave for all the employees of the Purchaser and its Subsidiaries. (i) the Purchaser and its Subsidiaries does not have any shop union contracts or enterprise collective bargaining agreements; (ii) the Purchaser and its Subsidiaries are not currently engaged in any labor negotiations or employment dispute or grievance except for minor grievances with individual employees and not with any employee organization or group; and (iii) to the Purchaser's Knowledge, the Purchaser and its Subsidiaries is the subject of any union organizing. Except as set forth in **Schedule 5.19,** the Purchaser and its Subsidiaries has not sponsored, maintained or participated in, nor does it currently sponsor, maintain or participate in, any oral or written employee benefit plan (as such term is defined in Section 3(3) of ERISA), or any trust related to any such plan.

5.20    Brokers or Finders. Except as set forth in **Schedule 5.20**, the Purchaser has not incurred nor will incur, directly or indirectly, any liability for any brokerage or finders' fees or agent's commissions or any similar charges in connection with this Agreement or any transaction contemplated hereby.

5.21    Books and Records. The minute books, stock record books and other records of the Purchaser and its Subsidiaries, all of which have been made available to the Company, are correct in all material respects. The minute books of the Purchaser and its Subsidiaries are accurate in material respects records of all meetings and other corporate actions of their respective shareholders and board of directors and committees thereof.

5.22    Financial Reports and Regulatory Documents. Except as set forth on **Schedule 5.22,** Purchaser has timely filed all reports, registrations and statements, together with any amendments required to be made with respect thereto, that it was required to file since January 1, 2000, with the SEC, and all other material reports and statement required to be filed by it with

M 00282
M00282

any Governmental Body since January 1, 2000, including, without limitation, any report or statement required to be filed pursuant to the laws of the United States or the State of Nevada, and has paid all fees and assessments due and payable in connection therewith. As of their respective dates, such reports, registrations and statements complied in all material respects with all the laws, rules and regulations of the applicable Governmental Body with which they are filed. The Purchaser SEC Reports (i) at the time filed, complied in all material respects with the applicable requirements of the Securities Act and Exchange Act, as the case may be, (ii) did not at the time they were filed (or if amended or superseded b a filing prior to the date of this Agreement, then on the date of such filing prior to the date of this Agreement, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Purchaser SEC Reports or necessary in order to make the statements in such Purchaser SEC reports, in light of the circumstances under which they were made, not misleading. None of Purchaser's Subsidiaries is required to file any forms, reports or other documents with the SEC. Except as set forth in this Agreement or the Schedules or Exhibits attached hereto, or as disclosed in the Purchaser SEC Reports, there is no fact that the Purchaser has not disclosed to the Company in writing and of which any of its officers, directors or executive employees is aware and that has had or would reasonably be expected to have a Material Adverse Effect.

## ARTICLE 6
## CONDUCT PENDING THE CLOSING

During the period from the date of this Agreement and continuing until the Closing Date or the termination of this Agreement, the Parties hereto agree as follows:

(a)    Access to Information. The Parties shall afford to the each other and to each others attorneys, accountants, and other authorized representatives, access to, and upon request, copies of, all information available to the parties and their respective Subsidiaries with respect to the operations of the parties and their respective Subsidiaries including, all of the respective properties, books, contracts, commitments, records and personnel. Such investigation shall be conducted in such a manner so as not to interfere unreasonably with the operations of the Company and its Subsidiaries. Further, each party agrees that it will not, and will cause its representative not to, use any Confidential Information obtained pursuant to this Section 6.1(a) (as well as any other Confidential Information obtained prior to the date hereof in connection with the entering into of this Agreement) for any purpose unrelated to the consummation of the transactions contemplated by this Agreement. Subject to the Requirements of Law, each party will keep confidential, and will cause its representative to keep confidential, all Confidential Information and documents obtained pursuant to this Section 6.1(a) (as well as any other information obtained prior to the date hereof in connection with the entering into of this Agreement). In the event that this Agreement is terminated or the transaction contemplated by this Agreement shall otherwise fail to be consummated, each party shall promptly cause all copies of documents or extracts thereof containing Confidential Information and data as to the other party to be returned to the other party. No investigation by either party of the business and affairs of the other party shall affect or be deemed to modify or waive any representation, warranty, covenant or agreement in this Agreement, or the conditions to either party's obligation to consummate the transactions contemplated by this Agreement.

M 00283
M00283

(b)    Director and Stockholder Approval. Each of the Parties shall take all action necessary (i) to obtain the written consent of its directors or to convene a meeting of its directors to approve the Merger, this Agreement and the transactions contemplated hereby and thereby, (ii) to obtain the written consent of the holders of the Company Stock or Purchaser Common Stock (as applicable) or to convene a meeting of their respective stockholders as soon as reasonably practicable and (iii) to solicit the approval of their respective stockholders of the Merger, this Agreement and the transactions contemplated hereby and thereby. Each of the Parties shall ensure that its director and stockholder approval is solicited in compliance with the procedural requirements of Delaware Law or Nevada Law, the Certificate of Incorporation and the Bylaws of the Company or the Purchaser (as applicable), provided, however, that no director or officer shall be required to violate any fiduciary duty or other requirement imposed by law in connection therewith.

(c)    Update to Disclosure Schedules. Without limiting any party's right to rely on the respective representations or warranties of the other parties contained in Articles IV or V of this Agreement, each party shall provide the other parties with updates to their respective Disclosure Schedules provided or made available pursuant hereto as to material facts which arise or are first discovered between the date of this Agreement and the Closing Date and which, if they had occurred and been known prior to the date of this Agreement, would have been required to be disclosed in order to make such party's respective representations and warranties true and correct in all material respects as of the date of this Agreement. Each party shall take all reasonable action within their respective capability necessary to render accurate as of the Closing Date its respective representations and warranties contained in this Agreement and shall refrain from taking any action which would render inaccurate as of the Closing Date any such representations or warranties. Each party shall notify the other of any material adverse development causing a breach of any of its own representations and warranties. Each party shall notify the other of any action, suit or proceeding that shall be instituted or threatened against such party to restrain, prohibit, or otherwise challenge the legality of any transaction contemplated by this Agreement.

(d)    Communications. Neither of the Parties shall furnish any communication to the public if the subject matter thereof relates to the other parties or to the transactions contemplated by this Agreement without the prior approval of the other party as to the content thereof, which approval shall not be unreasonably withheld. Nothing contained herein shall prevent any party at any time from furnishing any information to any Governmental Body or from issuing any release where it reasonably believes it is legally required to do so.

(e)    Ordinary Course of Business. Each of the Parties shall use, and cause each of its Subsidiaries to use, best efforts to: (i) preserve the services of its present officers and employees, its net asset value and its business, including its relationship with its customers and suppliers; (ii) operate and carry on its business operations only in the Ordinary Course of Business and substantially as presently operated; (iii) not sell, dispose of or encumber or enter into any agreement for the sale of any of its material assets other than in the Ordinary Course of Business; (iv) not change the method by which bonuses or other payments are made to its officers, directors and employees and (v) not enter into any material contract, arrangement or agreement.

M 00284
M00284

(f)    Dividends; Changes in Stock. Except in completing the transactions contemplated by this Agreement, none of the Purchaser and/or its Subsidiaries shall or shall propose to: (i) declare or pay any dividends on or make any other distributions in respect of any of its capital stock; (ii) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock; or (iii) repurchase or otherwise acquire any shares of its capital stock.

(g)    Legal Conditions. Each party shall take all reasonable actions necessary to comply promptly with any legal requirements which may be imposed on the consummation of the transaction contemplated herein and shall promptly cooperate with and furnish information to the other party in connection with any such requirements imposed upon such other party in connection herewith. Each party shall take all reasonable actions to obtain (and to cooperate with the other party in obtaining) any consent, authorization, order or approval of, or any exemption by, any Governmental Body, or other third party, required to be obtained or made by such party (or by the other party) in connection with the taking of any action contemplated thereby or by this Agreement. Each of the parties shall file any Notification and Report Forms and related materials that it may be required to file with the FTC and the DOJ under the HSR Act and shall use its reasonable best efforts to obtain an early termination of the applicable waiting period and make any further filings pursuant thereto that may be necessary, proper or advisable.

(h)    Issuance of Securities. Neither the Company nor the Purchaser shall issue, deliver or sell, or authorize or propose or enter into any agreement for the issuance, delivery or sale of, or purchase or propose the purchase of, any Convertible Securities or Equity Securities, except (i) pursuant to the provision of Convertible Securities issued and outstanding as of the date hereof or (ii) pursuant to the agreements contemplated by Sections 7.3(e),(g) and (i).

(i)    Governing Documents. None of the Purchaser and/or its Subsidiaries shall amend its charter documents.

(j)    Salaries, Benefit Plans, Etc. None of the Purchaser and/or its Subsidiaries shall incur any salaries or other compensation payable to officers, directors, employees or consultants, and shall not hire any employees or consultants, nor adopt or amend in any material respect any collective bargaining agreement or benefit plan or any other agreement with employees.

(k)    Notice of Certain Defaults or Claims. The Purchaser shall give prompt notice to the Company of (i) any notice of default received by it under any material instrument or material agreement to which any of the Purchaser and/or its Subsidiaries is a party or by which it is bound; (ii) any transaction that is reasonably likely to have a Material Adverse Effect.

## ARTICLE 7
## CONDITIONS TO CLOSING

7.1    Conditions to Each Party's Obligations. The obligations of each party to effect the Merger are subject to the satisfaction on or prior to the Closing Date of the following conditions unless waived (to the extent such conditions can be waived) by all such parties affected thereby, as applicable:

M 00285
M00285

(a)     <u>Government Consents; Authorizations</u>.  All material consents, authorizations, orders or approvals of, and filings or registrations with or imposed by, any Governmental Body which are required for or in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby shall have been obtained or made, including, without limitation, expiration or early termination of the waiting period under the HSR Act.

(b)     <u>Legal Action</u>.  No temporary restraining order, preliminary injunction or permanent injunction or other order preventing the consummation of the transactions contemplated herein shall have been issued by any Government Body of competent jurisdiction and remain in effect.  Each party agrees to use its reasonable best efforts to have any such injunction or order lifted.

(c)     <u>Legislation</u>.  No Requirement of Law shall have been enacted and remain in effect which prohibits or makes illegal the consummation of this Agreement or any of the conditions to the consummation of this Agreement.

7.2     <u>Conditions to Obligations of the Purchaser</u>.  The obligations of the Purchaser to perform this Agreement at the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived by the Purchaser:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, and the Purchaser shall have received a certificate signed by an officer of the Company to such effect.

