```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

Fusion Capital Fund II, LLC,            )
                                        )
        Plaintiff-Counter-Defendant,    )
                                        )
        v.                              )      07 C 4543
                                        )
Millenium Holding Group, Inc.,          )
Richard Ham and Carla Aufdenkamp,       )
                                        )
        Defendants-Counter-Plaintiffs.  )

## MEMORANDUM OPINION AND ORDER

Fusion Capital Fund II, LLC ("Fusion") has filed a three-count Amended Complaint ("Complaint") against Millenium Holding Group, Inc. ("Millenium"), Richard Ham ("Ham") and Carla Aufdenkamp ("Aufdenkamp"), labeling its contentions under the rubrics of "Alter Ego/Piercing the Corporate Veil" in Count I, "Indemnification" in Count II and "Attorneys' Fees and Costs" in Count III. Fusion seeks a declaration of its right to recover attorneys' fees and expenses it incurred both (1) while defending itself against a prior action brought by Millenium in the United States District Court for the District of Nevada ("Nevada Litigation") and (2) in prosecuting this action. It asserts that right under two provisions of a Stock Purchase Agreement ("Agreement," referred to by the litigants as "SPA") that it entered into with Millenium on July 20, 2004.

Fusion now moves for summary judgment against Millenium[1]

---

[1] Because relief against either or both of Ham and Aufdenkamp under Count I is necessarily contingent on Fusion's

under Fed. R. Civ. P. ("Rule") 56 on Counts II and III. With that motion now fully fleshed out and briefed by the parties,[2] it is ripe for decision.

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).

This case centers around the interpretation of contractual provisions. It is a "well-accepted principle that when contract

---

success against Millenium under Counts II and III, those individual defendants are not made targets of the current motion.

[2] This District Court's LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. Because this Court excused Millenium from filing such a statement, it relies heavily on Fusion's LR 56.1 statement (cited simply "¶--")to establish the background narrative of this case. Of course, to the extent that Millenium has expressed any disagreement about the facts in its responsive memorandum, that has been taken into account.

2

construction is at issue, the question whether contractual terms are ambiguous or not is a question of law for the court to decide" (Houben v. Telular Corp., 231 F.3d 1066, 1072 (7th Cir. 2000)). Relatedly Utility Audit, Inc. v. Horace Mann Serv. Corp., 383 F.3d 683, 687 (7th Cir. 2004) teaches:

> The interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment.

What follows is a summary of the facts, viewed of course in the light most favorable to nonmovant Millenium. As will be seen, they pose no material issues of fact--most importantly, they negate the existence of any ambiguity in the relevant contract between the litigants.

## Background

Sometime in May 2004 or thereabout, Millenium began merger discussions with Sutura, Inc. ("Sutura") (¶10). Sutura, a private company, sought to pursue a reverse merger with a public company such as Millenium to gain access to public markets (id.). As a result of their discussions, on July 9, 2004 Sutura and Millenium executed an agreement and plan of merger ("Merger Agreement") (id.). Under the Merger Agreement (1) Millenium would absorb Sutura, with Millenium owning 10% of the surviving company's common stock and Sutura owning the other 90%, (2) Sutura's obligation to close the merger deal was conditioned in part on Millenium's having entered into definitive agreements for

3

at least $15 million in post-Merger-Agreement financing and (3) either Millenium or Sutura could terminate their transaction if the merger was not consummated by November 30, 2004 (¶11).

In an effort to arrange for the post-Merger-Agreement financing required under the Merger Agreement, Millenium entered into its Agreement with Fusion on July 20, 2004 (¶12). Under the Agreement Fusion committed itself to purchase up to $15 million in Millenium stock, but it could terminate the Agreement (and of course that commitment) (1) if the Millenium-Sutura merger had not closed by October 31, 2004 or (2) if Fusion's stock purchases had not commenced because of Millenium's failure to satisfy certain specified conditions (id.).

