# EXHIBIT 1

CARLA AUFDENKAMP - 03/22/06

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MILLENIUM HOLDING GROUP, INC., )
                                )
                                )
Plaintiff/Counter-Defendant,    )
                                )
vs.                             ) Case No.
                                )
SUTURA, INC; FUSION CAPITAL     ) CV-S-05-0536-
FUND II, LLC; and FUSION        ) JCM-LRL
CAPITAL PARTNERS, LLC,          )
                                )
                                )
          Defendants.           )
_____)

VIDEOTAPED DEPOSITION OF CARLA AUFDENKAMP

LAS VEGAS, NEVADA

MARCH 22, 2006

REPORTED BY:  KIMBERLY A. FARKAS, RPR, CCR #741

LS&T JOB NO. 1-46959B

LITIGATION SERVICES & TECHNOLOGIES

Page 2

1    DEPOSITION OF CARLA AUFDENKAMP, taken at 3800
2  Howard Hughes Parkway, Suite 1000, Las Vegas, Nevada,
3  on Wednesday, March 22, 2006, at 1:05 p.m., before
4  Kimberly A. Farkas, Certified Court Reporter, in and
5  for the State of Nevada.
6
7  APPEARANCES:
8
9  For the Plaintiff/Counter-Defendant:
10      CONNELLY, ROBERTS & McGIVNEY, LLC
        BY:  MICHAEL CONNELLY, ESQ.
11      One North Franklin Street
        Suite 1200
12      Chicago, Illinois  60606
        (312) 251-9600
13      mconnelly@crmlaw.com
14
15  For the Defendant SUTURA, INC.:
16      SNELL & WILMER
        BY:  SCOTT SANDBERG, ESQ.
17      BY:  M. DARON DORSEY, ESQ.
        3800 Howard Hughes Parkway
18      Suite 1000
        Las Vegas, Nevada  89109
19      (702) 784-5200
        ssandberg@swlaw.com
20      ddorsey@swlaw.com
21
22
23
24
25

Page 3

1  APPEARANCES:
2
   For the Defendants Fusion Capital Fund II, LLC and
3  Fusion Capital Partners, LLC:
4      JENNER & BLOCK
       BY:  EDWARD F. MALONE, ESQ.
5      One IBM Plaza
       Chicago, Illinois  60611-7603
6      (312) 222-9350
       emalone@jenner.com
7
8
   The Videographer:
9
       LITIGATION SERVICES & TECHNOLOGIES
10     BY:  STEFAN RICHARDS
       1640 W. Alta Drive, #4
11     Las Vegas, Nevada  89106
       (702) 648-2595
12
13
   Also Present:  Richard Ham
14              Joshua Scheinfeld
                Steve Martin
15              Kristina Judge, Paralegal
16
17
18
19
20
21
22
23
24
25

Page 4

1             INDEX
2  WITNESS:  CARLA AUFDENKAMP
3
   EXAMINATION              PAGE
4
5  By Mr. Sandberg          6, 148
   By Mr. Malone            76
6
7
     E X H I B I T S
8
   NUMBER                   PAGE
9  130  Secured Promissory Note    27
10 131  Email String               28
11 132  June 25, 2004 Email        29
12 133  July 2 Email               30
   134  July 14, 2004 Email        31
13 135  Form 10QSB                 33
14 136  August 3, 2004 Email       52
15 137  September 2, 2004 Email     53
16 138  Email                      66
17 139  September 16, 2004 Fax      69
18 140  Email                      75
19 141  Bates documents 4862-4901    89
20 142  Bates documents M02031-M02036  96
21 143  Bates documents F014041-F014058  103
22 144  Bates documents M4108-M4223   109
23 145  Bates documents F011506-F011536  135
24
25

Page 5

1        LAS VEGAS, NEVADA, WEDNESDAY, MARCH 22, 2006;
2                    1:05 P.M.
3                     -o0o-
4        THE VIDEOGRAPHER:  This is the beginning
5  of videotape number one in the deposition of Carla
6  Aufdenkamp taken by the defense in the matter of
7  Millenium versus Sutura, Case Number
8  CV-S-05-0536-JCM-LRL, held at Snell & Wilmer, 3800
9  Howard Hughes, Suite 1000, Las Vegas, Nevada, 89109,
10 on March 22nd, 2006 at 1:05 p.m.  The court reporter
11 is Kim Farkas.  I am Stefan Richards, the
12 videographer, an employee of Litigation Services &
13 Technologies, located at 1640 West Alta Drive, Las
14 Vegas, Nevada, 89106.  This deposition is being
15 videotaped at all times unless specified to go off
16 the video record.  Would all present please identify
17 themselves beginning with the witness.
18     THE WITNESS:  Carla Aufdenkamp.
19     MR. CONNELLY:  Mike Connelly, attorney for
20 the plaintiffs.
21     MR. SANDBERG:  Scott Sandberg, attorney
22 for Defendant Sutura, Inc.
23     MR. MALONE:  Ed Malone. attorney for
24 Defendants Fusion Capital Partners and Fusion Fund
25 II.

CARLA AUFDENKAMP – 03/22/06

Page 10

1    Q.    What did you do for Ham Consulting?
2    A.    I processed insurance applications and was
3    also the receptionist and secretary.
4    Q.    Did you have any ownership interest in Ham
5    Consulting?
6    A.    No.
7    Q.    Is Ham Consulting currently an existing
8    company?
9    A.    Yes.
10   Q.    And is it owned by Richard Ham?
11   A.    Yes.
12   Q.    Is it still operating?
13   A.    Yes.
14   Q.    Do you do any work for Ham Consulting
15   currently?
16   A.    Very limited.
17   Q.    What do you do as far as your limited
18   work?
19   A.    Any of the existing insurance clients, if
20   they call up, we do answer any, I want to say process
21   any insurance clients, if they've got questions in
22   regards to their insurance policies.
23   Q.    So you worked at Ham Consulting before you
24   worked at Millenium; is that correct?
25   A.    That is correct.

Page 11

1    Q.    When did you start with Millenium?
2    A.    In '94.
3    Q.    And what is Millenium?
4    A.    It's a public company.
5    Q.    What does it do?
6    A.    It's in financial services.
7    Q.    What kind of financial services?
8    A.    We're in the process of doing insurance,
9    banking and securities.
10   Q.    Do you have an ownership interest in
11   Millenium?
12   A.    Yes.
13   Q.    When I say Millenium, I'm referring to the
14   plaintiff in this lawsuit. Is that your
15   understanding as well?
16   A.    Yes.
17   Q.    What is your ownership interest in
18   Millenium?
19   A.    I don't know the exact number.
20   Q.    Is it some percentage of stock?
21   A.    Yes.
22   Q.    Do you know approximately what percentage
23   it is?
24   A.    Jointly, in between my husband and I, I
25   think it's around 58 percent.

Page 12

1    Q.    You hold it jointly with your husband?
2    A.    Yes.
3    Q.    When did you marry Mr. Ham?
4    A.    In 1999.
5    Q.    What is Ameritas?
6    A.    It's an insurance company.
7    Q.    And when did you work for them?
8    A.    That was in about probably '96. I don't
9    know the exact date, but somewhere around there.
10   Q.    Was that in Nebraska?
11   A.    Yes.
12   Q.    Was Mr. Ham affiliated with Ameritas?
13   A.    No.
14   Q.    What did you do for them?
15   A.    I processed dental claims.
16   Q.    And then Eneregeco?
17   A.    Yes.
18   Q.    What is that?
19   A.    It was a limited liability company.
20   Q.    What did they do?
21   A.    It was in oil and gas.
22   Q.    And what did you do for them?
23   A.    I was just administration.
24   Q.    And what time period would that have been
25   in?

Page 13

1    A.    I don't know the exact dates of that.
2    Q.    Would it have been after Ameritas?
3    A.    I think it was before that, and then up
4    through when it merged into Millenium.
5    Q.    Eneregeco merged into Millenium; is that
6    correct?
7    A.    Yes.
8    Q.    Do you know when that would have taken
9    place?
10   A.    That was in '94.
11   Q.    So did Mr. Ham have an ownership interest
12   in Eneregeco?
13   A.    Yes.
14   Q.    Did you?
15   A.    Yes.
16   Q.    Were you with Eneregeco since the time it
17   started?
18   A.    Yes.
19   Q.    And when would that have been?
20   A.    I think it was started in '92, '91 or '92.
21   Q.    And so did Millenium exist before it
22   merged with Eneregeco?
23   A.    Yes.
24   Q.    There were two separate companies
25   operating independently for a time period?

4 (Pages 10 to 13)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 18

1　the phone number off of Mr. Anderson's cell phone.
2　　Q.　Was this in the first conversation you had
3　with Mr. Anderson or, I'm sorry, with Mr. Nobles?
4　　A.　Yes.
5　　Q.　So he told you he had gotten the phone
6　number for Millenium from Mr. Anderson's cell phone?
7　　A.　That is correct.
8　　Q.　Were you and Mr. Nobles the only two
9　people on the call?
10　　A.　Yes.
11　　Q.　And what else did Mr. Nobles tell you on
12　this call?
13　　A.　Well, he was just trying to find out
14　information and who that number was to.
15　　Q.　Is that all that was discussed in that
16　call?
17　　A.　Yes, to my knowledge.
18　　Q.　Did he tell you anything about Sutura or
19　that company?
20　　A.　No.
21　　Q.　So when was the first time you were
22　introduced to Sutura as a company?
23　　A.　Myself?
24　　Q.　Yes.
25　　A.　That was the first time I knew of Sutura.