(b)     <u>Director and Stockholder Approval</u>.  The Company shall have obtained all requisite approval of its directors and stockholders for this Agreement, the Merger and the transactions contemplated hereby.

(c)     <u>Performance of Obligations by the Company</u>.  The Company shall have performed in all material respects all obligations required to be performed by it under this Agreement on or before the Closing Date, and the Purchaser shall have received a certificate signed by an officer of the Company to such effect.

7.3     <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to perform this Agreement at the Closing are subject to the satisfaction on or prior to the Closing Date of the following conditions, unless waived by the Company:

(a)     <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser and contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date, and the Company shall have received a certificate signed by an officer of the Purchaser to such effect.

M 00286
M00286

(b)    <u>Director and Stockholder Approval</u>. The Purchaser shall have obtained all requisite approval of its directors and shareholders for this Agreement, the Merger and the transactions contemplated hereby.

(c)    <u>Performance of Obligations of the Purchaser</u>. The Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or before the Closing Date, and the Company shall have received a certificate signed by an officer of the Purchaser to such effect.

(d)    <u>Governmental Filings; No Violations</u>. Purchaser shall have made all filings required of it pursuant to the Exchange Act, including the filing of a Form 8-K upon execution of this Agreement describing the transaction, subject to the Company's prior review and reasonable approval.

(e)    <u>Restructure of Convertible Notes.</u> Those certain Convertible Notes issued by the Company to Al Novak and Bruce Burrows shall be restructured in a manner satisfactory to the Company. Such restructure will include the right of the Surviving Corporation to pay all principal and accrued but unpaid interest due under each such Convertible Note without the holder converting such Convertible Note into the right to receive any Merger Consideration or Purchaser Stock or Company Stock.

(f)    <u>Signed Releases of Principals</u>. The execution of Mutual Release, Hold Harmless and Indemnification Agreements as of the day of the Closing and in form satisfactory to the Company by Al Novak, Bruce Burrows, Anthony Nobles, Egbert Ratering, Oasis and Go Industries releasing the Company and its officers, directors, agents, employees and attorneys from any and all claims.

(g)    <u>Conversion of Preferred</u>. The conversion of the Company's preferred stock held by Groot Kasteel to common stock of the Company as a one-for-one basis..

(h)    <u>Limit on Dissenters</u>. Not more than five percent (5%) of the outstanding shares of either Purchaser Stock or Company Stock shall have exercised dissenter rights in connection with the proposed Merger.

(i)    <u>Financing Transaction</u>. Purchaser shall have entered into definitive agreements contemplating the purchase and sale of at least $15.0 million of securities of the Purchaser, in form and substance satisfactory to the Company in its sole and absolute discretion.

(j)    <u>Limitation on Outstanding Obligations</u>. Except for trade payables incurred in the Ordinary Course of Business and not past due, the Purchaser shall have no more than $185,000 of outstanding debt or liabilities (including, without limitation, any and all outstanding amounts owed or payable to employees or independent contractors of Purchaser and amounts owed to Egbert Ratering and to Sutura, Inc. pursuant to Promissory Notes).

(k)    <u>Termination of Employment Agreements</u>. The employment agreements with each of Richard Ham and Carla Aufdenkamp shall be mutually terminated by the Company and each such employee without any further liability or obligation of the Surviving Company

M 00287
M00287

pursuant to such agreements, which terminations shall be in form and substance satisfactory to the Company in its sole and absolute discretion.

## ARTICLE 8
## TERMINATION

8.1    Termination. Notwithstanding any other provisions of this Agreement, this Agreement may be terminated, and the Merger may be abandoned as follows:

(a)    Mutual Consent. At any time prior to the Effective Time, by the mutual consent of Purchaser and Company, if the Board of Directors of each so determines by vote of a majority of the members of its entire Board.

(b)    Breach. At any time prior to the Effective Time, by Purchaser or Company if its Board of Directors so determines by vote of a majority of the members of its Board, in the event of either: (i) a breach by the other party of any representation or warranty contained herein (subject to the standard set forth herein), which breach cannot be or has not been cured within 10 days after the giving of written notice to the breaching party of such breach; or (ii) a breach by the other party of any of the covenants or agreements contained herein, which breach cannot be or has not been cured within 10 days after the giving of written notice to the breaching party of such breach.

(c)    Delay. At any time prior to the Effective Time, by either Purchaser or Company if its Board of Directors so determines by vote of a majority of the members of its entire Board, in the event that the Merger is not consummated by November 30, 2004, except not by such Party to the extent that the failure of the Merger then to be consummated arises out of or results from knowing action or inaction of such party to the detriment of the other Party, except as permitted hereunder.

(d)    No Approval. By Company or by the Shareholders of Purchaser, if its Board of Directors so determines by a vote of a majority of the members of its entire Board, in the event the approval of any Governmental Body required for consummation of the Merger and the other transactions contemplated by this Agreement shall have been denied by final nonappealable action of such Governmental Body or any Governmental Body issues a final nonappealable order blocking the Merger.

(e)    Failure to Recommend, Etc. At any time prior to approval of the Merger by the stockholders of the Company or by the shareholders of Purchaser, by either Company or Purchaser, if the Board of Directors of the other shall have, based on good faith exercise of their fiduciary duty, failed to recommend this Merger and the Transactions contemplated herein to its stockholder or shareholders (as applicable), withdrawn such recommendation or modified or changed such recommendation in a manner adverse in any respect to the interests of the other party for any reason other than as a result of a termination of the Agreement allowed pursuant to Sections 8.1 (a) – (d).

(f)    Acquisitions Proposal. This Agreement may be terminated by either Company or Purchaser by written notice to the other if Purchaser (i) received an Acquisition Proposal, (ii) receives the advice of its outside counsel that to proceed with the Merger will

M 00288
M00288

violate the fiduciary duties of its Board of Directors to its stockholders in light of such Acquisition Proposal, and (iii) after receiving such advice, determines to accept such proposal; provided, however, that neither party shall be entitled to terminate this Agreement pursuant to this Section 8.1(f) unless it shall have provided the Company with written notice of such a possible determination (which written notice will inform the other of the material terms and conditions of the proposal, including the identity of the proponent) not less than two business days prior to such determination.

(g)    Disclosure Schedules Amendment or Supplement.  At any time prior to the Effective Time by either Company or Purchaser, if its Board of Directors so determines by vote of a majority of the members of its entire Board that the other party has amended its Disclosure Schedules provided pursuant to Articles IV or V hereof (as applicable) and such amendment discloses events that would be reasonably likely to result in a Material Adverse Effect on the Surviving Company following the Closing.

8.2    Effect of Termination and Abandonment.  In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article VIII, no party to this Agreement shall have any liability or further obligation to any other party hereunder except that termination under Section 8.1(b) will not relieve a breaching party from liability for any breach of this Agreement giving rise to such termination; provided, however, in no event shall the breaching party pay to the non-breaching party for such a breach an amount greater than the actual out-of-pocket costs and expenses incurred by the non-breaching party in connection with this Agreement and the enforcement of its rights hereunder.

## ARTICLE 9
## GENERAL PROVISIONS

9.1    Survival of Representations and Warranties.  The representation and warranties of the Company and Purchaser set out herein shall survive the Closing.

9.2    Further Assurances.  From time to time, each party will execute such additional instruments and take such actions as may be reasonably required to carry out the intent and purposes of this agreement.

9.3    Waiver.  Any failure on the part of either party hereto to comply with any of its obligation, agreements, or conditions hereunder may be waived in writing by the party to whom such compliance is owed.

9.4    Brokers.  Each party agrees to indemnify and hold harmless the other party against any fee, loss, or expense arising out of claims by brokers or finders employed or alleged to have been employed by the indemnifying party.

9.5    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been given if delivered in person or sent by prepaid first-class certified mail, return receipt requested or recognized commercial courier service as follows:

If to the Company:

M 00289
M00289

> Anthony A. Nobles
> Sutura, Inc
> 17080 Newhope Street
> Fountain Valley, CA 92708

If to the Purchaser:

> Richard L. Ham
> Millenium Holding Group, Inc,
> 12 Winding Road
> Henderson, Nevada 89052

9.6     Governing Law.  This agreement shall be governed by and construed and enforced in accordance with the laws of the State of Nevada

9.7     Assignment.  This agreement shall inure to the benefit of, and be binding upon, the parties hereto and their successors and assigns provided however, that any assignment by either party of its rights under this agreement without the written consent of the other party shall be void.

9.8     Counterparts.  This agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signatures sent by facsimile transmission shall be deemed to be evidence of the original execution thereof.

9.9     Closing Date.  The Closing shall take place upon the fulfillment by each party of all the conditions of Closing required herein, but not later than 15 days following execution of this agreement unless extended by mutual consent of the parties.

9.10     Review of the Agreement.  Each party acknowledges that it has had time to review this agreement and, as desired, consult with counsel.  In the interpretation of this agreement, no adverse presumption shall be made against any party on the basis that it has prepared, or participated in the preparation of, this agreement.

9.11     Schedules.  All schedules attached hereto, if any, shall be acknowledged by each party by signature or initials thereon and shall be dated.

9.12     Effective date.  The effective date of this agreement shall be upon its execution.

[Signatures on following page]

M 00290
M00290

**Signature Page to Agreement and Plan of Merger between Sutura, Inc. and  Millenium Holding Group, Inc.**


IN WITNESS WHEREOF, the parties have executed this agreement this ___ day of July 2004.

**Millenium Holding Group, Inc.**          **Sutura, Inc.**


By _____          By _____
    Richard L. Ham, President              Anthony A. Nobles, President

M 00291
M00291

## EXHIBIT A

## DEFINITIONS

"**Acquisition Proposal**" means any tender or exchange offer, proposal for a merger, consolidation or other business combination involving Purchaser or any proposal or offer to acquire in any manner a substantial equity interest in, or a substantial portion of the assets or deposits of, Purchaser, other than the transactions contemplated by this Agreement.

"**Agreement**" shall have the meaning set forth in the introductory paragraph.

"**Closing**" and "**Closing Date**" have the meanings set forth in Section 2.2 hereof.

"**Company**" shall have the meaning set forth in the introductory paragraph.

"**Company Activities to Date**" shall have the meaning set forth in Section 4.22

"**Company Common Stock**" shall have the meaning set forth in Section 4.5.

"**Company Dissenting Share**" means any share of Company Stock, which is owned by a stockholder who or which has exercised his, her or its appraisal rights under Delaware Law.