As of October 31, 2004 (1) the Millenium-Sutura merger had not closed and (2) Fusion's stock purchases had not been required to commence (¶13). On November 1, 2004 Fusion therefore terminated the Agreement (id.), and on December 8, 2004 Sutura terminated the Merger Agreement because Millenium had not obtained financing from Fusion or any other party (¶14).

On September 20, 2005 Millenium filed an Amended Complaint ("Nevada Complaint") in the Nevada Litigation that it had brought in the federal district court there against Sutura and Fusion (¶15). In part the Nevada Complaint charged Fusion with (1) tortious interference with a contract and (2) conspiracy to breach an implied covenant of good faith and fair dealing in the

4

Merger Agreement (id.). Fusion's defense of course entailed the expenditure of attorneys' fees and other expenses (¶17). On August 2, 2007 the Nevada court granted summary judgment in favor of Fusion, dismissing with prejudice all counts brought by Millenium against Fusion in the Nevada Litigation (¶16).

Two sections of the Agreement provided that Millenium would indemnify Fusion for certain expenditures, including reasonable attorneys' fees and expenses, in circumstances defined there. Agreement §8(c) specified that Millenium would indemnify Fusion for expenses, including reasonable attorneys' fees and disbursements, incurred by Fusion:

> as a result of, or arising out of, or relating to . . . (c) any cause of action, suit or claim brought or made against such Indemnitee [Fusion] and arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents[3] or any other certificate, instrument or document contemplated hereby or thereby, other than with respect to Indemnified Liabilities which directly and primarily result from the gross negligence or willful misconduct of the Indemnitee.

And under Agreement §11(p) Millenium agreed:

> If . . . an attorney is retained to represent the Buyer [Fusion] in any other proceedings whatsoever in connection with this Agreement, then the Company [Millenium] shall pay to the Buyer, as incurred by the Buyer, all reasonable costs and expenses including attorneys' fees incurred in connection therewith, in addition to all other amounts due hereunder.

In moving for summary judgment on Count II, Fusion asserts

---

[3] Agreement §3(b) defined "Transaction Documents" and included the Agreement itself among them.

5

that it is entitled under Agreement §8(c) to recover the attorneys' fees and expenses incurred in the Nevada Litigation. As to Count III, Fusion seeks recovery under Agreement §11(p) for the fees and expenses incurred both in the Nevada Litigation and in this litigation.[4] According to Fusion, the plain language of both Agreement §§8(c) and 11(p) and the undisputed facts establish that Fusion is entitled to such recovery. This Court agrees.

## Count II

Agreement §8(c) requires Millenium to indemnify Fusion for any suit brought against Fusion "arising out of or resulting from the execution, delivery, performance or enforcement of the Transaction Documents." As stated in n. 3, Agreement §3(b) expressly includes the Agreement as one of the Transaction Documents.

Fusion Mem. 4 asserts that the Nevada Litigation constitutes a suit against Fusion "arising out of or resulting from" execution of the Agreement. In support of that argument Fusion quite naturally directs attention to Millenium's Nevada Complaint (id. at 5). Millenium Mem. 4 retorts that the Nevada Complaint

---

[4] Fusion had filed a counterclaim in the Nevada Litigation, seeking a declaration that it was entitled to recover attorneys' fees under Agreement §11(p). In its same August 2, 2007 order ("Nevada Order") the Nevada court denied Fusion's motion for summary judgment on that counterclaim, having "conclude[d] that there are disputed issues of fact regarding the meaning of section 11(p)." More on this subject later.

6

merely "mentioned" the Agreement, so that Agreement §8(c) does not apply. As Millenium would have it, the Nevada Litigation could have proceeded even if the Agreement had never existed because, it contends, the Nevada Litigation "ar[ose] out of" and "result[ed] from" the Merger Agreement alone--not the Agreement.

But a reading of the Nevada Complaint plainly discloses that Millenium's allegations implicate the Agreement far more substantially than Fusion's Memorandum has identified:

1. Nevada Complaint ¶¶11-14 and 18 allege that Fusion and Millenium entered into discussions and engaged in negotiations starting in May 2004 regarding a proposed Millenium-Fusion funding agreement (the eventual Agreement) to provide wherewithal for the contemplated Millenium-Sutura merger.