Page 19

1　　Q.　So did Mr. Nobles tell you he was with
2　Sutura in his first call?
3　　A.　Yes, he did.
4　　Q.　But just so I'm straight, other than
5　asking who it was, who you were, and telling you that
6　he had gotten the number from Mr. Anderson, was
7　anything else said in that call that you recall?
8　　A.　Just that he was wanting to know who
9　Millenium was.
10　　Q.　And did you tell him who Millenium was?
11　　A.　No. I mean, it was a real short
12　conversation.
13　　Q.　When was the next time you spoke with
14　anybody from Sutura?
15　　A.　I don't recall the length of time.
16　　Q.　Was there a time after that where you
17　spoke with someone from Mr. Nobles, for instance?
18　　A.　Yes.
19　　Q.　And would that have been in the May 2004
20　time period?
21　　A.　Yes.
22　　Q.　It's your understanding or is it correct
23　that Sutura and Millenium ultimately entered an
24　agreement where they were going to merge; is that
25　correct?

Page 20

1　　A.　Yes.
2　　Q.　And what is your understanding of how that
3　agreement came to be?
4　　　　MR. CONNELLY: That calls for a narrative,
5　but go ahead.
6　　　　THE WITNESS: Initially, it was an
7　agreement with Mark Anderson through him. Then after
8　that then it was through Tony.
9　BY MR. SANDBERG:
10　　Q.　Tony Nobles?
11　　A.　Yes.
12　　Q.　And Millenium?
13　　A.　Yes.
14　　Q.　And how did the switch from dealing with
15　Camden and Mr. Anderson to dealing directly with
16　Millenium, how did that occur?
17　　　　MR. CONNELLY: Let me just object. You
18　mean dealing directly with Sutura?
19　　　　MR. SANDBERG: Right. Sutura is dealing
20　directly with Millenium.
21　　　　THE WITNESS: Okay. Can you repeat the
22　question, please.
23　BY MR. SANDBERG:
24　　Q.　I think you had said initially that Sutura
25　was dealing with Mr. Anderson and that was how the

Page 21

1　merger was dealing and then Sutura was dealing
2　directly with Millenium. I know I'm not using your
3　words exactly, but is that correct?
4　　A.　No.
5　　Q.　Why don't we go this way. Can you tell me
6　the people at Sutura that you recall interacting with
7　during your dealings with Sutura.
8　　A.　I didn't deal directly with Sutura.
9　　Q.　You didn't personally interact with anyone
10　from Sutura?
11　　A.　Not on any dealings with a merger, no.
12　　Q.　You didn't speak on the telephone with
13　anyone from Sutura on any dealings with the merger?
14　　A.　Yes, I did.
15　　Q.　Okay. And who would that have been that
16　you spoke with?
17　　A.　I spoke with Tony. I also had spoken,
18　someone in his office. I don't remember her name.
19　If it was Marilyn or Mary, but someone in his office.
20　　Q.　When you say Tony, you mean Mr. Nobles?
21　　A.　That is correct.
22　　Q.　And you spoke with him on the phone in
23　relation to the merger; is that correct?
24　　A.　Questions -- I mean, my conversations with
25　Tony did not deal with the merger except for just

6　(Pages 18 to 21)

LITIGATION SERVICES & TECHNOLOGIES

CARLA AUFDENKAMP - 03/22/06

Page 22

1 pertaining to information that I needed to do,
2 because I didn't have any, anything to do with the
3 merger itself.
4  Q.  Okay. Did you ever speak with a Mr. Rich
5 Babcock?
6  A.  Only if he had called in would I have
7 talked to him.
8  Q.  What was your title at Millenium in the
9 summer of 2004?
10  A.  Vice president and secretary.
11  Q.  And what were your day-to-day duties
12 during that time period?
13  A.  I was the secretary for filing, anything
14 that needed to be done with the company. Anything
15 that the president had asked me to do as far as work
16 wise, I would do that. Anything administration wise.
17  Q.  The president being Mr. Ham?
18  A.  That is correct.
19  Q.  And were you on the Board of Directors for
20 Millenium as well?
21  A.  Yes.
22  Q.  And what did that involve?
23  A.  I was responsible for the minutes and any
24 meetings that we had, the decisions of the company.
25  Q.  Who were the other members of the Board of

Page 23

1 Directors in the summer of 2004?
2  A.  Richard Ham.
3  Q.  It was just the two of you?
4  A.  That is correct.
5  Q.  Do you recall at any time if there were
6 any other members of the Board of Directors of
7 Millenium other than you and Mr. Ham?
8  A.  Yes.
9  Q.  Maybe if you could first give me other
10 members and then we can talk about what time period
11 they were, members of the Board of Directors.
12  A.  Going back how far?
13  Q.  Why don't we just go back five years
14 before 2004, so from 1999?
15  A.  From 1999 on, there was no others. Excuse
16 me. In early 1999, there was, and I don't remember
17 the people's name because I had stepped down off of
18 the board at that time.
19  Q.  Why did you step down?
20  A.  Because we were in the process of a
21 merger.
22  Q.  Did that merger go through?
23  A.  It did go through, yes.
24  Q.  That was with --
25  A.  But then it was reversed.

Page 24

1  Q.  Who was that merger with?
2  A.  U.S. Home Mortgage.
3  Q.  Since 2004, have you and Mr. Ham been the
4 only members of the Board of Directors of Millenium?
5  A.  Yes.
6  Q.  And so I'm clear on your role in the
7 Millenium-Sutura merger, it was just simply providing
8 information as requested by Mr. Ham; is that correct?
9  A.  Yes.
10  Q.  You weren't involved in any negotiations;
11 is that correct?
12  A.  No.
13  Q.  And in the course of that role in the
14 merger, did you make requests of Sutura for
15 information?
16  A.  Yes.
17  Q.  So you would have been contacting people
18 from Sutura for that information; is that correct?
19  A.  Yes.
20  Q.  And would that have been Mr. Nobles and
21 Mr. Babcock?
22  A.  Mr. Nobles usually would contact, if there
23 was an email, would sometimes copy that to
24 Mr. Babcock.
25  Q.  Did you have any contact with anyone from

Page 25

1 Fusion Capital?
2  A.  Yes.
3  Q.  And who would that have been?
4  A.  One was Jonathan Cope. There was also
5 another person, I don't remember what his name was,
6 if it was a George. I may have spoke with Eric
7 Brown.
8  Q.  And would those communications have
9 related to the Millenium-Sutura merger?
10  A.  Partially, yes.
11  Q.  And what types of communications would you
12 have had with people from Fusion Capital related to
13 the Sutura-Millenium merger?
14  A.  Only by providing documents to them.
15  Q.  Do you know if prior to the time when
16 Millenium and Sutura started discussing a merger, if,
17 before that, Millenium and Fusion had any
18 relationship?
19  A.  Say that again.
20  Q.  Do you know whether or not before a
21 Millenium-Sutura merger was being discussed, if
22 Millenium had any relationship with Fusion Capital?
23  A.  Yes.
24  Q.  And what was that relationship?
25  A.  There was conversations that were going on

7 (Pages 22 to 25)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP – 03/22/06

Page 66

1 advised anyone from Sutura that Dutchess would
2 provide alternative financing?
3     A.    When you're saying from Millenium, what do
4 you mean?
5     Q.    Either you or Mr. Ham.
6     A.    No.
7     Q.    No, you didn't advise Sutura to that
8 effect or no, you don't know?
9     A.    Neither Richard or I advised, no.
10         (Exhibit 138 marked)
11 BY MR. SANDBERG:
12     Q.    Showing you what's been marked as Exhibit
13 138, which is an email sent from you to Mr. Nobles;
14 is that correct?
15     A.    Yes.
16     Q.    And did you prepare and send this email?
17 Is this one that's sent by you?
18     A.    Yes.
19     Q.    And I notice it references some
20 information about Millenium pre merger/reverse split.
21 Do you see that?
22     A.    Pre merger -- yes.
23     Q.    What does that refer -- what does reverse
24 split refer to?
25     A.    Well, when you've got -- if there's a

Page 67

1 reverse split, it can be any amount, whether it's a
2 two for one or three for one, or whatever is set by
3 the parties.
4     Q.    And why did you provide this information
5 to Mr. Nobles?
6     A.    Mr. Ham asked me to.
7     Q.    Did he give you this information?
8     A.    No.
9     Q.    Where did this information come from?
10     A.    I did some calculations.
11     Q.    And on what information did you base your
12 calculations?
13     A.    Based upon the number of shares that were
14 issued and outstanding, and also upon information
15 that was provided to me by Mr. Ham.
16     Q.    And what information was provided to you
17 by Mr. Ham?
18     A.    He told me what I needed to do to
19 calculate the numbers.
20     Q.    And what did he tell you you needed to do?
21     A.    Well, there was information provided as
22 far as the number of shares that Sutura had, and then
23 based upon the reverse, which I don't remember what
24 that amount was, and I did the calculation.
25     Q.    At the bottom here it says, In doing it

Page 68

1 this way Sutura and Millenium share the dilution of
2 Fusion accordingly.
3         Do you see that?
4     A.    Yes.
5     Q.    What did you mean by that?
6     A.    In other words, the reverse merger, the
7 25,000 shares that were issued to Fusion, would then
8 be divided equally in the 90/10, in the split, the
9 dilution, so that both Sutura and Millenium would
10 share in that, those shares being issued.
11     Q.    Did you ever discuss this reverse split
12 with anyone other than Mr. Nobles or Mr. Ham?
13     A.    Not to my knowledge.
14     Q.    Do you know of an individual named Dennis
15 or Denny Burns?
16     A.    Yes.
17     Q.    Who is that?
18     A.    He's a shareholder. And he's also done
19 some consulting work.
20     Q.    What kind of consulting work?
21     A.    Investor relations.
22     Q.    Do you know where he currently lives?
23     A.    In Ohio.
24     Q.    Did he have any role in the
25 Millenium-Sutura merger?