"**Company Financial Statements**" means: (i) the audited consolidated balance sheets of the Company at December 31, 1997, 1998, 1999 and 2000, and the related statements of income, cash flows and changes in shareholders' equity for the fiscal years then ended; and (ii) the unaudited consolidated balance sheets of the Company at December 31, 2001, 2002, 2003 and the related statements of income and cash flows for the periods then ended.

"**Company Intellectual Property Assets**" shall have the meaning set forth in Section 4.16.

"**Company Licenses**" shall have the meaning set forth in Section 4.22.

"**Company Material Agreement**" shall have the meaning set forth in Section 4.15.

"**Company Preferred Stock**" shall have the meaning set forth in Section 4.5.

"**Company Products**" shall have the meaning set forth in Section 4.22.

"**Company Rights**" shall have the meaning set forth in Section 3.3.

"**Company Stock**" means all of the issued and outstanding shares of Common Stock and Preferred Stock of the Company issued and outstanding immediately before Closing, including any New Stock.

"**Company Stockholder**" means any holder of shares of Company Stock.

"**Confidential Information**" means all information relating to the customers or markets of the party which originally disclosed such information ("**Disclosing Party**"), the composition,

M 00292
M00292

manufacture or development of the Disclosing Party's products, the corporate structure and organization of the Disclosing Party and other technical data, trade secrets or proprietary information, the Financial Statements and all earlier and subsequent financial statements, financial information, budgets, forecasts, marketing plans and strategies, business plans, business, assets or prospects of the Disclosing Party which such party protects against unrestricted disclosure to others and such other information as the Disclosing Party shall advise the other parties to this Agreement is considered by the Disclosing Party as confidential. Confidential Information shall not include information that: (i) was rightfully in the possession of the party which originally received such information from the Disclosing Party ("**Receiving Party**") or was rightfully known to the Receiving Party prior to receipt from the Disclosing Party and is not subject to a separate confidentiality obligation; (ii) is independently developed by the Receiving Party; (iii) is or becomes publicly known without the fault of the Receiving Party; (iv) is or becomes rightfully available to the Receiving Party without confidentiality restriction from a source other than the Disclosing Party; or (v) which a party is required to disclose pursuant to a directive of a Governmental Body; provided that in each of the foregoing exceptions the burden of proof that any information does not constitute Confidential Information shall be on the Receiving Party.

 "**Convertible Securities**" means options, warrants or other rights to acquire securities of the Company or Purchaser (as the context requires).

"**Delaware Law**" shall have the meaning set forth in the Recitals.

"**Disclosure Schedules**" shall mean the Schedules of the Company provided pursuant to Article IV or of the Purchaser provided pursuant to Article V (as the context requires).

"**DOJ**" shall have the meaning set forth in Section 4.3.

"**Effective Time**" shall have the meaning set forth in Section 2.4

"**Encumbrance**" means any lien, claim, charge, security interest, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title, covenant or other claim or interest in property.

"**Environmental Laws**" means any laws, rules, regulations, orders, treaties, statutes and codes of any Governmental Body presently in effect which prohibit, regulate or control or relate to emissions, discharges, releases or threatened releases of any pollutants, contaminants, chemicals or industrial, hazardous or toxic materials or wastes or the transportation, storage, transfer, use, manufacture, processing, distribution, treatment, disposal, handling or dealing with such materials or which relate to pollution or to protection of the environment.

"**Equity Securities**" shall mean any capital stock or other equity interest or any securities convertible into or exchangeable for capital stock or any other rights, warrants or options to acquire any of the foregoing securities.

"**ERISA**" shall have the meaning set forth in Section 4.19.

-2-

M 00293
M00293

"**Exchange Act**" shall mean the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, as amended.

"**Exchange Ratio**" shall have the meaning set forth in the definition of Merger Consideration.

"**FDA**" shall have the meaning set forth in Section 4.22.

"**FTC**" shall have the meaning set forth in Section 4.3.

"**GAAP**" means generally accepted accounting principles in the United States, consistently applied.

"**Governmental Body**" means any court or any governmental or regulatory authority of the United States of America or any other country, or any state, county, locality, district, or other political subdivision thereof, and includes without limitation any self-regulatory organizations such as stock exchanges or the National Association of Securities Dealers, which govern the issuance or trading in securities.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property**" means all proprietary rights and information, including, without limitation, all patents (including any registrations, continuations, continuations in part, renewals and applications for any of the foregoing); ideas, conceptions and inventions (whether or not patentable, reduced to practice or made the subject of a pending patent application), copyrights (whether or not registered), copyrighted or copyrightable works, trademarks, service marks, trade names, URLs and Internet domain names, databases, designs, slogans and general intangibles of like nature, together with all goodwill related to the foregoing, drawings, designs, mask works or registrations thereof, technology, trade secrets and other confidential information, know-how, proprietary processes, customer lists, inventions, methodologies and, with respect to all of the foregoing, related confidential documentation manufacturing and production processes and techniques, research and development information and other confidential technical information, as well as all rights in and to computer programs, data files and other software.

"**Knowledge**". Where any representation or warranty contained in this Agreement is expressly qualified by reference to Knowledge of or relating to the Company, such Knowledge shall mean the actual knowledge of the following officers and directors of the Company: Anthony Nobles and Egbert Ratering. Where any representation or warranty contained in this Agreement is expressly qualified by reference to Knowledge of or relating to the Purchaser, such Knowledge shall mean the actual knowledge of the following officers and directors of the Purchaser: Richard Ham and Carla Aufdenkamp.

"**Material Adverse Effect**" means a material adverse effect on the business, results of operations or financial condition of the Company and its Subsidiaries or the Purchaser (as the context requires), in each case taken as a whole, other than any effect relating to the economy or securities markets in general, or the industries in which the relevant Party operates.

"**Merger**" shall have the meaning set forth in the Recitals.

M 00294
M00294

"**Merger Consideration**" shall mean and be determined as follows:

Each share of Company Stock shall be converted into and exchanged for that number of shares of Purchaser Common Stock pursuant to the following ratio ("Exchange Ratio"):

$$A = (B/.10)/C$$

A – means the number of shares of Purchaser Common Stock to be exchanged for each share of Company Stock.

B – that number of issued and outstanding shares of Purchaser Common Stock determined immediately prior to the Closing, on a fully diluted as converted basis, assuming conversion, exercise and/or exchange of all securities or other rights to acquire Purchaser Common Stock.

C - means that number of issued and outstanding shares of Company Stock immediately prior to the Closing, on a fully diluted as converted basis, assuming conversion, exercise and/or exchange of all Convertible Securities or other rights to acquire Company Stock.

"**Nevada Law**" shall have the meaning set forth in the Recitals.

"**Ordinary Course of Business**" means the ordinary course of business consistent with past custom and practice.

"**Parties**" shall have the meaning set forth in the introductory paragraph.

"**Permitted Liens**" means: (i) liens for Taxes, assessments and governmental charges not yet due and payable; (ii) zoning laws and ordinances which do not in any material respect, individually or in the aggregate, impair the value or merchantability or use of the property as it is currently being used; (iii) rights reserved to any Governmental Body to regulate the affected property; (iv) purchase-money liens arising out of the purchase or sale of products or services made in the Ordinary Course of Business; and (v) any Encumbrances that arise in the Ordinary Course of Business.

"**Person**" means any individual, corporation (including any non-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, foundation, labor union, or other entity or Governmental Body.

"**Purchaser**" shall have the meaning set forth in the introductory paragraph.

"**Purchaser Common Stock**" shall have the meaning set forth in Section 5.5.

"**Purchaser Intellectual Property Assets**" shall have the meaning set forth in Section 5.16.

"**Purchaser Material Agreement**" shall have the meaning set forth in Section 5.15.

"**Purchaser Preferred Stock**" shall have the meaning set forth in Section 5.5.

M 00295
M00295

"**Purchaser SEC Reports**" shall mean all the form, reports, and documents required to be filed by Purchaser with the SEC since January 1, 2000.

"**Related Party**" means a Person controlling, controlled by or under common control with a party to this Agreement or any Purchaser, offspring, spouse, brother or sister of such person or his or her spouse (collectively "**Family Member**") and any Person controlling, controlled by or under common control of such Family Member.

"**Requirement of Law**" means any U.S. federal, state, local, municipal, foreign, international, multinational or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stock Option Plans**" means the Amended and Restated 1999 and 2001 Stock Option Plans of the Company and those of the Purchaser.

"**Subsidiaries**" means any Person in which the Company or the Purchaser (as the context requires) has a direct or indirect equity ownership interest of 50% or more.

"**Surviving Corporation**" shall have the meaning set forth in Section 2.1.

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or foreign tax, including net income, alternative or add-on minimum, gross income, gross receipts, property, sales, use, transfer, gains, license, excise, employment, payroll, withholding or minimum tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Governmental Body.

M 00296
M00296

## Schedule 4.1

## SUBSIDIARIES

1. **Sutura B.V. is a European Union jurisdiction company, wholly owned subsidiary of Sutura, Inc.**
2. **Sutura GmbH is a German wholly owned subsidiary of Sutura BV.**
3. **Sutura B.V. France is a French wholly owned subsidiary of Sutura B.V.**

**Schedule 4.22**

**REGULATORY**

**FDA CLEARANCES**

1. SuperStitch section 510K clearance for the 8F product for sale in the US.
2. SuperStitch section 510K clearance for the 6F product for sale in the US.
3. SuperStitch CE mark for the 8F product for sale in the European Union.
4. SuperStitch CE mark for the 6F product for sale in the European Union.

**<u>Schedule 4.3</u>**

**<u>NONE</u>**

**Schedule 4.4**

**NONE**

## Schedule 4.6

## CAPITALIZATION TABLE & RIGHTS TO RECEIVE SECURITIES

## CAPITALIZATION TABLE

Included herein as Exhibit 4.6 and referenced hereby is a complete Capitalization Table including all shareholders, option holders and warrant holders.

## OPTIONS

2,187,000 options have been issued as described in the 1999 and 2001 Sutura Stock Option Plans as listed in the Capitalization Table.

## WARRANTS

339,762 Warrants have been issued as listed in the Capitalization Table.

## CONVERTIBLE NOTES

The Company currently has the following notes convertible to equity.

The Company expects to repay the following notes and is in negotiations and or has a contract with the parties to not convert.

| | |
|---|---|
| Burrows/ Oasis | $2,000,000 |
| Novak | $1,000,000* |
| Ratering | $1,883,666 |
| Nobles | $ 982,314 |

*Note currently past due, the company is currently negotiating extension.