2. Nevada Complaint ¶19 alleges that Fusion and Millenium executed the resulting Agreement on July 20, 2004.

3. Nevada Complaint ¶66 alleges that Fusion began communicating directly with Sutura, to Millenium's exclusion, "notwithstanding that the contemplated funding agreement [the Agreement] was to be between Millenium and Fusion."

4. Nevada Complaint ¶¶20-21, 57, 68 and 73 allege that Fusion introduced Sutura to Technology Visions Group, Inc. ("TVGR")--a company in which Fusion was then purportedly the

7

third largest shareholder--and that Sutura and TVGR, with Fusion's assistance, commenced merger discussions.

5. Nevada Complaint ¶¶25-26 allege that with Fusion's assistance Sutura secured interim financing that assertedly violated the terms of the Merger Agreement it had with Millenium.

6. Nevada Complaint ¶¶27 and 71 allege that Fusion expressed reservations to Millenium about proceeding with the financing arrangement under the Agreement.

7. Nevada Complaint ¶¶27, 31 and 73 allege that Fusion advised Millenium that it would work with Sutura to secure a merger partner, but Fusion would not work with Millenium, causing Millenium to seek other sources of financing.

8. Nevada Complaint ¶¶30, 68 and 76 allege that Fusion stood to gain more financially from a Sutura-TVGR merger than it would have under the Agreement.

9. Nevada Complaint ¶54 alleges that through the Agreement and Fusion's negotiations with Millenium, Fusion was aware of the Sutura-Millenium Merger Agreement, its terms and its conditions.

10. Nevada Complaint ¶¶58 and 71 allege that Fusion made false allegations about Millenium to Sutura and used those allegations as a "pretext to withdraw from its undertaking to provide funding and financing [under the Agreement] to

implement" the Merger Agreement.

11. Nevada Complaint ¶71 alleges that Fusion accused Millenium of various breaches of the Agreement "with full knowledge that the funding agreement with Fusion was a necessary prerequisite for the Millenium/Sutura merger."

It borders on the absurd to characterize that pervasive set of references as having merely "mentioned" the Agreement. To the contrary, Fusion Reply Mem. 4 accurately states that "[t]he SPA [was] thoroughly woven into the fabric of the conspiracy imagined in the Nevada Complaint."

Indeed, Nevada Complaint ¶71 itself recognized that the Agreement "was a necessary prerequisite for the Millenium/Sutura merger." Although Millenium Mem. 4 now says that the Nevada Litigation "could have proceeded even if the SPA did not exist," the facts are not only that it did exist but also that many of Millenium's allegations against Fusion in the Nevada Litigation must be viewed as "arising out of" and as "resulting from the ... enforcement of" (that is, the attempted enforcement of) the Agreement, just as many of Millenium's allegations against Sutura in the Nevada Litigation fit the same language vis-a-vis the Merger Agreement. There is no arguable ambiguity in that respect, so that as a matter of law the Nevada Litigation constituted a "suit" against Fusion covered under Agreement

9

§8(c).[5]

With that potential route to escape from liability sealed off, Millenium attempts to invoke the portion of Agreement §8(c) that relieves it of any obligation to indemnify for liabilities that "directly and primarily result[ed] from the gross negligence or willful misconduct of the Indemnitee [Fusion]." Millenium contends that it is not subject to liability because, it argues, Fusion's attorney's fees and expenses in the Nevada Litigation were the direct and primary result of Fusion's own willful misconduct--that (1) the Nevada Litigation "'directly and primarily result[ed]' from Fusion's willful misconduct in

---

[5] Millenium Mem. 4-6 also advances the contention that the Merger Agreement, which Millenium claims was the sole basis for the Nevada Litigation, was not "contemplated" by the Agreement and thus was not covered under the provision of Agreement §8(c) that deals with documents "contemplated" by Transaction Documents, including the Agreement itself. That contention seems bizarre--it seems to rest on one sense of the word "contemplated," as connoting something that may occur in the future, while the Merger Agreement was dated as of July 9, 2004 (11 days before the Agreement was executed). But "to contemplate" also carries the meaning "to think about" (indeed, that may really be its most common usage), and there is no question that the Agreement was entered into with the Merger Agreement very much in mind (remember (1) that Fusion was entering into the transaction to acquire common stock in Millenium, a far more valuable right when those would be shares in a public company [see Agreement §4(d), contemplating the listing of the shares] and (2) that the Merger Agreement had just been entered into to convert Millenium into such a public company). It is unnecessary to dispatch Millenium's contention on that ground alone, however, for this opinion has just explained that the Nevada Litigation is encompassed within Agreement §8(c)'s purview under other (and independent) language in that section.