Page 69

1     A.    No.
2     Q.    Did you discuss any aspect of the
3 Millenium-Sutura merger with him?
4     A.    No.
5     Q.    What about Mark Hitchen, have you ever
6 heard of him?
7     A.    Yes.
8     Q.    Who is that?
9     A.    He's a shareholder.
10     Q.    Did he have any other relationship with
11 Millenium other than as a shareholder?
12     A.    No.
13     Q.    Do you know where he currently resides?
14     A.    Somewhere in Canada.
15     Q.    And did he have any role in the
16 Millenium-Sutura merger?
17     A.    No.
18     Q.    And did you discuss any aspect of that
19 merger with him?
20     A.    No.
21         (Exhibit 139 marked)
22 BY MR. SANDBERG:
23     Q.    You've been handed Exhibit 139, which is a
24 fax sent by you to Mr. Babcock on September 16th,
25 2004; is that correct?

18 (Pages 66 to 69)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 70

1    A.    Yes.
2    Q.    And you were forwarding some promissory
3  notes and a consulting agreement; is that correct?
4    A.    Yes.
5    Q.    And do you know why you were doing that on
6  September 16th, 2004?
7    A.    As far as it was additional information
8  that was provided at the request of Carl that we
9  forward to Mr. Babcock, to my recollection.
10   Q.    These promissory notes, first I'll start
11 with the second one, $16,500 promissory note with
12 Richard and Carla Ham, was that you and Mr. Ham
13 borrowing money from some entity or lending money to
14 some entity?
15   A.    We were lending money to an entity.
16   Q.    To Millenium?
17   A.    Yes.
18   Q.    And was that promissory note, in fact,
19 executed?
20   A.    Yes.
21   Q.    And did you and Mr. Ham actually lend
22 $16,500 to Millenium?
23   A.    Yes.
24   Q.    And is the same true for the $2,700
25 promissory note listed in item 3?

Page 71

1    A.    Yes.
2    Q.    And for the $3,500 promissory note listed
3  in item 4?
4    A.    Yes.
5    Q.    And the $5,000 promissory note listed in
6  item 5?
7    A.    Yes.
8    Q.    And why did you make these loans to
9  Millenium?
10   A.    Because the merger had not been completed
11 and there was additional expenses that were occurring
12 that we needed to pay.
13   Q.    And what were those expenses?
14   A.    Just ongoing expenses, whether they be for
15 telephone, the auditor's work, just day-to-day
16 business.
17   Q.    Aside from the telephone and auditor's
18 work, can you think of any other day-to-day business
19 expenses that these loans would have been used for?
20   A.    Not without going back and looking.
21   Q.    The consulting agreement with
22 ERS Consulting dated September 6, 2004, do you see
23 that?
24   A.    Yes.
25   Q.    Was ERS Consulting given stock in

Page 72

1  Millenium as part of that consulting agreement?
2    A.    Yes.
3    Q.    And do you know what services
4  ERS Consulting was to provide?
5    A.    Investor relations.
6    Q.    Do you know if Millenium ever used an
7  individual named Barry Forward for investor
8  relations?
9    A.    Yes.
10   Q.    And would that have been in the summer of
11 2004, around the time that the Sutura merger
12 agreement was entered?
13   A.    Yes.
14   Q.    And do you have any understanding of any
15 problems between Millenium and Mr. Forward?
16   A.    Yes.
17   Q.    What is your understanding of those
18 problems?
19   A.    That there was a press release that was
20 put out without Millenium's knowledge.
21   Q.    And how do you know about that?
22   A.    Because we received phone calls from
23 shareholders when it went out.
24   Q.    Which shareholders were those?
25   A.    Shareholders that were calling in.  I

Page 73

1  don't know who they were.
2    Q.    Would Mr. Hitchen or Mr. Burns have been
3  one of those, any of those shareholders?
4    A.    They could have been.
5    Q.    Were you the one who actually received
6  those phone calls?
7    A.    I would have answered the phone, yes.
8    Q.    And what would the shareholders have said
9  regarding this press release?
10   A.    That there was a press release that was
11 out there, and they were excited about the press
12 release.
13   Q.    Anything else?
14   A.    That's all that I know right now.
15   Q.    And do you know why -- did they tell you
16 why they were excited?
17   A.    No.  Just that they thought it was a good
18 press release.
19   Q.    And did this cause some concerns regarding
20 Mr. Forward?
21   A.    Yes.
22   Q.    Was that because Millenium believed the
23 press release was not authorized?
24   A.    It wasn't authorized.
25   Q.    And do you know what was done in response

19  (Pages 70 to 73)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

Page 78

1 with the Securities and Exchange Commission?
2    A.    As far as drafting of them for submission,
3 you mean?
4    Q.    Well, this is what I'm --
5         (Interruption at the door)
6         MR. MALONE:  You could leave that right
7 out there.  Thanks.
8 BY MR. MALONE:
9    Q.    Let me try to get at it a different way.
10 Could you describe what your role was with respect to
11 the public filings?  What did you do to get those
12 public filings ready to go to the Securities and
13 Exchange Commission?
14    A.    I would work with the auditors on the
15 financials, and then I would also put them together,
16 give them to Carl.  Carl would review them, and then
17 he would give his approval, and then I would submit
18 them to the EDGAR file.
19    Q.    Carl being Mr. Ranno?
20    A.    That is correct.
21    Q.    What did you do with the auditors?  How
22 did you work with them?
23    A.    I submitted the financial information to
24 them.
25    Q.    Did you keep or have any responsibility

Page 79

1 for preparing the company's financial information,
2 its books and records that you submitted to the
3 auditors?
4    A.    Yes.
5    Q.    What was your responsibility?
6    A.    I would prepare anything that they had
7 requested as far as documentation that they need as
8 far as supporting documentation.  And I would provide
9 them with all of the financial information.
10    Q.    Did you, on a day-to-day basis, did you
11 maintain the company's financial books and records?
12    A.    Yes.
13    Q.    Did anyone else have any responsibility
14 for that?
15    A.    No.
16    Q.    In addition to the filings with the
17 Securities and Exchange Commission, were you
18 responsible for preparing or administering filings
19 with other public agencies?
20    A.    Filings with what?
21    Q.    Any other public or government agencies?
22    A.    Yes.
23    Q.    Did you have responsibility for preparing
24 any filings the company might make with the Internal
25 Revenue Service?

Page 80

1    A.    No.
2    Q.    Was there anyone in the company who had
3 that responsibility?
4    A.    Yes.
5    Q.    Who had that responsibility?
6    A.    Mr. Ham.
7    Q.    You testified earlier that the company had
8 not filed any income tax returns from 1998 through
9 2004; correct?
10    A.    Yes.
11    Q.    And you said that the reason that those
12 income tax returns had not been filed is that they
13 had not been prepared, correct?
14    A.    That is correct.
15    Q.    Do you know why the income tax returns had
16 not been prepared by Mr. Ham?
17    A.    No.
18    Q.    You never discussed that with him?
19    A.    No.
20    Q.    Are you aware of any filings that the
21 company made with the IRS during the period 2000
22 through 2004?
23    A.    No.
24    Q.    Are you aware that there were no such
25 filings?