**<u>Schedule 4.7</u>**

**<u>NONE</u>**

M 00302
M00302

**<u>Schedule 4.9</u>**

**<u>NONE</u>**

M 00303
M00303

**Schedule 4.10**

**NONE**

M 00304
M00304

## Schedule 4.11

## LEASED PROPERTIES

1. **17080 Newhope St., Fountain Valley, California**

2. **Allee Hector Pintus, Lot. Les Nertieres, 06610 La Gaude, France**

M 00305
M00305

# Schedule 4.14

# LITIGATION

| NAME | DESCRIPTION | AMOUNT | STATUS |
|---|---|---|---|
| 1. Roschelle | Note Rescission | $200,000 | Pending |
| 2. PWC | Vendor Dispute | $ 29,000 | Settled. |
| 3.Employees | Labor Disputes | $500,000 in the aggregate | To be paid. |

## Schedule 4.15

## CONTRACTS

### Distribution Agreements

1.  Getz Bros. Co. LTD. Japan/ Asia
2.  Getz Australia
3.  Ab Medica SRL Italy
4.  Cormedica SA Spain
5.  M.H. Material Hospitalar Portugal
6.  Lecks Medical Ltd, Dublin , Ireland
7.  Medicor Medical Supplies, Vienna, Austria.

### Representation Agreements

Goldman Sachs (Financial Advisor and M&A Advisors) GS is not receiving any compensation for this transaction and has been engaged to represent Sutura in the future M&A transactions.

# Schedule 4.16

# INTELLECTUAL PROPERTY

# Patent Status

| Case Patent Number | Title of Invention Issue | Countr | Status | Applicatio | Filing |
|---|---|---|---|---|---|
| NRMED.001A 8/23/1996 | METHOD AND APPARATUS FOR SUTURING 5860990 | US 1/19/1999 | Issued | 08/702315 | |
| NRMED.001CP2 1/14/1999 | SUTURING DEVICE AND METHOD FOR 6117144 SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | US 9/12/2000 | Issued | 09/231177 | |
| NRMED.001HAU 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | AU | Pending | 29731/99 | |
| NRMED.001HCA 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | CA | Pending | 2323084 | |
| NRMED.001HCN 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | CN | Pending | 99803869.5 | |
| NRMED.001HEP | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | EP | Pending | 99301495.0 | 3/1/1999 |
| NRMED.001HHK 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | HK | Pending | 01107482.9 | |
| NRMED.001HJP2 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL OR OTHER BIOLOGICAL STRUCTURE | JP | Pending | 544795/99 | |
| NRMED.001HRAU 2/23/1999 | SUTURING DEVICE FOR SEALING AN OPENING IN A BLOOD VESSEL | AU | Pending | 2003212025 | |
| NRMED.001PPC 3/13/2001 | SUTURING DEVICE AND METHOD | WO | Pending | PCTUS01/08050 | |

M 00308
M00308

| | | | | | | |
|---|---|---|---|---|---|---|
| NRMED.007VEP<br>5/15/2000 | KNOT PUSHER | EP | Pending | 00930726.5 | |
| NRMED.007VJP<br>5/15/2000 | KNOT PUSHER | JP | Pending | 2000-617802 | |
| NRMED.009A<br>8/27/2001 | SUTURE CUTTER<br>6733509 | US<br>5/11/2004 | Issued | 09/940384 | |
| NRMED.009CI | SUTURE CUTTER | US | Pending | 10/842031 | 5/7/2004 |
| NRMED.009VPC<br>8/27/2001 | SUTURE CUTTER | WO | Pending | PCTUS01/26724 | |
| NRMED.016VPC<br>10/3/2001 | FLUID DELIVERY AND EXTRACTION<br>DEVICE (AMENDED PER PCT SR); | WO | Pending | PCTUS01/30966 | |
| NRMED.1CP2CI<br>12/23/1999 | SUTURING DEVICE AND METHOD FOR<br>6245079<br>SEALING AN OPENING IN A BLOOD VESSEL<br>OR OTHER BIOLOGICAL STRUCTURE | US<br>6/12/2001 | Issued | 09/471866 | |
| NRMED.1CP2CICI<br>1/30/2001 | SUTURING DEVICE AND METHOD FOR<br>6551331<br>SEALING AN OPENING IN A BLOOD VESSEL<br>OR OTHER BIOLOGICAL STRUCTURE | US<br>4/22/2003 | Issued | 09/773046 | |
| NRMED.1CP2CICIC<br>4/21/2003 | SUTURING DEVICE AND METHOD FOR<br>SEALING AN OPENING IN A BLOOD VESSEL<br>OR OTHER BIOLOGICAL STRUCTURE | US | Published | 10/420355 | |
| NRMED.1CP3CP1<br>6/14/2001 | SUTURING DEVICE AND METHOD<br>6562052 | US<br>5/13/2003 | Issued | 09/881550 | |
| NRMED.1CP3CP1CI<br>5/12/2003 | SUTURING DEVICE AND METHOD | US | Pending | 10/435928 | |

# Trademark Status Report

| Case Number | Trademark Name | Country | Status |
|---|---|---|---|
| NRMED.003T | SUPERSTITCH | US | REGISTERED |
| NRMED.004T | SUTURA | US | REGISTERED |

# Schedule 4.17

# INSURANCE

### Medical Insurance

Blue Cross of California
Advantage PPO Plan
Group #343071
April 1, 2004 – March 31, 2005

### Property Liability

Evanston Insurance Company
Policy # BF 041800013
September 4, 2003 – September 3, 2004

### Flood Insurance

National Flood Insurance
Policy # 04770006133001
March 25, 2004 – March 24, 2005

### Erisa Bond (401k)

Travelers Insurance Company
Policy # 6304845
August 24, 2001 – August 23, 2004

**Schedule 4.19**

**EMPLOYEE CONTRACTS AND PLANS**

| Employee | Title | Annual Salary |
|---|---|---|
| 1. Anthony Nobles | President/ CEO | $250,000 |
| 2. Egbert Ratering | Managing Director | €150,000 |

**ERISA or qualified plans**

Sutura, Inc. currently maintains an employee 401k Plan.

M 00311
M00311

**Schedule 4.20**


**BROKER AGREEMENTS**


**Catalina Capital Advisors has been engaged by Sutura and has received warrants for its work with regard to Sutura. There are no cash fees for this transaction.**

M 00312
M00312

**Schedule 5.1**
**SUBSIDIARY & JURISDICTION**

None

M 00313
M00313

**Schedule 5.3**
**CONSENTS**

None

M 00314
M00314

**Schedule 5.4
CONFLICTS**

None

M 00315
M00315

**Schedule 5.6**
**CAPITAL STOCK OBLIGATION**

Employee Options

      Richard Ham       435,875 shares as of July 15, 2004 @ $2.00/share
      Carla Aufdenkamp  151,883 shares as of July 15, 2004 @ $2.00/share

Stock for Accounts Payable

      KSR Advertising/Snapdragon Interactive     9,756 shares
      Gary Steven Findley & Associates        7,914 shares

M 00316
M00316

**Schedule 5.7**
**EQUITY SECURITIES OWNERSHIP OF SUBSIDIARIES**

None

M 00317
M00317

## Schedule 5.9
## LIABILITIES

| | |
|---|---:|
| Airborne Express | 358.81 |
| American | 952.00 |
| Automatic Data Processing (ADP) | 126.08 |
| Binary.Net | 713.91 |
| Business Wire | 1,510.00 |
| Chavez & Koch, CPA's, LTD. | |
| Chon, Eric | 2,760.00 |
| City of Henderson | 235.30 |
| Compushare, Inc. | 6,270.00 |
| Computershare Investor Services | 320.46 |
| Cox Communications | 121.76 |
| Dana F. Cole & Company | 1,373.48 |
| The Depository Trust Company | 85.00 |
| FedEx | 322.00 |
| Gemisys | 85.07 |
| Laich, Steve | |
| GLS Landscape | 450.00 |
| Hangers | 30.00 |
| Hobe & Lucas Certified Public Accountants, Inc. | 9,500.00 |
| Imperial Financial Printing | 160.00 |
| Interland | 17.95 |
| Internet Wire | 250.00 |
| Kinko's | 35.00 |
| Law Offices of Patrick C. Clary, Chartered | 5,170.30 |
| Lincoln Journal Star | 43.13 |
| Mail Boxes, Etc. | 180.00 |
| Market Advantages, Inc. | 3,000.00 |
| MCI Worldcom Conferencing | 381.28 |
| Milliman USA | 8,382.50 |
| National Association of Insurance Commissioners | 25.00 |
| Nevada Power Company | |
| Nextel | 1,246.64 |
| Philip A. Waldron | 716.87 |
| PR Newswire (without interest) | 7,012.90 |
| Pro Design, LLC | 523.80 |
| Republic Services of Southern Nevada | 36.17 |
| Ruder Finn | 1,441.50 |
| Runyon Architects and Associates, Inc. | 27,606.03 |
| Southwest Gas Corporation | 35.61 |
| Sprint | 981.63 |

### Schedule 5.9 (continued)
### LIABILITIES

| | |
|---|---:|
| Standard & Poor's | 1,950.00 |
| Terra West Property Management | 145.66 |
| United | 958.00 |
| Voice Stream/T*Mobile | 43.48 |

Notes:

| | |
|---|---:|
| Fawcett (Principal plus Interest to July 15, 2004) | 2,667.12 |
| Eliassen (Principal plus Interest to July 15, 2004) | 5,424.67 |
| Pouch (Principal plus Interest to July 15, 2004) | 5,493.16 |
| Mark Anderson/Camden Holdings, Inc. | 45,000.00 |
| Egbert Ratering | 45,000.00 |
| Sutura, Inc. | 10,000.00 |
| Carl Ranno | 168,000.00 |
| Richard Ham | 739,625.00 |
| Carla Aufdenkamp | 303,382.50 |

|  |  |
|---|---:|
| **Total** | **$1,410,149.77** |

**Schedule 5.10**

## BUSINESS CHANGES

| | |
|---|---|
| Egbert Ratering | Promissory Note as of June 16, 2004 for $25,000 |
| Sutura, Inc. | Promissory Note as of June 25, 2004 for $10,000 |
| Egbert Ratering | Promissory Note as of July 2, 2004 for $20,000 |

**Schedule 5.11**
**LEASED PROPERTIES**

None

M 00321
M00321

**Schedule 5.12**
**TAX RETURNS DUE**

Federal Income Tax Return for 1998
Federal Income Tax Return for 1999
Federal Income Tax Return for 2000
Federal Income Tax Return for 2001
Federal Income Tax Return for 2002
Federal Income Tax Return for 2003

There are no federal income taxes due for the above referenced years.