10

tortiously interfering with Millenium's Agreement and Plan of Merger with Sutura"[6] and (2) this case "'directly and primarily result[ed]' from Fusion's willful misconduct in anticipatorily breaching the SPA."[7]

But those arguments run head on into the express determination in the Nevada Litigation itself that the sole reason the Millenium-Sutura Merger Agreement did not close was Millenium's own failure to obtain financing--not Fusion's interference through its termination of the Agreement. And given that determination, Millenium is precluded from taking a second bite at the same apple.

To begin with, although the parties' memoranda focus their attention on the narrower bar of issue preclusion, there is more than a substantial predicate for foreclosing Millenium's invocation of the "willful misconduct" exception on claim preclusion principles. There is no question that Millenium could have sued Fusion in the Nevada Litigation--and if successful,

---

[6] Note that, as explained earlier, such alleged tortious interference was one of the two major grounds asserted against Fusion in the Nevada Litigation. That very assertion hoists Millenium by its own petard in its effort to extricate itself from the toils of Agreement §8(c) via that section's "willful misconduct" exception. More on that subject next.

[7] Alternatively Millenium argues that, at minimum, a genuine issue of material fact exists as to whether Fusion engaged in such liability-barring misconduct. That however is really immaterial, for what controls is whether that subject was (or perhaps could have been) within the scope of the Nevada Litigation.

11

recovered--on the basis of Fusion's asserted "willful misconduct." Indeed, Millenium can scarcely quarrel with the reality that it <u>did</u> charge Fusion with "willful misconduct" in that earlier lawsuit--just look, for example, at the conduct that Millenium ascribed to Fusion as set out in paragraphs 4, 5, 7, 10 and 11 of the numerical laundry list particularized earlier in this opinion.

It is of course black letter law that a litigant embroiled in a dispute with an adversary for the second time cannot attempt to do so on grounds that it either did advance or could have advanced in the earlier lawsuit that it lost--that is the essence of claim preclusion (see, e.g., <u>Maher v. FDIC</u>, 441 F.3d 522, 526 (7th Cir. 2006)). In this instance Millenium could surely have mulcted Fusion in damages if it had been successful in proving, in the Nevada Litigation, what Millenium itself now characterizes as "willful misconduct." It tried to do just that, but it lost. And that being so, claim preclusion principles close off Millenium's current attempt to escape the consequences of Agreement §8(c) via its "willful misconduct" exception.

But even were that not the case, Millenium would be impaled on the other prong of preclusion doctrine--that of issue preclusion. This opinion turns then to that concept, on which the litigants did cross swords in their memoranda here.

As explained in Washington Group Int'l, Inc. v. Bell, Boyd &

12

Lloyd, LLC, 383 F.3d 633, 636 (7th Cir. 2004):

> [W]e apply the federal common law of issue preclusion. Under that law, a party seeking to invoke preclusion must show four things: 1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action.

All elements of that legal doctrine are met here. In the Nevada Litigation the court specifically found that "no evidence exists on this record that Sutura or Fusion prevented Plaintiff [Millenium] from entering a financing agreement with Dutchess Financial Advisors [another potential financier]." And having so found, the Nevada court granted summary judgment in favor of Fusion as to all of Millenium's counts against it.