Page 81

1    A.    Yes.
2    Q.    At the beginning of your testimony this
3 afternoon you testified that to the effect that
4 Millenium Holding Group is currently in the process
5 of developing a financial services business.  Is that
6 a fair characterization of your testimony?
7    A.    Yes.
8    Q.    How long has Millenium Holding Group been
9 in the process of developing a financial services
10 business?
11    A.    Since '99.
12    Q.    And since 1999, it has not developed, in
13 fact, it's not developed a financial services
14 business?
15    A.    We're still working on it.
16    Q.    Still in process?
17    A.    Yes.
18    Q.    So you haven't achieved that goal yet?
19    A.    That is correct.
20    Q.    I want to ask you some questions about Ham
21 Consulting.
22    A.    Yes.
23    Q.    First of all, in response to some of the
24 questions that Mr. Sandberg asked you about the
25 proposed consulting agreement between Sutura and a

21 (Pages 78 to 81)

CARLA AUFDENKAMP - 03/22/06

Page 82

1  company called Consulting Services Group, you
2  testified that Consulting Services was the same thing
3  as Ham Consulting Services?
4      A.   That is correct.
5      Q.   And are those the same -- are those
6  companies the same as Ham Consulting Company?
7      A.   No.
8      Q.   You have been employed by Ham Consulting
9  Company, correct, in the past?
10     A.   As far as just as I've got an ownership in
11 it, yes.
12     Q.   You have an ownership interest?
13     A.   Yes.
14     Q.   And you were also employed by that company
15 from 1985 through 1984 (sic)?
16     A.   I've never been employed.
17     Q.   You've never been employed.  Then I
18 misunderstood your testimony.
19         Do you serve on the Board of Directors of
20 Ham Consulting Company?
21     A.   Yes.
22     Q.   Do you have any involvement with Ham
23 Consulting Services?
24     A.   Yes.
25     Q.   What is your involvement with Ham

Page 83

1  Consulting Services?
2      A.   Just as far as working with the insurance
3  clients.
4      Q.   I may be getting confused here.  I thought
5  that you testified earlier that Ham Consulting
6  Company was the company that had the insurance
7  clients.  Is that not correct?
8      A.   No.
9      Q.   Let's start from the beginning.  What does
10 Ham Consulting Company do?
11     A.   It's a holding company.
12     Q.   And what are its subsidiaries?
13     A.   There are no subsidiaries.
14     Q.   Ham Consulting Services is a company you
15 described as a national marketing company?
16     A.   National marketing organization.
17     Q.   And that company had insurance clients,
18 correct?
19     A.   That is correct.
20     Q.   And what services did Ham Consulting
21 Company provide to those insurance clients before it
22 was, before Ham Consulting Company was acquired by
23 Millenium?
24     A.   Ham Consulting Company didn't have any
25 insurance clients.

Page 84

1      Q.   I'm sorry, Ham Consulting Services.  It
2  would be a lot easier if you gave these companies
3  different names.
4      A.   Just call it Consulting Services because
5  that's what it is now.
6      Q.   All right.  Prior to Millenium's
7  acquisition of Consulting Services, what services did
8  that company provide to insurance clients?
9      A.   Consulting Services, what did it provide?
10     Q.   Yes.
11     A.   We were -- we would actually -- we
12 actually had insurance agents that were in Consulting
13 Services also to where that's where the national
14 marketing organization was, to where we not only
15 serviced, you know, insurance clients, but we also
16 assisted the insurance agents that were across the
17 United States.
18     Q.   Consulting Services wasn't an insurance
19 brokerage firm, was it?
20     A.   No.
21     Q.   How did you assist the clients and the
22 insurance agents?
23     A.   They would submit their applications to
24 our office.  We, in turn, worked with the insurance
25 company in getting the applications ready for the

Page 85

1  underwriter for them to underwrite the insurance
2  application, and we would submit that complete file
3  then to the insurance company.  So we were kind of an
4  in-between between the insurance company and the
5  insurance agent.
6      Q.   In 2000, Millenium acquired Consulting
7  Services; is that correct?
8      A.   Around that time, yes.
9      Q.   And at the time that it acquired
10 Consulting Services, about how many clients did
11 Consulting Services have?
12     A.   I don't recall the exact number at this
13 point in time.
14     Q.   Can you give me a ballpark?
15     A.   I don't know if it was around 1,800 or
16 2,500.
17     Q.   At that time do you know what,
18 approximately what revenues Consulting Services
19 received from those clients on an annual basis?
20     A.   No.  I don't recall.
21     Q.   As of early 2004, was Consulting Services
22 still providing services to clients?
23     A.   Millenium was through Consulting Services.
24     Q.   Fair.  Was Consulting Services a
25 subsidiary to Millenium?

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 86

1    A.    No.
2    Q.    So it was Millenium that was providing the
3    services?
4    A.    That is correct.
5    Q.    And was it still providing those services
6    in early 2004?
7    A.    In early 2004, yes.
8    Q.    How many clients did it have by that
9    point?
10   A.    I don't know how many clients it had.
11   Q.    Was part of your responsibility to service
12   those clients, correct?
13   A.    Yes.
14   Q.    Can you say approximately how much time a
15   week you spent servicing those clients?
16   A.    Over the years it has gone down.  We
17   didn't have any, so the amount of time was very
18   limited on servicing the clients.
19   Q.    And I'm talking about early 2004.
20   A.    Very, very limited.  You know, I mean, if,
21   you know, it was maybe even, you know, an hour a
22   week, you know, it was pretty limited.
23   Q.    Was Millenium receiving any revenues from
24   those clients by early 2004?
25   A.    Yes.

Page 87

1    Q.    Do you know approximately how much?
2    A.    Very minimum, maybe 100, 250, somewhere
3    around there.
4    Q.    Two hundred fifty dollars?
5    A.    Um-hum.  So it was very minor.
6    Q.    And then prior to the proposed merger with
7    Sutura, did Millenium sell that insurance company
8    that was Consulting Services back to Mr. Ham or some
9    company owned or controlled by Mr. Ham?
10        MR. CONNELLY:  I'm just going to object to
11   form in the sense that you used the term insurance
12   company and it wasn't an insurance company.
13   BY MR. MALONE:
14   Q.    Prior to the Sutura merger, did Millenium
15   sell the agents that it was providing these services
16   back to Mr. Ham or a company controlled by Mr. Ham?
17   A.    Yes.
18   Q.    And who was, who exactly did it sell the
19   company back to?
20   A.    Richard Ham.
21   Q.    Richard Ham as an individual?
22   A.    Yes.
23   Q.    As far as you know, does Mr. Ham still own
24   that company?
25   A.    Yes.

Page 88

1    Q.    Is it still providing services to clients?
2    A.    Yes.
3    Q.    During the time that Millenium owned the
4    agency that was Consulting Services, was that company
5    operated out of the same address at which Millenium
6    runs its company, at which you reside?
7    A.    Yes.
8    Q.    At some point during the period from 2000
9    forward, did you also have any financial interest or
10   involvement in a company called Ambel International?
11   A.    Repeat that again.
12   Q.    Yes.  During the period from 2000 to 2004,
13   did you also have a financial interest or some other
14   involvement in a company called Ambel International?
15   A.    Yes.
16   Q.    What was Ambel International?
17   A.    It was an inactive corporation.
18   Q.    When did it become inactive?
19   A.    I don't recall.  I'd have to look it up.
20   Q.    Why did it become inactive?
21   A.    We weren't doing any business through it.
22   Q.    When was Ambel International formed?
23   A.    I don't know the exact day that it was.  I
24   know it was in February, but I don't remember what
25   year.

Page 89

1    Q.    Prior to 2000?
2    A.    Yes.
3    Q.    At some point did Ambel International have
4    a business?
5    A.    No.
6    Q.    Ambel International never did anything?
7    A.    No.
8    Q.    Did Ambel International own the rights to
9    any software or other intellectual property?
10   A.    No.
11   Q.    You're not aware that in the year 2000
12   Ambel International sold software to Millenium
13   Holding Group?
14   A.    No.
15        THE VIDEOGRAPHER:  Off of the record at
16   3:15 p.m.
17        (Exhibit 141 marked)
18        THE VIDEOGRAPHER:  This is the beginning
19   of videotape number two in the continuing deposition
20   of Carla Aufdenkamp.  Back on the video record at
21   3:25 p.m.
22   BY MR. MALONE:
23   Q.    Ms. Aufdenkamp, before we went off the
24   record, I was asking you some questions about Ambel
25   International.  Did you testify that when Ambel

23 (Pages 86 to 89)

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 90

1  International was an active company, you held a
2  financial interest in it? Did you hold a financial
3  interest in it before it became de-active?
4       A.   I had a percentage in it, yes.
5       Q.   What percentage did you hold, do you
6  remember?
7       A.   I don't remember.
8       Q.   I'm going to hand you what has been marked
9  Exhibit 141, which is a document bearing the Bates
10 numbers 4862 through 48 -- I'm sorry -- 4901. It is
11 a 10KSB filed by Millenium with the Securities and
12 Exchange Commission for the fiscal year ended
13 December 31, 2000. Is that correct?
14      A.   Yes.
15      Q.   Do you know whether you had any role in
16 preparing this document?
17      A.   Yes, I would have been involved at some
18 point, yes.
19      Q.   Would you turn to page 4870.
20      A.   48 what?
21      Q.   4870.
22      A.   Okay.
23      Q.   Do you see item 12, certain relationships
24 and related transactions?
25      A.   Yes.