**Schedule 5.14**
**LITIGATION**

Shareholder Complaint to SEC (see attached)
Action Against Camden Holdings, Inc. (see attached)
Judgment by PR Newswire (see attached)

**Schedule 5.15**
**CONTRACTS**

Transfer Agent – Computershare (see attached)
Carl Ranno (see attached)
Chavez & Koch, CPA's Ltd. (see attached)

**Schedule 5.16**
**INTELLECTUAL PROPERTY**

None

M 00325
M00325

**Schedule 5.17**
**INSURANCE**

None

M 00326
M00326

## Schedule 5.19
## EMPLOYMENT CONTRACTS & PLANS

<u>Richard Ham</u>

Employment Agreement dated April 2, 2003 (see attached)

| | |
|---|---|
| Current Salary: | $330,000 for April 2004 to April 2005 |
| Accrued Wages | $700,000 as of July 15, 2004 |
| Accrued Deferred Compensation: | $39,625 as of July 15, 2004 |
| Accrued Stock Options: | 435,875 shares as of July 15, 2004 |
| Vacation: | 4 weeks for April 2003 to April 2004 |
| | 5 weeks for April 2004 to April 2005 |
| Personal Leave: | 12 days for April 2004 to April 2005 |

<u>Carla Aufdenkamp</u>

Employment Agreement dated April 2, 2003 (see attached)

| | |
|---|---|
| Current Salary: | $113,400 for April 2004 to April 2005 |
| Accrued Wages | $289,575 as of July 15, 2004 |
| Accrued Deferred Compensation: | $13,807.50 as of July 15, 2004 |
| Accrued Stock Options: | 151,883 shares as of July 15, 2004 |
| Vacation: | 4 weeks for April 2003 to April 2004 |
| | 5 weeks for April 2004 to April 2005 |
| Personal Leave: | 12 days for April 2004 to April 2005 |

<u>2003 Stock Compensation Plan</u>

**Schedule 5.20**
**BROKERAGE OR FINDER'S FEES**

None

M 00328
M00328

**Schedule 5.22**
**REGULATORY**

None

M 00329
M00329

# Exhibit C

# – ORIGINAL –

1  WILLIAM R. URGA, ESQ.
   Nevada Bar No. 1195
2  ALICIA R. ASHCRAFT, ESQ.
   Nevada Bar No. 6890
3  JOLLEY URGA WIRTH
   WOODBURY & STANDISH
4  3800 Howard Hughes Parkway. 16th Flr.
5  Las Vegas, Nevada 89109
   telephone (702) 699-7500
6  facsimile (702) 699-7555

7  MICHAEL P. CONNELLY, ESQ.
8  WILLIAM E. SNYDER, ESQ.
   Connelly Roberts & McGivney, LLC
9  One North Franklin Street, Suite 1200
   Chicago, Illinois 60606
10 telephone (312) 251-9600
   facsimile (312) 251-9601
11

12 *Attorneys for Plaintiff*

13

14             **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE DISTRICT OF NEVADA**
15

16 MILLENIUM HOLDING GROUP, INC.,    )
                                     )   Case No.  CV-S-05-0356-JCM-LRL
17            Plaintiff,             )
                                     )
18 vs.                              )
                                     )   **AMENDED COMPLAINT**
19                                   )
20 SUTURA, INC. f/k/a TECHNOLOGY    )
   VISIONS GROUP, INC., Sucessor-In- )
21 Interest to SUTURA, INC.; FUSION  )
   CAPITAL FUND II; and FUSION       )
22 CAPITAL PARTNERS, LLC,            )
                                     )
23            Defendants.            )
24 _____)

25        Plaintiff Millenium Holding Group, Inc. ("Millenium"), as and for its Amended

26 Complaint against Defendants Sutura, Inc., Fusion Capital Fund II, LLC, Fusion Capital

27 Partners, LLC, states as follows:

28

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89109
TELEPHONE (702) 699-7500

S:\WRU\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC          Page 1 of 18



EXHIBIT
*Ham 146*
3/22/06 KF

Dbt f !3;16. dw 11467. KDN. M6M!!!!Epdvn f ou57!!!!Gjrhe!230!6!3116!!!!!Qbhf !3!pg29

## Jurisdiction

1.      This case was originally filed in the District Court, Clark County, Nevada and removed to this Court on notice of removal filed on March 15, 2005 by Defendants Fusion Capital Fund II, LLC ("Fusion Fund") and Fusion Capital Partners, LLC ("Fusion Partners"), which Notice asserted this Court's jurisdiction pursuant to 28 U.S.C. §1441(b) and 28 U.S.C. §1332, by reason of the diversity of citizenship of the parties.

2.      The amendment of the complaint and addition of Sutura, Inc., formerly known as Technology Visions Group, Inc., and as successor in interest to Sutura, Inc., as a party, does not destroy diversity and there remains complete diversity between Plaintiff and all Defendants for purposes of 28 U.S.C. §1332.

## The Parties

3.      Plaintiff, Millenium Holding Group, Inc. ("Millenium"), is a Nevada corporation with its principal place of business in Henderson, Nevada.   Millenium is a publicly held company trading on the over-the-counter market.

4.      Defendant, Sutura, Inc. ("Sutura II"), was formerly known as Technology Visions Group, Inc. ("TVGR"), and is and was at all relevant times, a Delaware corporation, with its principal offices in California.   It is, and at all relevant times, was a public company trading on the OTC market.   For purpose of clarity for this complaint, Sutura II will be referred to by its pre-merger designation name, "TVGR", unless otherwise specifically indicated.

5.      Sutura, Inc. ("Sutura") was a privately held Delaware corporation with its principal offices in Fountain Valley, California.   It will be referred to in this amended complaint as "Sutura."

6.      On August 19, 2005, a statutory merger was concluded between TVGR and Sutura whereby all stock of Sutura was cancelled and returned for shares of TVGR, Inc.; the

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS NEVADA 89109
TELEPHONE (702) 699-7500

S:\WRU\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 2 of 13

Dbt f !3;16.dw 11467.KDN .MSM!!!!Epdvn f ou57!!!!!Gjrhe!230I6@116!!!!!Cbhf !4!pg29

1  separate corporate existence of Sutura ceased, and the certificate of incorporation of TVGR was

2  amended to change TVGR's corporate name to Sutura, Inc., hereinafter referred to as Sutura II.

3       7.      Defendants Fusion Capital Partners LLC and Fusion Capital Fund II, LLC,

4  collectively referred to herein as "Fusion," are Illinois limited liability companies with their

5  principal place of business in Chicago, Illinois.

6                           **Allegations Common to All Counts**

7

8       8.      On or about May 2004, Anthony Nobles, then chief executive officer of Sutura,

9  telephoned Richard Ham, president of Millenium, in Henderson, Nevada. Mr. Nobles advised

10 Mr. Ham that Sutura was a company with a proven product in the medical devices market, was

11 successfully selling in Europe, and needed access, through a public company, to the US capital

12 market in order to secure funds to develop a market for its product in the United States.

13      9.      Since Millenium was a public corporation, the shares of which were publicly

14 traded as over-the-counter securities, a merger between Millenium and Sutura would provide

15

16 Sutura with access to the capital markets which it needed.

17      10.     The structure of any contemplated merger between Millenium and Sutura required

18 a substantial increase in the capital of Millenium in order to give the merged company sufficient

19 capital base to create market interest for its shares.

20      11.     Mr. Ham, in late May of 2004, contacted Fusion, and inquired as to whether

21

22 Fusion would have any interest in providing funding for the contemplated Sutura/Millenium

23 merger. Mr. Jonathan Cope of Fusion advised Mr. Ham that Fusion would be interested if

24 Millenium was going to be involved, since Fusion and Millenium had previously discussed

25 financing of other possible ventures.

26      12.     After speaking with Fusion, Mr. Ham contacted Mr. Nobles of Sutura, advised

27 him of Fusion's interest and secured Mr. Nobles' agreement for Mr. Ham to initiate a telephone

28

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
#### HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
#### WELLS FARGO TOWER
LAS VEGAS, NEVADA #####
TO PHONE ####-####

S:\WRU\Millenium 8351\02000 Sutura\Pleadings\Amend Comp 050920.DOC

Page 3 of 13

conference between Millenium, Sutura and Fusion on May 27, 2004.  Premised upon that telephone conference, in which information was exchanged, Sutura sent a due diligence package to Fusion but did not send one, at that time, to Millenium.

13.   On June 1, 2004, Mr. Ham initiated another telephone conference from Nevada, joining Mr. Nobles from Sutura and Messrs. Brown and Cope from Fusion on the call. During all discussions concerning possible funding by Fusion of the Millenium/Sutura merger, it was clearly articulated that the funding agreement would be between Millenium and Fusion.

14.   On or about June 7, 2004, a term sheet was sent by Fusion to Millenium in Nevada and was executed by Mr. Ham for Millenium and returned to Fusion.  The term sheet outlined the terms under which Fusion, the investor, would invest $15 million to $20 million into Millenium, in return for Millenium shares.

15.   On or about July 9, 2004, after negotiations between Sutura and Millenium, the final draft of the Millenium/Sutura merger agreement was executed by Sutura and Millenium. The Agreement provides it is to be governed, construed and enforced according to the laws of the state of Nevada.

16.   Pursuant to the Agreement, the merger, when consummated, would result in the acquisition by Millenium, a public company, of Sutura, a private company, and the cancellation of Sutura's stock in return for shares in Millenium.  The separate corporate existence of Sutura would cease, and the purchaser, Millenium, would continue as the surviving corporation.  The Certificate of Incorporation of Millenium would be amended so that Millenium's corporate name would be changed to Sutura, Inc.  The by-laws of the surviving corporation, Millenium, now the new Sutura, would be amended and restated to read as the by-laws of Sutura prior to the effective date of the merger.  Those persons who were directors and officers of Sutura would become the directors and officers of the new Sutura, formerly Millenium.  The net result of the merger was

JOLLEY URCA WIKTII
WOODSBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUCHES PARKWAY
SEVENTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89169
TP JTWON1 (702) 473-7500

Dbl f !3;16.dw11467.KDN .MSM!!!!Epdvn f ou57!!!!!Grhe!230!60!116!!!!!Qbhf !6!pg29

1   that Sutura would become a public company, incorporated in Nevada, having essentially

2   inhabited the "shell" of Millenium.

3       17.   The Millenium/Sutura Agreement further provided that both Millenium and

4   Sutura would take all reasonable action to "promptly" comply with the legal and regulatory

5
6   requirements necessary to the consummation of the transactions and each would provide

7   information necessary for the other party to comply with such requirements imposed by any

8   governmental or regulatory body.