Undaunted, Millenium Mem. 12 argues that its total defeat in the Nevada Litigation has no preclusive effect because the court there "made no determination whatsoever concerning whether or not Fusion had committed 'willful misconduct' that resulted in Fusion incurring attorney's fees in that case," an argument that could potentially undercut a holding of issue preclusion (but not claim preclusion). But while Millenium attempts to draw a distinction between the issues raised here and the issues presented in the Nevada Litigation, those issues are really the same for present purposes.

True enough, the court in the Nevada Litigation framed its dismissal of Millenium's action in terms of the total absence of

13

evidence that Fusion prevented Millenium from entering into a finance agreement with another potential financier. But given the nature of the charges that Millenium had heaped on Fusion in the Nevada Litigation as listed earlier in this opinion, and given Millenium's total loss there via summary judgment, it cannot be said that the Nevada Order left open the possibility that Fusion had committed other acts amounting to willful misconduct. There is no principled way to read the ruling in the Nevada Litigation as other than a holding that any ill effects Millenium suffered from the failure of the Millenium-Sutura merger were caused by Millenium itself--not by Fusion. It cannot therefore be said, without running afoul of the issue preclusion doctrine, that Fusion engaged in "willful misconduct" that would bar its recovery of attorneys' fees and expenses here.

Accordingly, whether the matter is viewed through the lens of claim preclusion or that of issue preclusion, Millenium's invocation of Agreement §8(c)'s "willful misconduct" exception has no effect. Fusion is successful on its theory of recovery under Agreement §8(c), and that alone spells success for its claim against Millenium.[8] But because Fusion has another (and

---

[8] As n.1 states, although Ham and Aufdenkamp are also named as defendants in Counts II and III, any liability on their part would hinge on Fusion's successful pursuit of Count I, which is not now at issue. Fusion's present summary judgment victory on Count II (and on Count III, discussed next) therefore does not apply to them.

14

independent) string to its bow, this opinion turns to the ground that it asserts in Court III.

## Count III

Agreement §11(p) requires Millenium to reimburse Fusion for attorneys' fees and expenses incurred in any "proceedings whatsoever in connection with [the Agreement]."[9] Fusion asserts that both the Nevada Litigation and this case constitute covered proceedings that are "in connection with" the Agreement.

Just as this opinion has found the required link under Agreement §8(c) between the Nevada Litigation and the Agreement, so too if finds for the same reasons that the Nevada Litigation constituted a "proceeding[ ] . . . in connection with" the Agreement under its Section 11(p).[10] Moreover, this Court holds

---

[9] Millenium Mem. 6 notes that Agreement §11(p) is headed "Enforcement Costs" and argues that because the Nevada Litigation did not seek to "enforce" the Agreement, its Section 11(p) should not govern. But as Fusion points out, Agreement §11(c) states explicitly that "[t]he headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement." With the interpretation of Agreement §11(p) thus controlled by its text, exclusive of the subsection label, Fusion is entitled under Agreement §11(p) to recover attorneys' fees in any "proceeding[ ] . . . in connection with" the Agreement, not just actions for its enforcement.

[10] This Court is of course aware of the Nevada court's conclusion, set out without any stated analysis, "that there are disputed issues of fact regarding the meaning of section 11(p)," so that the Nevada Order denied Fusion's summary judgment motion in the Nevada Litigation. As Millenium Mem. 6 acknowledges, however, "Judge Mahan's ruling is not binding on this Court." With no disrespect intended, this Court disagrees with that ruling: It concludes that there are really no disputed issues of material (that is, outcome-determinative) fact as to the meaning

15

that Agreement §11(p) applies equally to the present litigation, which quite clearly is "in connection with" the Agreement--in particular its Sections 8(c) and 11(p).[11]

<u>Substantive Unconscionability</u>

In a last ditch effort to extricate itself from the liabilities imposed under Agreement §§8(c) and 11(p), Millenium Mem. 12-15 claims that those provisions are unconscionable and therefore unenforceable. Under Illinois law determining whether a contractual clause is unconscionable is a matter of law for judicial decision (810 ILCS 5/2-302(1)). For that purpose <u>CogniTest Corp. v. Riverside Publ'g Co.</u>, 107 F.3d 493, 499 (7th Cir. 1997) has framed the judicial approach in these terms:

> Illinois courts look to the circumstances existing at the time of the contract's formation, including the relative bargaining positions of the parties and whether the provision's operation would result in unfair surprise.