Page 91

1       Q.   Would you read the first sentence under
2  item 12, please, out loud.
3       A.   The software to be used in the operation
4  of the company will be leased from Ambel
5  International of which the officers and directors of
6  the company are majority shareholders.
7       Q.   Having read that, are you aware of whether
8  the company ever leased software from Ambel
9  International?
10      A.   No.
11      Q.   No, you're not aware?
12      A.   No.
13      Q.   And, to your knowledge, Ambel
14 International did not own the rights to any software,
15 correct?
16      A.   At this point in time, no.
17      Q.   No?
18      A.   Not to my knowledge. But I couldn't tell
19 you for sure.
20      Q.   All right. Apart from Consulting Services
21 and Ambel International, are there, um, and Millenium,
22 are there any other companies that you have held a
23 financial interest in since 2000?
24      A.   Now, say that again. From where to where?
25      Q.   Apart from Consulting Services, Ambel

Page 92

1  International and Millenium Holding Group, are there
2  any other companies in which you have held a
3  financial interest since 2000?
4       A.   Okay. In Consulting Services, I've never
5  held a financial.
6       Q.   You've never held a financial?
7       A.   Not in Consulting Services, no.
8       Q.   You sat on the Board of Directors,
9  correct?
10      A.   No.
11      Q.   You sat on the Board of Directors of Ham
12 Consulting Company?
13      A.   Yes.
14      Q.   Apart from Millenium Holding Group and
15 Ambel International, are there any other companies
16 that you have held a financial interest in since
17 2000?
18      A.   Zingers Club.
19      Q.   Which is a nightclub?
20      A.   Right.
21      Q.   Any others?
22      A.   You said Millenium. Ambel. Fynco.
23      Q.   What is Fynco?
24      A.   That is Ambel International.
25      Q.   When did Ambel -- was Fynco the

Page 93

1  predecessor to Ambel or the successor to Ambel?
2       A.   That's what it, the name was changed to.
3       Q.   When was it changed to Fynco?
4       A.   Either in 2004 -- I think it was 2004.
5       Q.   Does Fynco have any operations?
6       A.   No.
7       Q.   Any other companies?
8       A.   Not that I can think of off the top of my
9  head.
10      Q.   And apart from the transaction with Ambel
11 International that's described in the 2000 10K, which
12 you don't have any knowledge or recollection of, have
13 any of the companies in which you've held a financial
14 interest engaged in any transactions of any sort with
15 Millenium between 2000 through 2004?
16      A.   Not besides Ham Consulting Company.
17      Q.   And you said Ham Consulting Company is a
18 holding company?
19      A.   Yes.
20      Q.   What transactions has Ham Consulting
21 Company engaged in with Millenium since 2000?
22      A.   None.
23      Q.   And have you personally engaged in any
24 transactions with Millenium since 2000?
25      MR. CONNELLY: I'm going to object to

24 (Pages 90 to 93)

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 94

1  form.  Would you define for her what you mean by
2  engaging in transactions.
3          MR. MALONE:  Sure.
4  BY MR. MALONE:
5      Q.   Have you provided any consulting services,
6  loaned any money, or engaged in any sort of
7  transaction with the company apart from your role as
8  an employee of the company?
9      A.   There was monies that were given to or
10 loaned to under the promissory notes by Mr. Ham and
11 myself.
12     Q.   And those are the promissory notes that
13 were listed in Exhibit 139 that Mr. Sandberg asked
14 you about?
15     A.   Yes.
16     Q.   And those were all entered in 2004?
17     A.   That is correct.
18     Q.   Any prior to 2004 that you recall?
19     A.   Not that I recall.
20     Q.   You are aware that -- you've testified
21 about the sale of the insurance agency from
22 Consulting Services to Millenium.  In connection with
23 that transaction or any other transactions between
24 entities owned or controlled by your husband, have
25 you had any discussions with him about whether it was

Page 95

1  appropriate for you or him to be involved in the
2  approval of those transactions on behalf of
3  Millenium?
4      A.   Can you repeat that one more time, please.
5      Q.   Sure.  I'll try to simplify it.  Companies
6  either owned or controlled by your husband have
7  engaged in transactions with Millenium since 2000,
8  correct?
9      A.   Yes.
10     Q.   And your husband has personally engaged in
11 some transactions with Millenium since 2000, correct?
12     A.   Yes.
13     Q.   And were those transactions approved by
14 the Millenium Board of Directors?
15     A.   Yes.
16     Q.   And the Millenium Board of Directors
17 consists of you and your husband?
18     A.   Yes.
19     Q.   There are no independent directors?
20     A.   Not at this time, no.
21     Q.   At no time since 2000, correct?
22     A.   That is correct.
23     Q.   Have you had any discussions with your
24 husband about whether it was appropriate for you and
25 your husband to approve those transactions on behalf

Page 96

1  of Millenium?
2      A.   No.
3          MR. MALONE:  I'm going to ask the court
4  reporter to mark this document as Exhibit 142.
5          (Exhibit 142 marked)
6  BY MR. MALONE:
7      Q.   The court reporter has marked as Exhibit
8  142 a document with Bates M02031 through 2036.
9          Do you recognize this document?
10     A.   Yes.
11     Q.   What is it starting with the first page
12 and then the attachment?
13     A.   It was an email that I had sent to
14 Jonathan Cope.  And then it was a due diligence
15 request that I had attached.
16     Q.   Who is Jonathan Cope?
17     A.   He is with Fusion.
18     Q.   And were you responding to a request from
19 Fusion to provide due diligence regarding Millenium?
20     A.   Yes.
21     Q.   Did you compile the due diligence that's
22 attached?  Let me withdraw that and ask you a
23 different way.
24          Did you prepare the response, draft the
25 response to the due diligence request attached to

Page 97

1  this email?
2      A.   I assisted with it, yes.
3      Q.   Who else participated in drafting this
4  response?
5      A.   Richard Ham and also through Carl Ranno.
6      Q.   Would you turn to the page M02035, and
7  look at number 9 at the bottom.  What does number 9
8  ask -- what sort of information does number 9 ask
9  for?
10     A.   Related party transactions.
11     Q.   Do you have an understanding of what a
12 related party transaction is?
13     A.   Yes.
14     Q.   In fact, there's a definition of it here,
15 isn't there, in this document?
16     A.   Yes.
17     Q.   What's your understanding of a related
18 party transaction?
19     A.   Anything that would be in between us and
20 the company as a side.
21     Q.   Us meaning who?  When you say us, who are
22 you talking about?
23     A.   Well, it says officers or directors, so
24 that would be Richard and myself.
25     Q.   And in response to this question for

25  (Pages 94 to 97)

LITIGATION SERVICES & TECHNOLOGIES

CARLA AUFDENKAMP - 03/22/06

**Page 98**

1 related party transactions -- first, do you remember
2 whether you prepared the response to number 9?
3    A.   No, I don't recall.
4    Q.   What is the response to number 9?
5    A.   None.
6    Q.   And based on what you've testified just
7 now about transactions between Mr. Ham and companies
8 controlled by him and Millenium, is that response
9 accurate?
10      MR. CONNELLY:  I'm going to object to the
11 form insofar as it calls for a legal conclusion
12 insofar as number 9 asks for material contracts.
13 BY MR. MALONE:
14   Q.   Do you have an understanding in terms of
15 material contracts?
16   A.   Just that it's important.
17   Q.   Do you know why there were, the response
18 to this question was none?
19   A.   Because there were no significant
20 contracts or other companies that were between that.
21   Q.   And what does the word significant mean to
22 you?
23   A.   That it's a major.
24   Q.   And what does that mean?  I'm just trying
25 to understand why there are -- how you determined

**Page 99**

1 what transactions you would list and which ones you
2 would not list?
3    A.   Well, it says between company and other
4 companies.  The other companies that we've listed
5 means that they are not actively doing any business,
6 they aren't major.  There's nothing there.  They're
7 just a company.
8    Q.   Well, they're just a company, but they
9 must be doing something if they are, in fact,
10 transacting business with Millenium, right?
11   A.   Those companies aren't transacting
12 business with Millenium.
13   Q.   But you just testified that Mr. Ham or
14 companies controlled by him did, in fact, have
15 transactions with Millenium between 2000 and 2004,
16 correct?
17   A.   Just the Consulting Services.
18   Q.   That's the -- the sale of the Consulting
19 Services business, correct?
20   A.   Yes.
21   Q.   And then the repurchase of the Consulting
22 Services business?
23   A.   Yes.
24   Q.   Which happened in about April 2004, right?
25   A.   Somewhere around there, yes.

**Page 100**

1    Q.   Those are the only transactions between
2 Mr. Ham or companies controlled by him that you're
3 aware of between 2000, 2004?
4    A.   Yes.
5    Q.   Mr. Ham, for instance, never licensed
6 software to Millenium?
7    A.   No.
8    Q.   You're not aware that in Millenium's
9 public filings Millenium stated that Mr. Ham had
10 licensed software to Millenium?
11   A.   There's no licensed software owned by
12 Mr. Ham.
13   Q.   So if Millenium's public filings stated
14 that Millenium had licensed software from Mr. Ham,
15 that would be wrong?
16   A.   Mr. Ham does not have any licensed
17 software.
18   Q.   Has Mr. Ham ever had any software that he
19 owned and licensed to Millenium?
20   A.   No.
21   Q.   Has Millenium ever developed a computer
22 system of any kind?
23   A.   It's in the process.
24   Q.   How long has it been in the process?
25   A.   Probably about 10 years.