9       18.   As a condition to the obligation of Sutura to consummate the merger, it was the

10  obligation of Millenium to have entered into a definitive funding agreement contemplating the

11  purchase by a third-party of at least $15 million of securities of Millenium.    The

12  Millenium/Fusion agreement was to fulfill this condition.

13
14      19.   On July 20, 2004, Mr. Ham, in Nevada, executed the Common Stock Purchase

15  Agreement with Fusion, by which agreement Fusion agreed to purchase and Millenium agreed to

16  sell $15 million worth of Millenium's common stock, with the right for Fusion to enter into a

17  second Common Stock Purchase Agreement for an additional $5 million of Millenium common

18  stock under certain enumerated circumstances.

19      20.   The Millenium/Sutura agreement, by its terms, provided that it could be

20  terminated by either party if the merger was not consummated by November 30, 2004, but

21
22  specifically provided that no such right of termination existed if the failure to consummate the

23  merger arose out of or resulted from knowing action or inaction of the terminating party to the

24  detriment of the other party.

25      21.   Shortly after Millenium facilitated the introduction of Fusion and Sutura, and

26  unknown to Millenium, Fusion introduced Sutura to TVGR.  Fusion was, at that time, the third

27  largest shareholder of TVGR. Upon information and belief, the introduction of Sutura to TVGR

28

JOU.EY URGA WKTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
.300 HUNGARD 13..GHES PARKWAT
SIXTEEN 7H! FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 84!09
TE .EPHONT (709) 699.7500

S:\WRU\Millenium 835 IN02000 Sutura\Pleadings\Amd Comp 030920.DOC

Page 5 of 18

Dbt f l3;16.dw11467.KDN .MSMIIIIEpdvn f ou57IIIIIQrfhe!230608116IIIIIQbhf !7!pg29

1  by Fusion occurred sometime in August 2004. Despite the fact that Sutura had entered into a

2  valid and enforceable merger agreement with Millenium, Sutura commenced discussions about a

3  possible merger with TVGR as early as September 2004. Unknown to Millenium, TVGR

4  provided an actual draft merger proposal to Sutura on or about October 16, 2004.

5        22.    The merger discussions between TVGR and Sutura were facilitated by and

6
   participated in with Fusion which stood to gain substantially if a merger occurred between Sutura
7
   and TVGR as opposed to Sutura and Millenium.
8

9        23.    Notwithstanding its ongoing and surreptitious negotiations with TVGR, initiated

10 by and participated in with Fusion, Sutura, through Mr. Nobles, its chief executive officer,

11 advised Millenium that Sutura was continuing to work on implementation of the merger

12
   agreement with Millenium, and advised Millenium on August 30, 2004, that SEC Form 14C,
13
   necessary for the implementation of the Sutura/Millenium merger, had been completed by Sutura
14
   and would be returned to Millenium in order that the steps necessary for consummation of the
15
   merger could be completed.
16

17       24.    Despite that assurance and the despite repeated requests by Millenium, Sutura did

18 not return the SEC Form 14C, a document essential to the implementation of the merger

19 agreement.

20       25.    In September 2004, Sutura, with the assistance of Fusion, secured approximately
21
   $6.5 million of interim financing from an entity consisting of a number of British Virgin Islands
22
   limited partnerships and two individuals, collectively referred to herein as "White Box." As a
23
   part of this financing agreement facilitated for Sutura by Fusion, Sutura agreed to provide to the
24
   various White Box limited partnerships, warrants to purchase shares of Sutura's common stock
25
26 as consideration for the loan.

27

28

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89109
TI LEPHONE (702) 699-7500

S :\WP.U\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Dbt f !3;16.dw 11467.KDN.M5M!!!!Epdvn f ou57!!!!!Gjrhe!230\6\63116!!!!!Qbhf !8!pg29

26.     Sutura's agreement in providing these common stock warrants constituted a violation of the terms of its merger agreement with Millenium.  Millenium was not aware of Sutura's agreements with White Box until after they had been executed.

27.     Shortly after Sutura's loan agreements with White Box, and while Sutura was, unknown to Millenium, negotiating with TVGR for a merger, Mr. Steven Martin of Fusion contacted Mr. Ham, on October 4, 2004, and expressed "reservations" about proceeding with the financing agreement with Millenium.  Approximately one week later, on October 12, 2004, Mr. Martin called Mr. Ham and advised Mr. Ham that Fusion would work with Sutura to secure a merger partner, but would not work with Millenium.

28.     On that same date, October 12, 2004, Mr. Nobles of Sutura contacted Mr. Ham of Millenium and advised him that Sutura would "take the best deal" for Sutura and would work with Fusion to secure another merger partner if such a partner presented a better economic opportunity for Sutura.

29.     On November 10, 2004, and while the Millenium/Sutura agreement was still in full force and effect, Sutura, through its counsel, sent a copy of the proposed Sutura/TVGR merger agreement to Millenium's counsel and requested Millenium's counsel to match or counter the terms of the TVGR merger.  Under the terms of the TVGR merger, TVGR shareholders, on consummation of the merger with Sutura, would hold only 5% of the Sutura stock as opposed to the 10% which would have been held by Millenium shareholders had the merger with Sutura been consummated.

30.     By reason of the fact that Fusion was a large shareholder in TVGR, Fusion would be enriched to a significantly greater extent in the event of a merger between Sutura and TVGR as opposed to the merger between Millenium and Sutura being consummated.

JOLLEY URCA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
xxxx H HWARD HGCHES PARKWAY
SIXTEA TH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89109
TELEPHONE (702) 699 7500                    S:\WRU\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 030920.DOC                    Page 7 of 18

Dbtf l3;16.dw11467.KDN.MSMII!!Epdvn f ou57!!!!Gfrhel230l608116ll!!!Qbhf !9!pg29

31.    Having been advised by Fusion that Fusion would not proceed with the financing, Millenium secured another source of financing which would provide the $15 capital investment necessary under the Millenium/Sutura agreement. Millenium advised Sutura that it had secured the financing.

32.    Notwithstanding its obligations under the Millenium/Sutura agreement, on November 22, 2004, Sutura, through its counsel, advised Millenium that Sutura would not recommend proceeding with the Millenium merger to Sutura's shareholders. On November 22, 2004, Sutura, through its counsel, advised Millenium that it would not proceed with the merger with Millenium.

33.    Sutura and TVGR executed a merger agreement on November 22, 2004 and consummated their merger on August 19, 2005.

<u>Count I – Breach of Contract – Sutura II as Successor In Interest to Sutura</u>

34.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs 1-33 as though set forth herein verbatim.

35.    Pursuant to the terms of the Millenium/Sutura Agreement, Sutura had a contractual obligation and duty to perform its promises and undertakings contained in the Agreement, including but not limited to cooperating with Millenium in the preparation and completion of all forms, applications and consents necessary for the consummation of the contemplated transaction.

36.    In breach of its obligations and undertakings aforesaid, Sutura delayed and refused, despite repeated demands by Millenium, to provide necessary information and forms for securing approval of the Securities Exchange Commission and for the progress and implementation of the merger agreement.

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
WV 17 JWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89109
TELEPHONE (702) 699-7500

S.\WRUAMcRannon 8331\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 8 of 18

Dbt f l3;16.dw 11467.KDN.MSMl!!!lEpdvn f ou57l!!!lGrhe!230l6081l16l!!!lQbhf l: lpg29

37.    In breach of its contractual obligations and undertakings, Sutura entered into loan and financing transactions which provided warrants and rights to shares of Sutura stock, which were in violation of its undertakings, representations and warranties under the Millenium/Sutura agreement, and which created impediments to its implementation.

38.    In breach of its obligations and undertakings as aforesaid, Sutura refused to proceed with implementation and consummation of the merger with Millenium, and further negotiated and executed a merger agreement with TVGR, notwithstanding the fact that the Millenium/Sutura agreement was still in full force and effect and thereafter concluded a merger with TVGR.

39.    Millenium performed and stood ready to complete all of its obligations under the Millenium/Sutura Agreement.

40.    Premised upon valuation contained in the White Box transaction documents provided by Sutura, the market value of the merged company would be $250 million, of which Millenium would have a 10% equity interest had the merger been completed as provided by the Agreement.

41.    As a direct and proximate result of Defendant's conduct, Plaintiff has been damaged in an amount in excess of $75,000.00, plus interest, and any additional damages in an amount subject to proof at trial.

42.    By reason of the merger between TVGR and Sutura, the surviving company, Sutura II, acquired all assets of liabilities of Sutura, including all liability for damages caused to Millenium by reason of Sutura's breaches of its contracts and agreements with Millenium.

43.    Plaintiff has been required to retain the services of an attorney to prosecute this action and has been damaged thereby.   Plaintiff is therefore entitled to recover reasonable attorney's fees and costs of suit.

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
WED 18 WARD II.CHO FARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89101
TELEPHONE (702) 699-7500

S:\WRU\Millenium 8351\02000 Suture\Pleadings\Amd Comp 050920.DOC

Page 9 of 18

Dbt f !3;16.dw11467.KON .MSM!!!!Epdvn f ou57!!!!G!he!230!6!3116!!!!Qbhf !21!pg29

## Count II – Breach of Covenant of Good Faith and Fair Dealing – Sutura II as Successor in Interest to Sutura

44.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though set forth herein verbatim.

45.    The Agreement and Plan of Merger between Millenium and Sutura contained or gave rise to an implied promise of good faith and fair dealing between the parties to the contract, pursuant to which implied promise each party agreed not to do anything to destroy or injure the benefits of the contract and not to prevent or hinder performance by the other party.

46.    Having been introduced to TVGR by Fusion, and having determined on its own and having been informed by Fusion that a merger with TVGR would be more economically beneficial, Sutura undertook a course of conduct designed and intended to prevent, hinder and impede the Millenium/Sutura merger, and to deprive Millenium of the intended benefits of the Millenium/Sutura agreement.

47.    In breach of the implied promise and undertaking, Sutura delayed and refused to provide forms and information necessary to secure regulatory approval for the merger; entered into financing and loan agreements in violation of the terms of the Millenium/Sutura Agreement, which would impede and hinder its implementation; made public filings and statements designed and intended to impede consummation of the merger; publicized its merger discussions with TVGR while purporting to proceed with the Millenium/Sutura agreement; wrongfully refused to proceed with or cooperate in the implementation of the Millenium/Sutura Agreement; and executed a merger agreement with TVGR while the Millenium/Sutura Agreement was still in force and effect.