To turn to the Illinois law of unconscionability directly-- that is, what the Illinois courts themselves say rather than how federal courts may paraphrase it--<u>Razor v. Hyundai Motor Am.</u>, 222 Ill.2d 75, 100, 854 N.E.2d 607, 622 (2006) teaches that contracts are viewed as substantively unconscionable if their "terms . . . are inordinately one-sided in one party's favor." And in

---

and applicability of Agreement §11(p).

[11] Notably, Millenium proffers no real argument to contend otherwise, other than to declare that summary judgment should not be granted in general and to complain that Agreement §11(p) is generally unconscionable.

considering the parties' relative bargaining positions to that end, "though the courts will readily apply [the unconscionability] doctrine to contracts between consumers and skilled corporate sellers, they are reluctant to rewrite the terms of a negotiated contract between businessmen" (Walter E. Heller & Co. v. Convalescent Home of the First Church of Deliverance, 49 Ill.App.3d 213, 219-20, 365 N.E.2d 1285, 1289 (1st Dist. 1977)).

In contending that the unconscionability doctrine should apply in this case, Millenium Mem. 13 cites three cases, all of which involved contracts of adhesion between consumers and large corporations: Kinkel v. Cingular Wireless LLC, 223 Ill. 2d 1, 857 N.E.2d 250 (2006); Razor, cited and quoted in the preceding paragraph of this opinion and Tortoriello v. Gerald Nissan of N. Aurora, Inc., 379 Ill.App.3d 214, 854 N.E.2d 607 (2d Dist. 2008). But Millenium was not of course a "vulnerable consumer[ ] or helpless worker[ ]" negotiating a contract with a more powerful corporate adversary (see Siemer v. Quizno's Franchise Co. LLC, 2008 WL 904874, at *8 (N.D. Ill. Mar. 31)). Exactly the opposite is true: Here the Agreement comprised 26 single-spaced printed pages (exclusive of over 35 pages of attached schedules) that had been negotiated by business people well represented by counsel and that looked to a potential $15 million transaction between the parties.

It simply cannot be said that the facts presented here can even arguably support any notion that the terms of Agreement §§8(c) and 11(p) are unconscionable. Millenium does not argue that it succumbed to the Agreement's terms under duress or through deception or unfair advantage. It merely complains that the terms themselves should be disregarded. When Millenium and its lawyers negotiated the Agreement they obviously regarded it as a deal worth making, and they will not be heard to urge in hindsight that its terms are so one-sided as to be unconscionable. This Court will not ignore those terms simply because Millenium does not now like their impact.

Once again, Millenium and Fusion negotiated the terms business-to-business, and when this Court looks back at the articulation of the standard in CogniTest it sees no reason to believe that those terms would subject Millenium to "unfair surprise."[12] Millenium strikes out on the unconscionability front, just as it has on all other issues posed by the current motion.

---

[12] Any such notion would be particularly ironic in light of Millenium's complaint that Agreement §11(p) is especially unconscionable because it lacks the Agreement §8(c) exclusion for "gross negligence or willful misconduct." If Millenium had wanted such a provision in Agreement §11(p), it could have negotiated for it, just as it did (with success) in Agreement §8(c). Millenium cannot claim "surprise" when it caused Section 8(c) of the same document to include an express exception that it now begs this Court to read inferentially into Agreement §11(p).

18

<u>Conclusion</u>

It is an understatement to say that Millenium has failed to produce either evidence or argument as to Counts II and III to counter an adverse ruling, issued as a matter of law. Fusion's motion for such a ruling (framed as a motion for partial summary judgment) is granted. This action is set for a next status hearing at 9:15 a.m. on January 5, 2009.

_____
Milton I. Shadur
Senior United States District Judge

Dated:    December 23, 2008