**Page 101**

1    Q.   And has Millenium contracted with any
2 companies to help develop that computer service or
3 that computer system?
4    A.   Yes.
5    Q.   Who has it contracted with?
6    A.   IBM, Kirchman.  There was Compushare.  We
7 had also had some draft agreements, I don't know if
8 they were finalized, with Ginelco.  There was about
9 eight or nine different companies.  The others I
10 don't remember off the top of my head.
11   Q.   When did Millenium contract with IBM?
12   A.   That was probably back in 2000.
13   Q.   Did IBM ever do anything for Millenium?
14   A.   There was work that was being done, yes.
15   Q.   What did IBM do?
16   A.   There was research and development they
17 were doing.
18   Q.   Do you know how much Millenium paid IBM
19 for that service?
20   A.   Nothing.
21   Q.   And did that service end in 2000?
22   A.   I don't know when it ended.  As far as my
23 knowledge, those contracts are still in effect.
24   Q.   Do you know when the last time IBM did
25 work for Millenium?

26 (Pages 98 to 101)

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 102

1   A.   No, I do not.
2   Q.   You can put that back.
3        You testified a couple times that you are
4   secretary of Millenium's board?
5   A.   That is correct.
6   Q.   And in that capacity, you prepare board
7   minutes?
8   A.   Yes.
9   Q.   How often does Millenium's board meet?
10  A.   Whenever it is required that we have
11  business to discuss.
12  Q.   Does it meet every year?
13  A.   Yes.
14  Q.   Does it have an annual meeting, a regular
15  meeting every year?
16  A.   We hold meetings throughout the year, yes.
17  Q.   How often would you say Millenium's board
18  meets?
19  A.   It varies on what is happening.
20  Q.   Millenium is also required to have annual
21  meetings of its shareholders, correct?
22  A.   Yes.
23  Q.   And when is the last time that Millenium
24  held an annual meeting of its shareholders?
25  A.   I don't remember off the top of my head.

Page 103

1   Q.   Are you aware that the bylaws call for one
2   to be held in March?
3   A.   Yes.
4   Q.   Was there a meeting of the shareholders --
5   is there one scheduled for this year?
6   A.   No.
7   Q.   Was there one held last year?
8   A.   No.
9   Q.   What about the year before?
10  A.   No.
11  Q.   The year before that?
12  A.   What year is that?
13  Q.   We're back to 2003.
14  A.   Not to my knowledge.
15  Q.   I'm going to have the court reporter mark
16  as Exhibit 143 --
17       (Exhibit 143 marked)
18  BY MR. MALONE:
19  Q.   The court reporter has marked Exhibit 143
20  a document with the Bates number F014041 through
21  14058. Do you recognize this document?
22  A.   Yes.
23  Q.   What is the document, cover page and
24  attachments?
25  A.   It was a fax to Jonathan cope.

Page 104

1   Q.   That's a fax from you to Mr. Cope?
2   A.   Yes.
3   Q.   And what are you attaching here?
4   A.   Information as part of the due diligence.
5   Q.   Going to ask you to turn to page 14049.
6   A.   Yes.
7   Q.   What document starts on this page?
8   A.   The bylaws.
9   Q.   Bylaws of Millenium?
10  A.   Of Amex Systems.
11  Q.   Amex was the predecessor to Millenium?
12  A.   The name changed, yes, prior to them.
13  Q.   Name changed in 1999?
14  A.   Yes. Well, I mean, Amex was first. Then
15  it turned into Millenium Holding Group.
16  Q.   It turned into Millenium Holding Group in
17  1999; is that correct?
18  A.   Yes.
19  Q.   And these bylaws were in effect at the
20  time that it changed names to Millenium and they were
21  still in effect in 2004; is that correct? I'm just
22  assuming that since these are the bylaws that you
23  gave to Mr. Cope in 2004.
24  A.   That is correct.
25  Q.   In addition to the meeting requirements

Page 105

1   that we discussed, the document also, bylaws also had
2   requirements about the number, tenure and
3   qualification of directors, correct? Page 14050,
4   article 3.
5   A.   Yes.
6   Q.   How many directors did the bylaws require
7   Millenium to have?
8   A.   Not less than three.
9   Q.   And has Millenium had three directors at
10  any time since 2000?
11  A.   No.
12  Q.   Why not?
13  A.   Well, after the merger, the proposed
14  merger that was with U.S. Home Mortgage, there were
15  three at that time or more. And then when the
16  reverse merger was, there was just, I was put on as a
17  board member to replace the ones that were with U.S.
18  Home Mortgage, and there's never been any since then.
19  Q.   And my question is why has Millenium not
20  appointed a third board member to satisfy the
21  requirements of the bylaws?
22  A.   No other reason than we just financially
23  we didn't have another board member on there, number
24  one.
25  Q.   Any other reasons?

27 (Pages 102 to 105)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

---

**Page 106**

1  A.  No.
2  Q.  Have you ever had any conversations with
3  Mr. Ham about the possibility of appointing a third
4  board member?
5  A.  We've had discussions over the time, yes.
6  Q.  What do you remember about those
7  discussions?
8  A.  That when, whether it was the insurance
9  when we actually had brought to where we actually had
10  operations that we would bring additional board
11  members into the company on the Board of Directors.
12  Q.  And you haven't had operations?
13  A.  That is correct.
14  Q.  Anything else you remember about those
15  discussions with Mr. Ham?
16  A.  No.
17  Q.  You can put that away.
18      In response to some questions from
19  Mr. Sandberg, you testified that you think that
20  together you and Mr. Ham own about 58 percent of
21  Millenium?
22  A.  Right.
23  Q.  That's correct?
24  A.  That is correct.
25  Q.  And do you and Mr. Ham hold those shares

---

**Page 107**

1  directly or are some of them held indirectly?
2  A.  Some of them indirectly.
3  Q.  And what entity holds the shares that are
4  held indirectly?
5  A.  Ham Consulting Company.
6  Q.  And you and Mr. Ham are, own all the
7  shares of Ham Consulting Company?
8  A.  No.
9  Q.  Who else owns shares of Ham Consulting
10  Company?
11  A.  Reginald Shamore.
12  Q.  Reginald Shamore?
13  A.  Um-hum.
14  Q.  Do you and Mr. Ham own the majority of the
15  shares?
16  A.  Yes.
17  Q.  And Mr. Shamore is the only other
18  shareholder?
19  A.  Yes.
20  Q.  Since July 2004, have you or Mr. Ham
21  acquired additional shares of the company?
22  A.  Since when?
23  Q.  July 2004.
24  A.  Yes.
25  Q.  When did you acquire additional shares in

---

**Page 108**

1  the company?
2  A.  It was either the last part of November or
3  the first part of December.
4  Q.  And how many shares did you acquire in the
5  company approximately?
6  A.  I don't recall.
7  Q.  We can look at that 10K to remind you.
8  A.  Yes.
9  Q.  And were those shares issued to Mr., to
10  you and Mr. Ham, to at least partially compensate you
11  for the accrued salaries that you've been accruing
12  since 1999?
13  A.  They were for accrued salaries, yes.
14  Q.  And so they were compensation?
15  A.  For accrued salaries, yes.
16  Q.  And I take it from your testimony earlier
17  that you're not aware of any filings that have been
18  made with the Internal Revenue Service reporting that
19  compensation that was paid to you?
20  A.  No.
21      MR. CONNELLY:  Let me -- by Millenium?
22      MR. MALONE:  By Millenium.
23  BY MR. MALONE:
24  Q.  No?
25  A.  No.

---

**Page 109**

1  Q.  Have you sold any shares in Millenium
2  since July 2004?
3  A.  No.
4  Q.  Do you know if Mr. Ham has?
5  A.  No.
6  Q.  No, he hasn't or no, you don't know?
7  A.  No, he has not sold any.
8      MR. MALONE:  I'm going to ask the court
9  reporter to mark as Exhibit 144.
10      (Exhibit 144 marked)
11  BY MR. MALONE:
12  Q.  Exhibit 144 bears the Bates numbers M4108
13  through M4223.  It is the December 31, 2004
14  10K filing of Millenium Holding Group with the
15  Securities and Exchange Commission; is that correct?
16  A.  Yes.
17  Q.  Would you turn to page 4117.  And about
18  three-quarters of the way down the page there's a
19  paragraph that begins, salary expense for the years
20  ended December 31, 2004 and 2003.  Do you see that?
21  A.  Yes.
22  Q.  That paragraph doesn't say how many shares
23  you and Mr. Ham were issued, but it does state the
24  amount of compensation that those shares were
25  intended to cover, correct?