48.    As a direct result of Sutura's breach of its implied promise of good faith and fair dealing, the implementation and consummation of Millenium/Sutura Agreement was hindered,

JOLLEY URGA WIRTH WOODBURY & STANDISH ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY SIXTEENTH FLOOR WELLS FARGO TOWER LAS VEGAS, NEVADA 89109 TELEPHONE (702) 699-7500

S:\WRL\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 10 of 18

Dbl f !3;16.dw 11467.KDN.MSM!!!!Epdvn f ou57!!!!Gjrhe!230!603116!!!!Qbhf !22!pg29

1  delayed and frustrated, depriving Millenium of the intended benefits of the contract, the

2  Agreement and Plan of Merger.

3      49.    Premised upon valuation contained in the White Box transaction documents,

4  provided by Sutura, the market value of the merged company would exceed $250 million, of

5  which Millenium would have a 10% equity interest had the merger been completed as provided

6

7  by the Agreement.

8      50.    As a direct and proximate result of Defendants' conduct, Plaintiff has been

9  damaged in an amount in excess of $75,000.00, plus interest, and any additional damages in an

10  amount subject to proof at trial.

11      51.    By reason of the merger between TVGR and Sutura, the surviving company,

12  Sutura II, acquired all assets and liabilities of Sutura, including all liability for damages caused to

13  Millenium by reason of Sutura's breaches of its contracts and agreements with and tortious

14  conduct toward Millenium.

15

16      52.    Plaintiff has been required to retain the services of an attorney to prosecute this

17  action and has been damaged thereby.    Plaintiff is therefore entitled to recover reasonable

18  attorney's fees and costs of suit.

19  **Count III – Tortious Interference with Contract –**
**Fusion Capital Partners, LLC and Fusion Capital Fund II, LLC/Sutura II f/k/a**
20  **Technology Visions Group, Inc,**

21
22      53.    Plaintiff repeats and realleges each and every allegation contained in the

23  foregoing paragraphs as though set forth herein verbatim.

24      54.    The Fusion defendants, through the negotiations and stock purchase agreement

25  with Millenium, were aware of the existence of the Agreement and Plan of Merger between

26  Millenium and Sutura, as well as the various terms and conditions of that Agreement.

27

28

JOLLEY UNGA WIKTH
WOODBURY & STANDISI
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
MD LS FARGO TOWER
LAS VEGAS NEVADA 89109
TELEPHONE (702) 699-7500

S:\W:R:L\Millenium 8351\07000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 11 of 18

Dbt f l3;16.dw 11467.KDN.MSM!!!!Epdvn f ou57!!!!!Gjrhe!23016031 16!!!!!Cbhf l23!pg29

55.     TVGR, by reason of public filings and announcements, its financial and business relations with Fusion, its discussions with Sutura, an its own due diligence, was aware of the Agreement and Plan of Merger between Millenium and Sutura, as well as the various terms and conditions of that Agreement.

56.     After being introduced to Sutura by Millenium, Fusion undertook a course of conduct designed and intended to cause Sutura to breach its contract and agreement with Millenium in order to secure for Fusion greater financial rewards and profits by arranging a merger with TVGR, an entity in which Fusion held 6.3% of the common stock, making it TVGR's third largest shareholder.

57.     In furtherance of its efforts and intent to interfere with and frustrate the Millenium/Sutura Agreement, Fusion arranged an introduction and meeting between the principals of Sutura and TVGR, sometime in late August or early September 2004, in an effort to interest Sutura in a potential merger with TVGR.

58.     Fusion further undertook to wrongfully accuse Millenium of various breaches of undertakings of the Millenium/Sutura Agreement, wrongfully imparted these false allegations to Sutura, and used these false allegations as a pretext to withdraw from its undertaking to provide funding and financing to implement the Millenium/Sutura Agreement, and providing a pretext for Sutura and to justify its merger with TVGR.

59.     Each of Fusion and TVGR, despite their knowledge of the valid and existing Agreement and Plan of Merger between Millenium and Sutura, planned, worked toward, and concluded a merger agreement between TVGR and Sutura on November 22, 2004, and thereafter consummated the TVGR/Sutura merger on August 19, 2005, despite the repeated protests of Millenium.

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS NEVADA 89109
TELEPHONE (800) 699 7500

S:\WRU\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 12 of 18

Dbt f l3;16.dw 11467.KDN.NSMII!!Epdvn f oU57IIIIGjrhe!230l603116!!!!Cbhf !24!pg29

60.    Premised upon valuation analysis contained in the White Box transaction documents, provided by Sutura, the market value of the merged company would exceed $250 million, of which Millenium would have a 10% equity interest had the merger been completed as provided by the Agreement.

61.    As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of $75,000.00, plus interest, and any additional damages in an amount subject to proof at trial.

62.    By reason of the merger between TVGR and Sutura, the surviving company, Sutura II, acquired all assets and liabilities of Sutura, including all liability for damages caused to Millenium by reason of Sutura's breaches of its contracts and agreements with and tortious conduct toward Millenium, as well as TVGR's own wrongful conduct as alleged herein.

63.    Plaintiff has been required to retain the services of an attorney to prosecute this action and has been damaged thereby.  Plaintiff is therefore entitled to recover reasonable attorney's fees and costs of suit.

**Count IV – Conspiracy to Breach Implied Covenant of Good Faith and Fair Dealing – Sutura II f/k/a TVGR, Fusion Capital Fund II, LLC, and Fusion Capital Partners, LLC**

64.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as though set forth herein verbatim.

65.    On information and belief, at sometime in August or September 2004, Sutura, TVGR and Fusion entered into a combination and conspiracy designed and intended to deprive Millenium of its contractual rights and the intended benefits of the Millenium/Sutura Agreement, and to prevent and hinder Millenium from implementing and consummating its agreement with Sutura.

. . . .

JOLLEY URGA WHITT
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS NEVADA 89169
TELEPHONE (702) 699-7500

S:\WRU\Millenium E351\02000 Sutura\Pleadings\Amd Comp 050920.DOC          Page 13 of 18

Dbt f !3;16.dw 11467.KDN.M5M!!!!Epdvn f ou57!!!!Qrfhe!230!6l3116!!!!Qbhf !25!pg29

66.     Subsequent to the introduction of Sutura to Fusion by Millenium, Sutura began a course of communicating directly with Fusion, to the exclusion of Millenium, frequently neither including nor informing Millenium of these communications, and notwithstanding that the contemplated funding agreement was to be between Millenium and Fusion.

67.     In late July, or sometime in August 2004, after the execution of the Millenium/Sutura agreement, and the Millenium/Fusion Stock Purchase Agreement, a meeting between Mr. Nobles of Sutura, and Mr. Martin of Fusion, took place at Fusion offices in Chicago, Illinois. The purpose of this meeting, arranged by Mr. Martin, was part of an effort to secure interim or bridge financing for Sutura.

68.     On information and belief, at or about the same time period as the meeting between Fusion and Sutura in Chicago, Fusion introduced Sutura to TVGR, offering TVGR as a possible alternate merger candidate for Sutura, for potentially better terms and conditions resulting in greater financial rewards for both Sutura and Fusion.

69.     Subsequent to the White Box transaction and Fusion's introduction of Sutura to TVGR, a number of meetings, telephone calls and correspondence occurred between and among TVGR, Sutura and Fusion, all related to a possible merger agreement between TVGR and Sutura with the intent and purpose of frustrating and impeding the implementation and consummation of the Millenium/Sutura Agreement and effecting an ultimate merger between TVGR and Sutura.

70.     In furtherance of the common scheme and purpose, Sutura delayed and refused to provide information to Millenium necessary to complete various regulatory filings, and secure governmental regulatory approval for the Millenium/Sutura merger, while at the same time, and unknown to Millenium, actively conducting merger negotiations with TVGR and Fusion.

. . . .

JOLLEY URGA WIRTH
WOODBURY & STANDISH
A TTORNEYS AT LAW
30l E WARD MLLMS PARKWAY
SIXTEENTH FLOOR
W ELLS FARGO TOWER
LAS VEGAS NEVADA 89101
TELEPHONE (702) 699-7500

S:\WRUA\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 14 of 18

Dbt f l3;16.dw11467.KDN .MSM!!!!Epdvn f ou57!!!!Gjrhe!230l60l116!!!!Qbhf l26!pg29

71.     As a result of the delays and obfuscation by Sutura, the progress of the merger between Sutura and Millenium was delayed and impeded. In furtherance of the TVGR/Fusion/Sutura scheme and design, Fusion advised Millenium that, in view of the delays, Fusion was having "reservations" about providing the funding or financing for the Millenium/Sutura merger. Further, Fusion, through Mr. Martin, wrongfully, and without basis or justification, orally and in correspondence, accused Millenium and its principal, Mr. Ham, of various breaches of the agreement and offenses all designed to provide an artificial justification for not proceeding with the funding and financing. These expressions and reservations on the part of Mr. Martin were in early October 2004, and made with the full knowledge that the funding agreement with Fusion was a necessary prerequisite for the Millenium/Sutura merger.

72.     Mirroring the conduct of and in concert with Fusion, Mr. Nobles and Sutura, orally and in correspondence, repeated the allegations of wrongful conduct and breaches by Mr. Ham and Millenium, proffering them as pretexts for concerns about proceeding with the Millenium/Sutura Agreement.

73.     On October 12, 2004, Mr. Martin called Mr. Ham in Nevada and advised that Fusion intended to continue working with Sutura, but would not work with Millenium. On that same date, and in furtherance of their common plan, scheme and design, Mr. Nobles advised Mr. Ham, in a telephone call, that Mr. Nobles was aware of Fusion withdrawing from its commitment to do the financing and stated that Sutura would proceed with Fusion and secure the "best deal." As of that time, Fusion, TVGR and Sutura had been actively pursuing negotiations for a merger between TVGR and Sutura, in breach of the Millenium/Sutura Agreement.

74.     On or about November 10, 2004, Sutura, through its counsel, sent to Millenium's counsel, a copy of the TVGR merger proposal requesting comments from Millenium's counsel

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
WB HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS NEVADA 89109
TELEPHONE (702) 699-7500

S:\WR.U\Millenium 8351\02000 Sutura\Pleadings\Amd Comp 050920.DOC

Page 15 of 18

1   and requesting a counter-offer, notwithstanding the existence of the Millenium/Sutura

2   Agreement.

3       75.    Thereafter, Sutura's attorney advised Millenium that Sutura would not

4   recommend the Millenium merger to its shareholders, and on November 22, 2004, Sutura's

5   attorney advised that Sutura would not proceed with the Millenium merger, and in fact, executed

6   a merger agreement with TVGR and ultimately consummated that merger on August 19, 2005.