---

28  (Pages 106 to 109)

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 110

1    A.    Say that again.
2    Q.    That paragraph that I've just identified
3  states the amount of compensation that the, was being
4  paid to the shares that you and Mr. Ham were issued
5  in November 2004, right?
6    A.    That is correct.
7    Q.    How much was that compensation?
8    A.    $573,375.
9    Q.    And do you know what the value of, the
10  price of the shares that were issued to you or value
11  of the shares that were issued to you to pay that
12  compensation was?
13   A.    Not off the top of my head, no.
14   Q.    And that compensation, $573,375, do you
15  know how much was paid to you and how much to
16  Mr. Ham?
17   A.    Not off the top of my head, no.
18   Q.    Prior to the -- you can close that up.
19  Prior to the issuing of shares in November 2004 that
20  you just testified to, how did you receive shares in
21  Millenium? Let me withdraw that.
22       When did you, you Carla, first begin,
23  first receive shares in Millenium Holding Group or
24  its predecessor?
25   A.    Those were the first shares.

Page 111

1    Q.    You never held shares before November, you
2  personally never held shares before November 2004?
3    A.    Personally, no.
4    Q.    You were, between 1999 and 2004, you
5  accrued salary, correct?
6    A.    Yes.
7    Q.    Prior to that, did Millenium Holding Group
8  pay you a salary?
9    A.    No.
10   Q.    Were you ever -- prior to November 2004,
11  did you ever actually receive compensation for any
12  work you did for Millenium as an employee? Let me
13  withdraw that. Prior to November 2004, did you ever
14  receive compensation as an employee of Millenium
15  Holding Group?
16   A.    As an employee?
17   Q.    Yes.
18   A.    No.
19   Q.    And you never received -- you received no
20  compensation either cash or shares in the company?
21   A.    No.
22   Q.    And I take it from your testimony before
23  that you haven't personally engaged in any
24  transactions with the company since 2000 in which you
25  received shares as compensation for --

Page 112

1    A.    No.
2    Q.    Prior to 2000? I guess the answer is no
3  since you didn't receive any shares --
4    A.    No.
5    Q.    Do you know anything about the details of
6  the transaction by which Millenium acquired the
7  insurance agency from Consulting Services?
8    A.    Now, say that again.
9    Q.    I'll withdraw that. I'm going to turn to
10  a new subject, slightly new subject.
11       As vice president/secretary of the company
12  since 1999; is that correct?
13   A.    '94.
14   Q.    '94. You've been vice president and
15  secretary since '94?
16   A.    Yes.
17   Q.    Would you say you're generally familiar
18  with the company's operations?
19   A.    Yes.
20   Q.    During the period from 2000 to 2004, did
21  Millenium have any employees besides you and your
22  company?
23       MR. CONNELLY: You and your company?
24       MR. MALONE: Thank you.
25  BY MR. MALONE:

Page 113

1    Q.    You and your husband.
2    A.    No.
3    Q.    Did you have any employees, any contract
4  employees?
5    A.    Say what you mean by contract employees.
6    Q.    Were there people who were not full-time
7  employees of the company but who provided services to
8  the company pursuant to a contract?
9    A.    Pursuant to a contract, yes.
10   Q.    And who were those people?
11   A.    They were consultants, Michael
12  Hershberger.
13   Q.    When was Mr. Hershberger a consultant?
14   A.    I don't recall the exact dates.
15   Q.    Roughly? Can you give me a ballpark when
16  he was a consultant?
17   A.    Sometime between, I'd say, 2002 and maybe
18  2003 or ended 2004.
19   Q.    Was he paid any compensation under that
20  contract?
21   A.    Shares.
22   Q.    Do you know how many shares he got?
23   A.    No, I do not.
24   Q.    Did he have a written contract?
25   A.    Yes.

29 (Pages 110 to 113)

LITIGATION SERVICES & TECHNOLOGIES

CARLA AUFDENKAMP - 03/22/06

Page 114

1    Q.    And what services did Mr. Hershberger
2  provide?
3    A.    Computer.
4    Q.    Can you be more specific?
5    A.    He was our chief information, CIO.
6    Q.    What did he actually do for the company in
7  that capacity?
8    A.    He was preparing all for the computer
9  system, working with IBM, working with all of the
10  other vendors that we were going to have, the nine
11  different vendors that were going to be on the
12  computer system.
13    Q.    Do you know what he actually did with
14  those vendors?
15    A.    That was in between him and Mr. Ham.
16    Q.    Any other contract employees besides
17  Mr. Hershberger?
18    A.    Greg Hoshbach.
19    Q.    Greg?
20    A.    Hoshbach.
21    Q.    What did Mr. Hoshbach do?
22    A.    He was working on human resources.
23    Q.    Can you be more specific.
24    A.    Well, we were developing human resources
25  for the company with the three entities that we were

Page 115

1  preparing with the financial services company on the
2  insurance, securities and on the banking.
3    Q.    I'm sorry.  Could you repeat your answer,
4  please.
5    A.    He was in the human resources in the
6  integration that we were working on with the banking,
7  securities and insurance.  We were integrating all of
8  those into one company.  And so he was doing the
9  human resources as far as getting our manuals put
10  together that we needed for the development of what
11  we wanted the company to be when we started bringing
12  people in to the company.
13    Q.    He was -- but at the time he was working
14  on this, there were no operations to integrate,
15  right?
16    A.    No.  We were getting everything ready for
17  the three companies that we were working on putting
18  together into one company.
19    Q.    Those being insurance, Internet banking
20  and what was the third?
21    A.    Insurance, banking and then the brokers
22  securities.
23    Q.    During what period of time was
24  Mr. Hoshbach under contract with the company?
25    A.    Again, I don't know the exact dates.

Page 116

1    Q.    Was it also around the 2002, 2003 time
2  frame?
3    A.    Somewhere around in that time frame, yes.
4    Q.    Did Mr. Hoshbach have a contract?
5    A.    Yes, he did.
6    Q.    Did he receive any compensation?
7    A.    Yes.
8    Q.    Shares?
9    A.    Yes.
10    Q.    Did Mr. Hershberger and Mr. Hoshbach have
11  titles in their capacity, the capacities you've
12  described?
13    A.    Not other than what we had in the
14  consulting agreements because they were consultants.
15    Q.    Have you ever reviewed any of Millenium's
16  marketing materials?
17    A.    As far as?
18    Q.    Information that's distributed to
19  companies like say Fusion, that describe Millenium's
20  business?
21    A.    Yes.
22    Q.    And some of those materials describe or
23  list Mr. Hershberger and Mr. Hoshbach in those
24  materials?
25    A.    Yes.

Page 117

1    Q.    And do you recall whether they were given
2  titles in those materials?
3    A.    I think they do.
4    Q.    Do you know why they were given titles if
5  they weren't, in fact, employees of the company?
6    A.    Because they were actually doing work for
7  the company.
8    Q.    Did you have any role in preparing those
9  materials?
10    A.    Not other than proofing grammatic wise.
11    Q.    Did Mr. Ham?
12    A.    Yes.
13    Q.    Mr. Sandberg asked you some questions
14  about the salaries that you accrued at Millenium.
15  You didn't remember exactly how much you had accrued,
16  right?
17    A.    Yes.
18    Q.    Why don't you take a look at Exhibit 141,
19  which is the 2000 10K.  Would you turn to page 4869,
20  please.  And look at item 10, executive compensation.
21    A.    Yes.
22    Q.    And does that refresh your recollection
23  about the compensation that you and Mr. Ham were
24  receiving, were accruing, with the company in the
25  year 2000?

30 (Pages 114 to 117)

LITIGATION SERVICES & TECHNOLOGIES

CARLA AUFDENKAMP - 03/22/06

Page 118

1  A.  That's what it was started in 1999, yes.
2  Q.  So the salaries described here were for
3  1999 and 2000, that was the rate of compensation you
4  were receiving during that period?
5  A.  I don't know how far that salary went into
6  2000 or if it was changed thereafter. Again, I'd
7  have to review some of the other filings.
8  Q.  At least in this public filing, the
9  12/31/2000 10K, this was the only salary that you
10 reported that you and Mr. Ham were accruing, right?
11 A.  That is correct.
12 Q.  And what was the compensation?
13 A.  For Mr. Ham it was $4,500, for myself it
14 was $3,000.
15 Q.  That's per month?
16 A.  Accrues monthly, yes.
17 Q.  And how much does that work out about per
18 year?
19 A.  I don't have a calculator.
20 Q.  Well, in your case, $3,000 is about
21 $36,000, right?
22 A.  That sounds right.
23 Q.  And Mr. Ham's would be slightly above
24 $50,000, right?
25 A.  Yeah.

Page 119

1  Q.  Would you now take a look at whatever I
2  labeled as the December 31, 2004 10K.
3  MR. CONNELLY:  144.
4  BY MR. MALONE:
5  Q.  Do you have it?
6  A.  Um-hum, yes.
7  Q.  And would you look at page, pages 4116
8  through 4117, please. Does that refresh your
9  recollection about the compensation that you and your
10 husband received in fiscal year 2004 or that you and
11 your husband accrued in fiscal year 2004?
12 A.  Yes.
13 Q.  And what salaries did you and your husband
14 accrue in fiscal year 2004?
15 A.  Richard accrued $322,500. And mine was
16 $111,300.
17 Q.  So during the period from 2000 to 2004,
18 each of your salaries increased substantially; is
19 that correct?
20 A.  Yes.
21 Q.  And that was during the period when the
22 company had no operations, correct?
23 A.  Yes.
24 Q.  And the company had minimal revenues,
25 right?