7

8       76.    The conspiracy and conduct of Sutura, Fusion and TVGR or during the period

9   from late August/early September 2004 up to and including Sutura's purported termination of the

10  Millenium/Sutura agreement, and thereafter in implementing the TVGR/Sutura merger

11  agreement was in derogation and in breach of Sutura's implied promise of good faith and fair

12  dealing, and was intended and designed to result in a breach of that implied promise and to

13  deprive Millenium of the intended benefit of its agreement, and to wrongfully enrich Sutura,

14  Fusion and TVGR and to garner for Sutura, Fusion and TVGR financial gain which they would

15
    not have had had the Millenium/Sutura Agreement been implemented as intended.
16

17      77.    Premised upon valuation analysis contained in the White Box transaction

18  documents provided by Sutura, the market value of the merged company would exceed $250

19  million of which Millenium would have had a 10% equity interest had the merger been

20  completed as provided by the Agreement.

21
        78.    As a direct and proximate result of Defendants' conduct, Plaintiff has been
22
    damaged in an amount in excess of $75,000.00, plus interest, and any additional damages in an
23
24  amount subject to proof at trial.

25      79.    By reason of the merger between TVGR and Sutura, the surviving company,

26  Sutura II, acquired all assets and liabilities of Sutura including all liability for damages caused to

27

28

JOLLEY URGA WIRTH
WOODBURY & STANDISH
A ATTORNEYS AT LAW
WIS MC WARD BILLARD PARKWAY
SIXTEENTH FLOOR
W ELLS FARGO TOWER
LAS VEGAS NEVADA 8909
TELEPHONE (702) 699-7500

Millenium by reason of Sutura's breaches of its contracts and agreements with and tortious conduct toward Millenium as well as its own wrongful conduct as alleged herein.

80.    Plaintiff has been required to retain the services of an attorney to prosecute this action and has been damaged thereby.  Plaintiff is therefore entitled to recover reasonable attorney's fees and costs of suit.

WHEREFORE, Plaintiff demands judgment against Sutura, Inc. (Sutura II) f/k/a Technology Vision Group, Inc., Fusion Fund II, LLC, and Fusion Capital Partners, LLC, and each of them, as follows:

1.    For damages in an amount in excess of $75,000.00, plus interest;

2.    For reasonable attorney's fees and costs of suit incurred herein; and

3.    For such other and further relief as the Court deems just and proper.

Dated: September 20, 2005.                    Respectfully submitted,

JOLLEY URGA WIRTH WOODBURY & STANDISH


By: _____
William R. Urga, Esq.
Nevada Bar No. 1195
Alicia R. Ashcraft, Esq.
Nevada Bar No. 6890
3800 Howard Hughes Pkwy., 16th Flr.
Las Vegas, Nevada 89109
(702) 699-7500

Michael P. Connelly, Esq.
William E. Snyder, Esq.
Connelly Roberts & McGivney LLC
One N. Franklin Street, Suite 1200
Chicago, Illinois 60606
(312) 251-9600

Attorneys for Plaintiff
Millenium Holding Group, Inc.

Dbtf!3;18.dw11467.KDN.MSM!!!!Epdvn f ou57!!!!Grhe!23016CB116!!!!Cbhf !29lpg29

## CERTIFICATE OF SERVICE BY MAIL

1

2      I, the undersigned, hereby certify that I am employed in the County of Clark, State of

3 Nevada, am over the age of 18 years and not a party to this action.  My business address is that

4 of Jolley Urga Wirth Woodbury & Standish, 3800 Howard Hughes Parkway, Suite 1600, Las

5 Vegas, Nevada 89109.

6      On ~~September~~ December 5th, 2005, I served the within **AMENDED COMPLAINT** on the

7

8 parties in said action or proceeding by placing a true copy thereof enclosed in a sealed envelope,

9 addressed as follows:

10 Paul R. Hejmanowski, Esq.          Patrick G. Byrne, Esq.
    G. Lance Coburn, Esq.             Snell & Wilmer, LLP
11
    Lionel Sawyer & Collins         3800 Howard Hughes Parkway, Suite 1000
12     1700 Bank of America Plaza      Las Vegas, Nevada 89109
    300 S. Fourth Street            Attorneys for Defendant Sutura, Inc.
13     Las Vegas, Nevada 89101
    Attorneys for Defendants
14          Fusion Capital Fund II, LLC and
         Fusion Capital Partners, LLC
15

16 and placing the envelope in the mail bin at the firm's office.

17      I am readily familiar with the firm's practice of collection and processing correspondence

18 for mailing.  Under that practice it is deposited with the U.S. Postal Service on the same day it is

19 placed in the mail bin, with postage thereon fully prepaid at Las Vegas, Nevada, in the ordinary

20 course of business.

21      I certify under penalty of perjury that the foregoing is true and correct, and that this

22

23 Certificate of Service by Mail was executed by me on ~~September~~ December 5th, 2005 at Las Vegas,

24 Nevada.

25

26                 _Sam R. Dhof_

27            An employee of JOLLEY URGA WIRTH
             WOODBURY & STANDISH

28

JOLLEY URGA WIRTH
WOODBURY & STANDISH
ATTORNEYS AT LAW
3800 HOWARD HUGHES PARKWAY
SIXTEENTH FLOOR
WELLS FARGO TOWER
LAS VEGAS, NEVADA 89109
TELEPHONE (702) 699-7500

S:\WR\UA\Millenium 8351\02000 Sutera\Pleadings\Amd Comp 050920.DOC          Page 18 of 18

# Exhibit D

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | | |
|---|---|---|
| Millenium Holding Group Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CV-S-05-0356-JCM-LRL |
| v. | ) | |
| | ) | |
| Sutura, Inc., et al. | ) | |
| | ) | |
| Defendants, | ) | **ORDER** |
| | ) | |
| | ) | |
| | ) | |
| Fusion Capital Fund II LLC, | ) | |
| | ) | |
| Counter-plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Millenium Holding Group Inc., | ) | |
| | ) | |
| Counter-defendant. | ) | |

This matter comes before the Court on Docket Nos. [136] **SEALED MOTION** for Summary Judgment On Plaintiff's Claims and Defendant Sutura, Inc.'s Renewed Motion for Summary Judgment on its Counterclaim, filed by Defendant Sutura, Inc. (individually and collectively with its predecessor Technology Visions Group, Inc. or TVGR "Sutura"), [137] **SEALED** MOTION in Limine to Bar Evidence of Damages filed by Defendants Fusion Capital Fund II and Fusion Capital Partners, LLC, (individually and collectively "Fusion"), and [138] **SEALED** MOTION for Summary Judgment As to Counts III and IV of Millenium's First Amended Complaint and Count 1 of Fusion's Counterclaim, filed by Fusion. Having fully considered the briefs filed by all parties and having heard argument on the motions, and for the

reasons set forth below, the Court grants Sutura's motion for summary judgment in part and denies it in part, grants Fusion's motion for summary judgment in part and denies it in part, and denies Fusion's motion in limine as moot.

Plaintiff's Amended Complaint seeks damages from defendants Fusion and Sutura arising from Sutura's termination of a Merger Agreement between Plaintiff and Sutura. The Amended Complaint alleges four claims for recovery. Count I alleges that Sutura breached the Merger Agreement. Count II alleges that Sutura breached the covenant of good faith and fair dealing implied in the Merger Agreement. Count III alleges that Fusion and TVGR tortiously interfered with the Merger Agreement.[1] Count IV alleges that Fusion, Sutura, and TVGR conspired to cause Fusion to breach the covenant of good faith and fair dealing implied in the Merger Agreement. Sutura and Fusion contend that they are entitled to summary judgment on each of these claims for several reasons. The Court finds two of the asserted grounds for summary judgment dispositive and therefore grants the defendants' motions as to Counts I-IV of the Amended Complaint, without ruling upon the other grounds asserted by Fusion and Sutura.

First, the Court finds that Counts I-IV of Plaintiff's Amended Complaint fail as to all defendants. The undisputed facts establish that (1) the Merger Agreement did not close because Plaintiff did not fulfill its obligation to obtain a definitive agreement for $15 million in post-merger financing, which was a condition precedent of the agreement; (2) after Fusion terminated its agreement with Plaintiff to provide such financing, Dutchess Financial Advisors offered to provide financing to Plaintiff; (3) Plaintiff did not pursue that financing; (4) Plaintiff was not ready willing and able to perform under the Merger Agreement; (5) no evidence exists on this record that Sutura or Fusion prevented Plaintiff from entering a financing agreement with

---

[1] In its Response to Sutura's Motion for Summary Judgment, Plaintiff stated that it did not intend to pursue its claim for tortious interference, Count III, against TVGR or Sutura.

2

148561.1

Dutchess Financial Advisors; and (6) Sutura was therefore not obligated to close the merger. Therefore, defendants Sutura and Fusion are entitled to summary judgment on all of Plaintiff's claims in the Amended Complaint.

Second, Count IV fails for the additional reason that Plaintiff cites to no evidence to maintain an actionable claim for civil conspiracy against Fusion and Sutura. *See e.g. In re Citric Acid Litigation,* 191 F.3d 1090, 1103 (9th Cir. 1999).

Sutura and Fusion also seek summary judgment on their counterclaims. Sutura's counterclaim alleges that Plaintiff has breached the terms of a promissory note between Plaintiff and one of Sutura's directors in the amount of $55,000. The Court finds that disputed issues of material fact must be resolved to decide Sutura's counterclaim and it therefore denies Sutura's motion for summary judgment on that claim.

Fusion's counterclaim seeks a declaratory judgment that it is entitled to recover its attorneys fees in this action from Plaintiff under section 11(p) of Common Stock Purchase Agreement. The Court concludes that there are disputed issues of fact regarding the meaning of section 11(p), and it therefore denies Fusion's Motion for Summary Judgment.
Accordingly,

IT IS ORDERED THAT judgment is entered in favor of Sutura on Counts I-IV of Plaintiff's Amended Complaint and Plaintiff's claims against Sutura are hereby dismissed with prejudice.

IT IS FURTHER ORDERED THAT judgment is entered in favor of Fusion on Counts III -IV of Plaintiff's Amended Complaint and Plaintiff's claims against Fusion are hereby dismissed with prejudice.

3

148561.1

IT IS FURTHER ORDERED THAT Sutura's motion for summary judgment on its

Counterclaim against Plaintiff is denied.

IT IS FURTHER ORDERED THAT Fusion's motion for summary judgment on its

Counterclaim against Plaintiff is denied.

IT IS FURTHER ORDERED THAT Fusion's motion in limine is denied as moot.

IT IS FURTHER ORDRERED THAT the parties shall submit a Pretrial Order in the

form specified by LR 16-4 regarding the remaining claims of Sutura and Fusion within 30 days

of the entry of this Order.


So Ordered this 2nd day of August, 2007.

_James C. Mahan_
United States District Judge

4