Page 120

1  A.  Yes.
2  Q.  No profits?
3  A.  Yes.
4  Q.  And you and your husband approved those
5  salary increases for yourselves?
6  A.  Yes.
7  Q.  On what basis did you and your husband
8  determine that you should receive that additional
9  compensation between 2000 and 2004?
10 A.  Based upon the things that we were
11 discussing and different acquisitions that we were
12 going into as far as with the insurance, the banking
13 and securities. We entered into some employment
14 agreements.
15 Q.  And the company was never successful in
16 developing any of those businesses, right?
17 A.  It hasn't been developed yet, but it's
18 still in the process.
19 Q.  For 10 years?
20 A.  Yes.
21 Q.  You can close that up.
22 From time to time Millenium Holding Group
23 has retained what are called investor relations
24 consultants, correct?
25 A.  Yes.

Page 121

1  Q.  Have you had any involvement in either the
2  retention or the oversight of those consultants?
3  A.  No.
4  Q.  Do they always report to Mr. Ham?
5  A.  Yes.
6  Q.  Do you ever communicate with any of them?
7  Let me withdraw that. In 2004, are you aware of what
8  investor relation consultants Millenium had retained
9  in 2004?
10 A.  If you give me some documentation, I can.
11 Q.  Was one of them Ruder Finn?
12 A.  Yes.
13 Q.  Did you ever have any communications with
14 someone from Ruder Finn named Montieth Illingworth?
15 A.  Yes.
16 Q.  Did I pronounce his name correctly?
17 A.  Yes.
18 Q.  I'm going to show you what's been
19 previously marked as Plaintiff's Exhibit 99. This
20 isn't the copy that's been marked.
21 Do you recognize that document?
22 A.  It has my name on it that a copy went to
23 me, but I don't remember seeing it.
24 Q.  Would you look down the front page to item
25 4E. Do you see that?

31  (Pages 118 to 121)

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 122

1   A.   Yes.
2   Q.   Would you read item 4E.
3   A.   One of our overarching concerns here is
4   that this will likely be seen as a reverse merger
5   which, as we all know, have been getting a bad wrap
6   in the press of late.  We need to discuss how to deal
7   with that and position this accordingly.
8   Q.   Did you ever have any discussions with
9   Mr. Illingworth or anyone else at Ruder Finn about
10  how to position, about the fact that the
11  Sutura-Millenium deal was a reverse merger and how
12  that should be positioned?
13  A.   No.
14  Q.   Did you ever have any conversations with
15  anyone else about that subject?
16  A.   No.
17  Q.   Did you ever have any conversations with
18  Barry Forward of Vosnuevo Communications?
19  A.   As far as what do you mean by
20  communications?
21  Q.   Conversations, email exchanges, any sort
22  of communications?
23  A.   Yes.
24  Q.   Tell me about your communications with
25  Barry Forward.

Page 123

1   A.   When we had a press release going out, he
2   and I would work together on getting those ready to
3   be released.  If he would call in, I would answer the
4   phone call.  But other than that, I really didn't
5   have any conversations with Barry.
6   Q.   Did you have any conversations with your
7   husband about the work that investor relations people
8   were doing for Millenium in the period say July
9   through September 2004?
10  A.   As far as what do you mean as far as what
11  kind of --
12  Q.   Any conversations you can remember with
13  him about the work that they were doing apart from
14  what you've already testified to about Barry Forward
15  being fired because he hadn't shown that press
16  release to Mr. Ham before it went out?
17  A.   No.
18  Q.   No, you didn't have any conversations or
19  no, you don't recall specific conversations?
20  A.   Don't recall specific conversations.
21  Q.   Do you have any understanding of what
22  investor relations consultants do?
23  A.   Yes.
24  Q.   What is your understanding?
25  A.   They work with the public on, actually

Page 124

1   with the shareholders on getting information out to
2   the public about companies.
3   Q.   Did you have any conversations with your
4   husband about what he had specifically asked Barry
5   Forward to do?
6   A.   No.
7   Q.   Did you have any conversations with your
8   husband about what he had asked any other investor
9   relations person to do in the period July through
10  September 2004?
11  A.   No.
12  Q.   Do you know how Millenium compensated the
13  investor relations consultants it hired in 2004?
14  A.   Yes.
15  Q.   How did it compensate them?
16  A.   Shares.
17  Q.   Do you know whether those shares were
18  restricted or free trading?
19  A.   Restricted.
20  Q.   Did you have any involvement in issuing
21  those shares to the investor relations consultants?
22  A.   Yes.
23  Q.   Do you know whether the shares that were
24  restricted to them always beared legends indicating
25  that they were restricted?

Page 125

1   A.   Yes.
2   Q.   Did you have any conversations with
3   anybody at Fusion regarding the proposed merger
4   agreement between Sutura and Millenium?
5   A.   Yes.
6   Q.   Tell me about those conversations.  First
7   of all, who did you have them with?
8   A.   I don't remember exactly, but I think
9   Jonathan Cope was one.  And it was only limited as
10  far as the schedules and getting information about
11  Millenium to Fusion.
12  Q.   Do you recall whether you had any
13  conversations with anyone at Fusion about the
14  Millenium-Sutura merger after July 9, 2004 when the
15  merger agreement was signed?
16  A.   Not other than in the schedules and
17  getting information to them, no.
18  Q.   Would it be fair to say that your husband
19  was the person at Millenium --
20  A.   That is correct.
21  Q.   You've got to let me finish my question.
22  A.   I'm sorry.
23  Q.   Is it fair to say that your husband was
24  the person at Millenium who was responsible for
25  handling that merger deal?

LITIGATION SERVICES & TECHNOLOGIES

16440efe-f37c-43a0-a70a-c719baaaec63

CARLA AUFDENKAMP - 03/22/06

Page 154

1   diligence, and I realize you haven't articulated all
2   of those, and legal fees, are you aware of any other
3   out-of-pocket costs that Millenium claims it incurred
4   as a result of any claimed breach by Sutura?
5        A.   Say that again.
6        Q.   Aside from diligence costs and legal fees,
7   are you aware of any other out-of-pocket costs that
8   Millenium claims to have incurred as a result of any
9   alleged breach by Sutura?
10       A.   Well, again, there would be the
11  accountants fees, the transfer agent fees.
12       Q.   Aside from those and the other expenses
13  you've already talked about, are there any other fees
14  you can think of or any other costs you can think of?
15       A.   Right now, no.
16       Q.   And do you have any idea the amount of
17  costs that were incurred, even if it's an
18  approximation, for diligence costs?
19       A.   No, I don't.
20       Q.   And what about for legal fees?
21       A.   I don't know.  Not off the top of my head.
22            MR. SANDBERG: Nothing further.
23            MR. MALONE: Do you want to mark it
24  confidential?
25            MR. CONNELLY: I do.  I want to mark it

Page 155

1   confidential.
2            THE VIDEOGRAPHER: This concludes the
3   deposition of Carla Aufdenkamp on March 22nd, 2006,
4   which consists of two videotapes.  The original
5   videotapes will be retained by Litigation Services &
6   Technologies.  Off the video record at 5:07 p.m.
7            (Deposition concluded at 5:07 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 156

1            CERTIFICATE OF DEPONENT
2   PAGE LINE     CHANGE          REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14            * * * * *
15       I, Carla Aufdenkamp, deponent herein, do hereby
    certify and declare the within transcription to be my
16  deposition in said action; that I have read,
    corrected and do hereby affix my signature to said
17  deposition.
18            _____
19            Carla Aufdenkamp, deponent
20  STATE OF NEVADA   )
                      )SS:
21  COUNTY OF CLARK   )
22       Subscribed and sworn to before me this _____ day
23  of _____, 2006.
24            _____
25            Notary Public
26

Page 157

1            CERTIFICATE OF REPORTER
2   STATE OF NEVADA  )
                     ) SS:
3   COUNTY OF CLARK  ),
4        I, Kimberly A. Farkas, a duly commissioned
5   Notary Public, Clark County, State of Nevada, do
6   hereby certify:  That I reported the taking of the
7   deposition of CARLA AUFDENKAMP, commencing on
8   Wednesday, March 22, 2006 at 1:05 p.m.
9        That prior to being examined, the witness was
10  duly sworn by me to testify to the truth.  That I
11  thereafter transcribed my said shorthand notes into
12  typewriting, and that the typewritten transcript of
13  said deposition is a complete, true and accurate
14  transcription of said shorthand notes.
15       I further certify that I am not a relative or
16  employee of an attorney or counsel of any of the
17  parties, nor a relative or employee of an attorney or
18  counsel involved in said action, nor a person
19  financially interested in the action.
20       IN WITNESS WHEREOF, I have hereunto set my hand
21  in my office in the County of Clark, State of Nevada,
22  this 5th day of April, 2006.
23
24            _____
25            Kimberly A. Farkas, CCR 741

40 (Pages 154 to 157)

16440efe-f37c-43a0-a70a-c719baaaec63